**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| MARIETTA BRISCOE, on behalf of herself and others similarly situated, | Case No. 08 C 1279 |
| Plaintiff, | Judge James B. Zagel |
| v. | Mag. Judge Michael T. Mason |
| DEUTSCHE BANK NATIONAL TRUST COMPANY, DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE FOR NEW CENTURY NCHET 2005-C, N.A., | |
| Defendants. | |

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEUTSCHE BANK
NATIONAL TRUST COMPANY, IN ITS INDIVIDUAL CAPACITY,
AND DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE'S,
MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

In accordance with Federal Rule of Evidence 201, Deutsche Bank National Trust Company ("DBNTC, in its individual capacity") and Deutsche Bank National Trust Company, as trustee for New Century NCHET 2005-C, N.A. ("DBNTC, as trustee") respectfully request that this Court take judicial notice of each of the exhibits accompanying this Request for Judicial Notice in support of its Motion to Dismiss, filed herewith.

Federal Rule of Evidence 201 allows a court to take judicial notice of facts that are "not subject to reasonable dispute in that [they are] either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Each of the accompanying documents easily meets this standard, for the reasons set forth below.

## EXHIBITS

**A.      Court Records**

Judicial notice may be taken of court records.  Accordingly, DBNTC, in its individual capacity, and DBNTC, as trustee, requests that this Court take judicial notice of the following documents, which are public records filed with the United States Court of Appeals for the Seventh Circuit: Attached as <u>Exhibit 1</u> is a true and correct copy of the full substantive briefing in the pending matter captioned *Andrews v. Chevy Chase Bank, FSB*, 07-1326 filed in the United States Court of Appeals for the Seventh Circuit.

**B.      OCC Filed: Filings with the Office of the Comptroller of the Currency**

Judicial notice may be taken of filings with the Office of the Comptroller of Currency. Accordingly, DBNTC, in its individual capacity, and DBNTC, as trustee, requests that this Court take judicial notice of the following documents, all of which are public records filed with the Office of the Comptroller of Currency: Attached as <u>Exhibit 2</u> is a true and correct copy of the Articles of Association, as amended, dated as October 7, 1985, of DBNTC (f/k/a Bankers Trust Company of California, National Association).

Dated: August 7, 2008                    Respectfully submitted,

**DEUTSCHE BANK NATIONAL TRUST COMPANY and DEUTSCHE BANK NATIONAL TRUST COMPANY, as trustee**


By:  /s/ Kevin B. Dreher
                          One of Their Attorneys

Kevin B. Dreher
Morgan, Lewis & Bockius LLP
77 W. Wacker Drive, 5th Floor
Chicago, IL  60601
Telephone: 312-324-1000
Facsimile: 312-324-1001

Counsel for Deutsche Bank National
Trust Company and Deutsche Bank National
Trust Company, as trustee

**<u>EXHIBIT 1</u>**



2007 WL 1571161 (C.A.7)

For Dockets See 07-1326

United States Court of Appeals, Seventh Circuit.
Susan and Bryan ANDREWS and a class of persons
similarly situated,
v.
CHEVY CHASE BANK, F.S.B., Defendant-
Appellant.
No. **07-1326.**
May 17, 2007.

Appeal from the United States District Plaintiffs-
Appellees, Court for the Eastern District of
Wisconsin
No. 05-C-0454-LA
Hon. Lynn Adelman

Reply Brief for Defendant-Appellant Chevy Chase
Bank, F.S.B.
Michele L. Odorizzi, Jeffrey W. Sarles, Lucia Nale,
Shauna L. Fulbright, Mayer, Brown, Rowe & Maw
LLP, 71 South Wacker Drive, Chicago, Illinois
60606, (312) 782-0600, Attorneys for Defendant-
Appellant.

**\*i** TABLE OF CONTENTS

TABLE OF AUTHORITIES ... ii

INTRODUCTION ... 1

ARGUMENT ... 2

 A. Plaintiffs' Response Cannot Be Reconciled With
The Statutory Text ... 2

 B. Plaintiffs' Response Cannot Be Reconciled With
The History And Purpose Of TILA Sections 1635
And 1640 ... 5

 C. Plaintiffs Offer No Valid Basis For Rejecting The
Conclusions Of The First And Fifth Circuits ... 10

 D. Plaintiffs Have Not Met Their Burden To Show
That The Certified Class Complies With The
Requirements Of Rule 23 ... 15

CONCLUSION ... 22

**\*ii** TABLE OF AUTHORITIES

Cases

Alexander v. Sandoval, 532 U.S. 275 (2001) ... 14

Allen v. International Truck & Engine Corp., 358
F.3d 469 (7th Cir. 2004) ... 16

Califano v. Yamasaki, 442 U.S. 682 (1979) ... 9

Cole v. General Motors Corp., ___ F.3d ___, 2007
WL 1054697 (5th Cir. Apr. 10, 2007) ... 18

In re Consolidated Non-Filing Ins. Fee Litig., 195
F.R.D. 684 (M.D. Ala. 2000) ... 17

Crawford v. Equifax Payment Servs., Inc., 201 F.3d
877 (7th Cir. 2000) ... 17

Doll v. Brown, 75 F.3d 1200 (7th Cir. 1996) ... 15

Goldman v. First Nat'l Bank, 532 F.2d 10 (7th Cir.
1976) ... 13

Haynes v. Logan Furniture Mart, Inc., 503 F. 2d 1
161 (7th Cir. 1974) ... 13

In re Household Int'l Tax Reduction Plan, 441 F. 3d
500 (7th Cir. 2006) ... 16

Illinois Sch. Dist. Agency v. Pacific Ins. Co., 471
F.3d 714 (7th Cir. 2006) ... 15

J.I. Case Co. v. Borak, 377 U.S. 426 (1964) ... 14

James v. Home Constr. Co., 621 F.2d 727 (5th Cir.
1980) ... 11

James v. Home Constr. Co., 458 F. Supp. 54 (S.D.
Ala. 1978), rev'd, 621 F.2d 727 (5th Cir. 1980) ... 11

*Legal Servs. Corp. v. Velazquez,* 531 U.S. 533 (2001) ... 7

**\*iii***McKenna v. First Horizon Home Loan Corp.,* 475 F.3d 418 (1st Cir. 2007) ... 5, 9, 13

*In re MetLife Demutualization Litig.,* 156 F. Supp. 2d 254 (E.D.N.Y. 2001) ... 14

*Raines v. Byrd,* 521 U.S. 811 (1997) ... 21

*Tcherepnin v. Franz,* 461 F.2d 544 (7th Cir. 1972) ... 14

*Tcherepnin v. Knight,* 389 U.S. 332 (1967) ... 14

*Tower v. Moss,* 625 F.2d 1161 (5th Cir. 1980) ... 12

*Welmaker v. W.T. Grant Co.,* 365 F. Supp. 531 (N.D. Ga. 1972) ... 17

*Wilcox v. Commerce Bank,* 474 F.2d 336 (10th Cir. 1973) ... 13

Statutes and Rule

15 U.S.C. § 771(a)(2) ... 15

15 U.S.C. § 1635 ... 3, 10

15 U.S.C. § 1640(a)(3) ... 3

Fed. R. Civ. P. 23(b)(3) ... 19

Other Authorities

Board of Governors of the Federal Reserve System, REPORT TO THE CONGRESS: FINANCE CHARGES FOR CONSUMER CREDIT UNDER THE TRUTH IN LENDING ACT (Apr. 1996) ... 14

H.R. 1858 § 107 (1995), available at http://thomas.loc.gov/cgibin/query/z? c104:H.R. 1858.IH ... 8

National Consumer Law Center, TRUTH IN LENDING (5th ed. 2003) ... 18

Ralph J. Rohner & Fred H. Miller, TRUTH IN LENDING (2000) ... 4

INTRODUCTION

Chevy Chase's opening brief established that 15 U.S.C. § 1635, a provision that gives an individual borrower three days to rescind a mortgage, does not allow a court to authorize an entire class of borrowers to rescind their mortgages and receive a windfall benefit of interest-free loans for up to three years, thereby imposing far greater harm on a single lender than TILA allows in a damages class action. The text, history, and purpose of TILA all support that conclusion, and the only two federal courts of appeals to address this issue have so held. In addition, we showed that, even aside from the issue of authorization under TILA, a TILA rescission class action would not comply with the requirements of Rule 23.

As demonstrated below, plaintiffs' response (as well as the brief of their amici) does violence to the TILA text, distorts the statute's history and purpose, and effectively admits that the ruling below simply ushers in a new round of individual judicial proceedings that cannot be reconciled with the class action mechanism.[FN1]

> FN1. Plaintiffs also launch unwarranted rhetorical accusations that have no bearing on the propriety of class certification. *E.g.,* Pl. Br. 54 & n.17. Chevy Chase will refute such charges at the proper time, *i.e.,* on any appeal from the district court's summary judgment ruling. Plaintiffs (at 2 n.1) further assert that Chevy Chase's Rule 26.1 Statement is inaccurate. Plaintiffs are incorrect. Chevy Chase has no parent corporation (notwithstanding the technical designation of some of its shareholders as "thrift holding companies"), and no publicly held company owns 10% or more of its stock. Plaintiffs' reference to B. F. Saul Real Estate Investment Trust as "publicly traded under the name 'Saul Centers,' and the symbol 'BFS,' " is wrong. Saul Centers, Inc. is a totally different entity from B.F. Saul Real Estate Investment Trust, and, although it is an affiliate of Chevy Chase, Saul Centers holds no ownership interest, directly

or indirectly, in Chevy Chase. For avoidance of doubt, we note that although B.F. Saul Real Estate Investment Trust, which owns 80% of Chevy Chase's common stock, is not a corporation and is privately held, it does have publicly held debt.

**\*2** ARGUMENT

A. Plaintiffs' Response Cannot Be Reconciled With The Statutory Text.

Plaintiffs are wrong when they contend (at 22-23) that Chevy Chase "seeks to insert" an express bar on rescission class actions into TILA. As explained in our opening brief (at 18-22), the TILA text and structure establish that damages for a TILA violation are available on a class-wide basis (subject to a strict cap) and that rescission is available only on an individual basis.

1. Plaintiffs respond (at 24-25) with a distorted reading of the statutory text. They contend that, pursuant to sections 1635(g) and 1640(a)(3), rescission is available "in any action" and therefore must be available in class actions. But the meaning of a statute cannot be ascertained by plucking phrases out of their statutory context. One need but read the referenced provisions to see that they do not mean what plaintiffs say. **\*3** Section 1635(g) states:
In any action in which it is determined that a creditor has violated this section, in addition to rescission the court may award relief under section 1640 of this title for violations of this subchapter not relating to the right to rescind.

This provision says nothing about the availability of rescission class actions. It plainly says that an award of rescission under section 1635 does not preclude an award of damages pursuant to section 1640 if there are underlying disclosure violations. That plain meaning makes perfect sense because, as plaintiffs themselves point out (at 41-42), section 1635(g) was added in response to contentions that damages for disclosure violations could not be awarded if the consumer had rescinded the underlying transaction on which that liability was based. Plaintiffs' attempt to transform that simple proposition into an express authorization for rescission class actions is baseless.

Plaintiffs' reliance on section 1640(a)(3) is equally unavailing. It provides that the relief to which a prevailing TILA plaintiff is entitled includes
in the case of any successful action to enforce the foregoing liability or in any action in which a person is determined to have a right of rescission under section 1635 of this title, the costs of the action, together with a reasonable attorney's fee as determined by the court.

Again, the phrase "in any action" says nothing about the availability of rescission class actions. The clause in which that phrase appears **\*4** provides only that "in any action" in which there is a right to rescission, a prevailing plaintiff is entitled to costs and attorney fees. Plaintiffs have to turn that clause inside-out to read it to provide a right to rescission "in any action," including class actions.

It is not surprising, then, that no court addressing the propriety of rescission class actions under TILA has relied on the "in any action" language in either section 1635(g) or section 1640(a)(3). Although plaintiffs (at 41) cite the district court opinion in support of their "in any action" argument, the district court opinion does not even mention that phrase. Plaintiffs (at 41-42) then claim support from the TRUTH IN LENDING treatise, based on a block quote that neither mentions "in any action" nor says anything about class actions. In fact, as noted in our opening brief, that treatise maintains that TILA "does not contemplate rescission as a class remedy." Ralph J. Rohner & Fred H. Miller, TRUTH IN LENDING ¶ 12.08[5], at 881 (2000). Plaintiffs' primary argument is therefore unprecedented as well as contrary to the plain meaning of the provisions on which they rely.

2. Plaintiffs' additional contentions (at 19, 25) that "[t]he primary relief in TILA is rescission" and that the damages provisions in § 1640 offer merely "additional relief" are both unsupported and irrelevant to the issue before this Court. Congress entitled section 1635(g) "Additional relief" simply to make clear that rescission is not the **\*5** exclusive relief for a violation of the underlying disclosure requirements of TILA. That sensible provision says nothing that would authorize rescission class actions.

3. The provision of section 1640 that *does* refer to class actions is subsection (a)(2)(B). As explained in our opening brief (at 18-19), the fact that no such reference appears in section 1635 supports the conclusion that TILA does not make rescission

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

available on a class-wide basis. See also *McKenna v. First Horizon Home Loan Corp.*, 475 F.3d 418, 423 (1st Cir. 2007). Plaintiffs simply disregard that striking difference between section 1640 and section 1635.

B. Plaintiffs' Response Cannot Be Reconciled With The History And Purpose Of TILA Sections 1635 And 1640.

Plaintiffs (at 40) misconstrue the purpose of Chevy Chase's references to legislative history. They were not intended to "rewrite" TILA or engage in "imaginative reconstruction." Rather, they show that the history of the relevant TILA provisions confirms the purpose expressed by the TILA text - to both encourage lenders to make material disclosures to consumers and prevent them from incurring intolerable levels of liability for violating TILA's highly technical requirements.

1. Plaintiffs recognize (at 25) that Congress narrowed the scope of potential lender liability by placing "limiting language" in section 1640 with respect to damages class actions. Yet they insist that Congress **6** blithely left lenders open to potentially much greater liability from rescission class actions. They try to justify that bizarre conclusion by observing (at 37-38) that section 1640(a) specifies "the resources of the creditor" as a relevant factor in determining the amount of damages to be awarded in a damages class action and that no similar language appears in section 1635. But that difference simply highlights the fact that class actions are referenced only in section 1640 and not in section 1635. It also supports the view of the First Circuit in *McKenna* and other courts that Congress never contemplated rescission class actions and thus had no need to address "the resources of the creditor" in section 1635. Again, it defies credulity to postulate, as plaintiffs do, that if Congress had contemplated rescission class actions, it would have mandated consideration of a creditor's "financial resources" in a damages class action, but not in a rescission class action which could result in even more devastating liability. See Def. Br. 28.

2. Plaintiffs are wrong to charge (at 36) that Chevy Chase raised its "substantial harm" argument for "the first time on appeal." Chevy Chase expressly raised that argument in its district court brief opposing class certification. See R.44 at 25 (calling a rescission class

action "disproportionate and unjustifiably punitive"). Plaintiffs also claim (at 38-39) that this argument is but a "sideshow" because there is "no record of harm to the Defendant or the industry." Plaintiffs misunderstand our **7** argument, which is not based on harm to a particular lender from a particular lawsuit. Rather, the argument is that allowing rescission class actions, which would require lenders to return vast amounts of interest, finance charges, and other fees to a large class of borrowers at one fell swoop, would be wholly inconsistent with Congress's repeated efforts to limit liability for TILA violations. Although plaintiffs suggest (at 39) that the projected harm to the industry from rescission class actions is "overblown," they posit that the lender's liability in this case alone would be some $210 million. That may not be "billions," as plaintiffs observe (id. at n. 13), but it would not take many such cases to make "billions" a disturbing reality.[FN2]

> FN2. That harm inevitably would extend to consumers as well in the form of higher rates or contracted credit. See Brief of Financial Services Amici, at 8-9.

3. Plaintiffs contend (at 44) that "[i]f Congress had wanted to ban class actions in the rescission context, it could have." But that would be true only if Congress thought that rescission class actions were available in the first place. Despite the extensive legislative record underlying the numerous amendments to TILA over the years, neither plaintiffs nor their amici offer any evidence of Congressional intent to authorize class action rescission.[FN3]

> FN3. Plaintiffs (at 47 n. 14) contrast TILA with what they label the "ban [on] class action lawsuits" addressed in *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533 (2001). In fact, that case involved only the First Amendment constitutionality of barring class action filings by Legal Services Corporation grantees. See *id.* at 537-38.

**8** In particular, plaintiffs offer no support for their assertion (at 42) that Congress's failure to ban rescission class actions in the wake of the *Rodash* case demonstrates Congressional authorization of such actions. None of plaintiffs' extensive quotes from the legislative history (at 43-45) even addresses

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the issue of class-wide rescission. Rather, they simply acknowledge that Congress preserved the basic underlying individual right to rescind and rejected proposed amendments that would have eliminated that right for a broader range of loans. See, *e.g.,* H.R. 1858 § 107 (1995) (expanding statutory exemptions from the right to rescind to include non-cash-out refinancings of purchase money mortgage loans), available at http://thomas.loc.gov/cgi-bin/query/z?c 104:H.R. 1858.IH:.

Furthermore, Congress temporarily suspended a broad range of TILA class actions based on the types of claims at issue, without any suggestion that rescission class actions were in fact available. None of the numerous bills introduced to amend TILA during the moratorium proposed barring rescission class actions, a fact that further refutes **\*9** plaintiffs' suggestion (at 41) that Congress considered and rejected a ban on rescission class actions.[FN4]

> FN4. Plaintiffs' recitation of the legislative history is replete with errors. For example, they state (at 42) that "Rep. McCollum introduced H.R. 1858 to radically overhaul TILA and prevent class actions, requiring, among other things, proof of individual reliance to make TILA rescission claims." In fact, H.R. 1858 was introduced by House Banking Committee Chairman Leach and, more importantly, the addition of an explicit requirement to prove individual reliance applied to *damages,* not rescission claims. See *id.* at § 112. Plaintiffs (at 42) and their amici (at 7) also cite the *Congressional Quarterly* of April 9, 1995 in support of their legislative history argument. In fact, April 9, 1995 was a Sunday, and no *Congressional Quarterly* was issued that day. We have located nothing in any other issue published during that period that would support plaintiffs' contention that Congress considered and rejected a ban on rescission class actions.

4. Plaintiffs argue (at 34) that all civil actions must be subject to class certification under Rule 23. They rely on an inapplicable case, *Califano v. Yamasaki,* 442 U.S. 682, 700 (1979). As the First Circuit explained in *McKenna,* 475 F.3d at 425, *Califano* addresses a right to judicial review of administrative action under

a jurisdictional statute and thus is inapposite to the question of rescission class actions under TILA. More fundamentally, plaintiffs fail to recognize the unique nature of TILA rescission and its inherent incompatibility with class treatment. As numerous courts have recognized and as explained at length in our opening brief (at 34-38), the TILA rescission process is highly individualized, requiring individual notice by the borrower to the creditor and a response by the creditor with respect to that borrower that often requires equitable tailoring by a court.

**\*10** 5. The unique character of TILA rescission, which makes it fundamentally ill-suited for class-wide relief, is underscored by the fact that it was not designed to serve as a remedy for TILA violations. Section 1635 simply gives the borrower a three-day window in which to reconsider and back out of a mortgage. To address any failure by the lender to notify the borrower of that right or to provide the disclosures necessary for an informed decision, Congress specified that the three-day rescission period would not be triggered until the lender satisfies those requirements (subject to a three-year maximum). 15 U.S.C. § 1635(a), (f). Of course, as the trigger date is extended, the amount of interest the lender will have to refund increases. But the fact remains that a window of opportunity to reconsider a mortgage is very different from a typical remedy, such as damages or an injunction, which immediately redresses a legal wrong and thus may be easily applied to a class of similarly situated individuals. The unique nature of TILA rescission helps explain why so many courts have concluded that it does not fit into the Rule 23 paradigm.

 C. Plaintiffs Offer No Valid Basis For Rejecting The
     Conclusions Of The First And Fifth Circuits.

Plaintiffs ask this Court to create a circuit split by following those district courts that have reached conclusions different from those of the First and Fifth Circuits. Pl. Br. 28. They even rely (*id.* n.7) on district **\*11** court cases from the First Circuit that are no longer good law in light of *McKenna.* But they offer no viable reason to depart from the holdings of the First and Fifth Circuits.

1. Plaintiffs (at 30) attempt to distinguish *James v. Home Constr. Co.,* 621 F.2d 727 (5th Cir. 1980), on the ground that "[t]he plaintiff in *James* sought to

impose actual rescission upon the whole class rather than declaratory relief." Plaintiffs concoct that distinction out of whole cloth - there is not a word in the *James* opinion that indicates whether the plaintiff sought a declaration or an imposition of rescission. (The same is true of the district court opinion in *James.* See 458 F. Supp. 54 (S.D. Ala. 1978).)

Plaintiffs also contend (at 29-31) that subsequent amendments to TILA during the 1980s, which made rescission, costs, and attorneys' fees available "in any action," superseded the *James* holding. That proposition rests on the same misreading of "in any action" explained in Part A, *supra.* Moreover, if plaintiffs were correct about the impact of those amendments, then TILA presumably would have barred rescission class actions *prior* to their adoption. Yet, Congress never so much as hinted that it intended those amendments to initiate a new era of rescission class actions, and neither has any court or commentator.

Finally, plaintiffs contend that the Fifth Circuit limited *James* a few short months after issuing that opinion. According to plaintiffs (at 31), **\*12** the Fifth Circuit recognized in *Tower v. Moss,* 625 F.2d 1161 (5th Cir. 1980), that "private enforcement of individual rescission rights was appropriate in a class action." That is a grossly misleading summary of *Tower. Tower* did not address the propriety of the class that had been certified before the case was settled. Furthermore, *Tower* does not even mention rescission pursuant to section 1635. Rather, the issue in *Tower* was whether an individual class member's claim under the settlement had been properly denied on the ground that she was not a member of the class because her transaction was a business rather than a consumer transaction. It is true that the settlement gave class members the option of recovering damages according to an agreed-upon formula or rescinding their mortgages under agreed-upon terms. *Id.* at 1163. The class member whose claim had been denied had opted for the rescission alternative. *Id.* at 1166. But there is absolutely no discussion in the opinion of the question whether a court may award TILA rescission to a class. Thus, it is hardly surprising that the *Tower* court did not even refer to the *James* holding that rescission is a personal remedy not available on a class-wide basis. Plaintiffs cannot overcome *James* by reference to this plainly inapplicable case.

2. As for *McKenna,* plaintiffs (at 35, 47) disparage the First Circuit's comprehensive opinion as an exercise in "frustration," claim that the First Circuit deferred to industry amici rather than engage in its **\*13** own analysis, and demeaningly reduce the opinion to a ruling that "there are too many remedies in TILA." In fact, the First Circuit held that "Congress did not intend rescission suits to receive class-action treatment" and explained that holding at length based on the text, history, and purpose of the relevant TILA provisions. *McKenna,* 475 F.3d at 423.

Plaintiffs also claim (at 35-36) that *McKenna* "guts the primary relief afforded by TILA" by not following plaintiffs' misreading of TILA's references to "any action" and "additional relief." As noted above, no court - not even any of the district courts authorizing rescission class actions - has relied on that plainly inapplicable language.

3. Plaintiffs further attempt (at 20-21) to find support for their position from class action cases where the plaintiffs sought only damages and the courts therefore did not address rescission. See *Haynes v. Logan Furniture Mart, Inc.,* 503 F.2d 1161, 1162 (7th Cir. 1974) ("This is an action for damages"); *Wilcox v. Commerce Bank,* 474 F.2d 336, 340 (10th Cir. 1973) (plaintiffs "sought damages"); *Goldman v. First Nat'l Bank,* 532 F.2d 10, 16 (7th Cir. 1976) (discussing plaintiffs' proposed damages). These cases have no bearing on the question presented here - whether a court may certify a class to seek rescission.

4. Plaintiffs next invent support from the Federal Reserve Board, contending (at 46) that "the Federal Reserve declined to pursue a ban on**\*14** TILA class actions for rescission." But the document they cite for that proposition does not even *mention* rescission class actions, let alone express an opinion on that subject. See Board of Governors of the Federal Reserve System, REPORT TO THE CONGRESS: FINANCE CHARGES FOR CONSUMER CREDIT UNDER THE TRUTH IN LENDING ACT 12-14 (Apr. 1996). That report addressed rescission only with respect to whether abusive refinancing practices were preventing borrowers from exercising their right to rescission, concluding that the existing statutory and regulatory structure was sufficient to protect against any abuses. *Ibid.* The long block quote from

the Board's 1995 Annual Report in plaintiffs' brief (at 45-46) is simply a summary of the 1995 amendments and similarly expresses no view on the availability of rescission class actions.

5. Finally, plaintiffs (at 52) look to the very different statutory scheme governing securities claims. They cite *J.I. Case Co. v. Borak,* 377 U.S. 426 (1964), which was not a class action and which set forth an analysis of implied remedies that the Supreme Court subsequently rejected in *Alexander v. Sandoval,* 532 U.S. 275, 287 (2001). They also cite three securities law decisions, *Tcherepnin v. Franz,* 461 F.2d 544 (7th Cir. 1972), *Tcherepnin v. Knight,* 389 U.S. 332 (1967), and *In re MetLife Demutualization Litig.,* 156 F. Supp. 2d 254 (E.D.N.Y. 2001), none of which addresses the propriety of rescission class actions. In any event, rescission in the securities context, which involves a mere return of **\*15** purchased securities at a uniformly calculated price (see 15 U.S.C. § 771(a)(2)), is not comparable to the necessarily individualized multi-step rescission process that Congress created specifically for TILA.

> D. Plaintiffs Have Not Met Their Burden To Show That The Certified Class Complies With The Requirements Of Rule 23.

As explained in our opening brief (at 29-42), regardless of whether Congress intended class-wide rescission to be available under TILA, the class certified by the district court does not satisfy the requirements of Rule 23 for a variety of reasons. Plaintiffs offer little in response.[FN5]

> FN5. Plaintiffs (at 56-57) ask this Court to order broader relief than the district court ordered, namely, certification of a class to recover statutory damages. Plaintiffs waived that request by failing to file a cross-appeal. "When an appellee wants additional relief beyond what the trial court gave him * * * he must cross-appeal." *Doll v. Brown,* 75 F.3d 1200, 1207 (7th Cir. 1996); accord *Illinois Sch. Dist. Agency v. Pacific Ins. Co.,* 471 F.3d 714, 722 (7th Cir. 2006). Furthermore, plaintiffs' request challenges the district court's summary judgment ruling that plaintiffs are ineligible for statutory damages (A14), a ruling that is not the subject of this appeal.

1. Plaintiffs first contend (at 1-2) that this court lacks jurisdiction to address Rule 23 issues because those issues were supposedly not encompassed within Chevy Chase's Rule 23(f) Petition. In fact, Chevy Chase's Rule 23 argument answers the very question raised in the Petition - whether the district court erred by certifying a class to seek rescission under TILA. Chevy Chase contends both that TILA bars class-wide rescission and that the rescission class certified by the district court does not comply with the requirements of Rule 23. Plaintiffs' **\*16** reliance on *In re Household Int'l Tax Reduction Plan,* 441 F.3d 500 (7th Cir. 2006), is misplaced. That opinion does not address appellate jurisdiction but rather explains why the Court considered only one of the issues raised in an ERISA plan's Rule 23(f) petition. The Court noted that only that issue met this Court's criteria for granting Rule 23(f) petitions "and so it's the only issue we shall resolve." *Id.* at 501. Here, in contrast, Chevy Chase asks the Court to resolve the question presented in the Petition on either of two applicable grounds.

2. As we demonstrated (Def. Br. 30-32), the district court erred by certifying this class under Rule 23(b)(2). Plaintiffs offer no response to our showing that the declaratory relief awarded by the district court is neither injunctive in nature nor final, as Rule 23(b)(2) requires. Plaintiffs' citation of *Allen v. International Truck & Engine Corp.,* 358 F.3d 469 (7th Cir. 2004), does not get them past those requirements. The Court in *Allen* approved a (b)(2) class on discrimination claims seeking *final injunctive* relief (*id.* at 470), precisely what Rule 23(b)(2) calls for. There was no issue involving a declaration of a class-wide right to rescind. A final injunction prohibiting discrimination against a class of employees is obviously suited to a (b)(2) class action; a declaration that merely *invites* a process of individual rescission actions in different courts is not.

3. Nor are plaintiffs able to refute our showing (Def. Br. 21-22) that declaratory relief is not available even to an individual TILA plaintiff, **\*17** much less an entire class. Plaintiffs claim (at 48) that TILA §§ 1635(g) and 1640(a)(3) are "controlling authority" for their contention that TILA authorizes declaratory relief. But neither provision says a word about declaratory relief, addressing only rescission and damages, respectively.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Plaintiffs (at 51) claim that Chevy Chase "overstates and bends" the cases holding that the analogous FDCP and FCRA statutes do not authorize declaratory relief. See Def. Br. 21-22. Plaintiffs do not elaborate other than to assert that there is not "unanimity" on this point. But any lack of unanimity among district courts would not overcome this Court's ruling in *Crawford v. Equifax Payment Servs., Inc.,* 201 F.3d 877, 882 (7th Cir. 2000), that "all private actions under the Fair Debt Collection Practices Act are for damages."

Moreover, the authorities cited by plaintiffs (at 48) do not support their view that TILA authorizes declaratory relief. The only declaration sought by the plaintiffs in *In re Consolidated Non-Filing Ins. Fee Litig.,* 195 F.R.D. 684, 695 (M.D. Ala. 2000), who also requested an injunction and damages, was that the defendant had violated TILA "in the past." There was no issue involving a declaration of a right to seek relief in the future, as in this case, much less rescissionary relief. Plaintiffs' citation of *Welmaker v. W.T. Grant Co.,* 365 F. Supp. 531, 554 (N.D. Ga. 1972), is baffling. The court in that case did not issue (or even discuss) any declaratory relief. Rather, it issued an injunction and proceeded to *deny***18** the plaintiffs' request to certify a class. Finally, none of the cases cited in National Consumer Law Center, TRUTH IN LENDING § 8.4 (5th ed. 2003), involved declaratory relief.

4. Plaintiffs disregard our showing (Def. Br. 33) that their proposed class, if subject to Rule 23 at all, would have to meet the requirements of Rule 23(b)(3) and that it could not satisfy the predominance and superiority requirements of that provision.

We offered numerous examples of the many and varied types of individualized judicial proceedings that would result if the district court's certification order were upheld. Def. Br. 34-37. These examples are not fanciful, as the case citations we provided show. Yet plaintiffs do not even mention them, much less refute their import. At bottom, plaintiffs do not contest our showing that a host of individual proceedings in a variety of courts would follow inexorably from the district court's ruling. Nor do they deny that a variety of state laws would come into play in these proceedings, an additional reason

why a grant of a right to rescind to this nationwide class is inappropriate. See Def. Br. 37 n.6; *Cole v. General Motors Corp.,* ___ F.3d ___, 2007 WL 1054697, at *8 (5th Cir. Apr. 10, 2007) (predominance requirement not satisfied due to "variations in state law").

5. Plaintiffs also offer no evidence that their proposed class satisfies the superiority requirement of Rule 23(b)(3). They do not show **\*19** how a declaration giving rise to hundreds if not thousands of individual rescission actions can be consistent with the Rule's concern about "the difficulties [in] the management of a class action." Fed. R. Civ. P. 23(b)(3). Although plaintiffs (at 53) invoke "efficiency," they acknowledge (at 32) that the district court - *after* its declaration - still must "establish individual rescission procedures that will meet the needs of individual class members, while at the same time assist Defendant in recovering loan principal without an immediate loss of security interest." Plaintiffs thereby admit that the district court's declaration has opened up a new wave of individual court proceedings. And because the putative class members reside throughout the country, those proceedings will likely take place in many different courts. This is a recipe for chaos, not efficiency.

6. Plaintiffs contend (at 53) that "[b]anning class actions will prevent many people from asserting their rights," opining without support (at 50) that "[t]he task of suing a bank in federal court is beyond the means of most borrowers." But plaintiffs offer no response to our showing (Def. Br. 40-41) that a typical prevailing borrower can expect to receive over $57,000 in an individual rescission action, plus attorneys' fees and costs. Nor do they challenge our showing (*id.* at 41) that many borrowers do bring individual rescission actions. There is no need to **\*20** resort to class actions when the incentives to bring individual actions are so substantial.

7. Plaintiffs do not deny that not a single one of the thousands of absent class members has ever suggested that the alleged TILA violations affected their decision to enter into the mortgage or notified Chevy Chase of a desire to rescind. See Def. Br. 31-32. Plaintiffs nevertheless insist (at 51-52) that there is a "case and controversy" involving these absent class members because "TILA was violated for all class members so clearly." Notwithstanding any

purported violation, however, there is no case or controversy over a right to rescind on the part of borrowers who have never expressed any interest in rescinding. Indeed, plaintiffs acknowledge (at 39) that "many class members might decline rescission because market rates have risen." In these circumstances, it was inappropriate for the court below to issue what amounts to an advisory opinion inviting all such borrowers to recoup all the interest, finance charges, and fees that each has paid without objection over the term of their mortgage. As explained above, the "efficiency" of such an advisory opinion is illusory. But even if it were "efficient" to hand absent class members this windfall, Rule 23 should not be misappropriated for such purposes. As the Supreme Court has cautioned, "convenience and efficiency" do not override the requirements of Article III. *Raines v. Byrd,* 521 U.S. 811, 820 (1997).

**\*21** Plaintiffs seek an unwarranted windfall for thousands of putative class members, none of whom has sought to rescind his or her mortgage. If the class-wide rescission plaintiffs seek were granted, each of those heretofore uncomplaining borrowers, who have made their monthly mortgage payments for years, suddenly would be invited to demand reimbursement of all the interest and charges they willingly paid for up to three years and effectively obtain a free loan for that entire period. To prevent such an unintended and inappropriate result, this court should join its sister circuits in holding that borrowers seeking TILA rescission must assert their own claims and reject the notion that a court may award the right to pursue the inherently individual rescission process on a class-wide basis.

**\*22** CONCLUSION

The district court's order certifying a class should be reversed.

Susan and Bryan ANDREWS and a class of persons similarly situated, v. CHEVY CHASE BANK, F.S.B., Defendant-Appellant.
2007 WL 1571161 (C.A.7)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.



2007 WL 1511716 (C.A.7)                                                                                          Page 1

For Dockets See 07-1326

United States Court of Appeals, Seventh Circuit.
SUSAN and Bryan Andrews, and a class of persons
similarly situated, Plaintiffs-Appellees,
v.
CHEVY CHASE BANK, F.S.B., Defendant-
Appellant.
No. **07-1326**.
May 8, 2007.

Appeal From The United States District Court for the
Eastern District of Wisconsin Case No. 05-C-0454-
LA The Honorable Lynn Adelman, District Judge

Brief for Amici Curiae AARP, Center for
Responsible Lending, National Consumer Law
Center, Public Citizen, and Harriet Holder, Steven
Bourassa, Scott Ventola and Lynn Gay in Support of
Plaintiffs-Appellees and Arguing for Affirmance
Nina F. Simon, Jean Constantine-Davis, AARP
Foundation Litigation, 601 E Street, NW,
Washington, DC 20049, [202] 434-2060.Deepak
Gupta, Brian Wolfman, Public Citizen, 1600 20th
Street, NW, Washington, DC 20009 [202] 588-
7739.Gary Klein, Shennan Kavanagh, Roddy, Klein,
& Ryan, 727 Atlantic Avenue, Second Floor, Boston,
MA 02111, [617] 357-5500.Kathleen Keest, Melissa
Briggs, Center for Responsible Lending, 915 17th
Street, NW, Suite 500, Washington, DC 20006, [202]
349-1850.Stuart T. Rossman, National Consumer
Law Center, 77 Summer Street, 10th Floor, Boston,
MA 02110, [617] 542-8010, Attorneys for Amici
Curiae.

**\*2** CIRCUIT RULE 26.1 DISCLOSURE
STATEMENT

To enable the judges to determine whether recusal is
necessary o r appropriate, an attorney for a non-
governmental party or amicus curiae, or a private
attorney representing a government party, must
furnish a disclosure statement providing the
following information in compliance with Circuit
Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be

filed immediately following docketing; but, the
disclosure statement must be filed within 21 days of
docketing or upon the filing of a motion, response,
petition, or answer in this court, whichever occurs
first. Attorneys are required to file an amended
statement to reflect any material changes in the
required information. The text of the statement must
also be included in front of the table of contents of
the party's main brief. Counsel is required to
complete the entire statement and to use N/A for any
information that is not applicable if this form is used.
(1) The full name of every party that the attorney
represents in the case (if the party is a corporation,
you must provide the corporate disclosure
information required by Fed. R. App. P 26.1 by
completing item #3):
AARP
(2) The names of all law firms whose partners or
associates have appeared for the party in the case
(including proceedings in the district court or before
an administrative agency) or are expected to appear
for the party in this court:
None
(3) If the party or amicus is a corporation:
I) Identify all its parent corporations, if any; and
*None*
ii) list any publicly held company that owns 10% or
more of the party's or amicus' stock:
None

**\*4** CIRCUIT RULE 26.1 DISCLOSURE
STATEMENT

To enable the judges to determine whether recusal is
necessary o r appropriate, an attorney for a non-
governmental party or amicus curiae, or a private
attorney representing a government party, must
furnish a disclosure statement providing the
following information in compliance with Circuit
Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be
filed immediately following docketing; but, the
disclosure statement must be filed within 21 days of
docketing or upon the filing of a motion, response,
petition, or answer in this court, whichever occurs
first. Attorneys are required to file an amended
statement to reflect any material changes in the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

required information. The text of the statement must also be included in front of the table of contents of the party's main brief. Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.
(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):
Center for Responsible Lending
(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
N/A
(3) If the party or amicus is a corporation:
I) Identify all its parent corporations, if any; and
N/A
ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:
N/A

**\*6** CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. Counsel is required to complete the entire statement and to use for any information that is not applicable if this form is used.
(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by

completing item #3):
The National Consumer Law Center ("NCLC") is a Massachusetts non-profit corporation established in 1969 and incorporated in 1971. NCLC operates as a tax-exempt organization under the provisions of §501(c)(3) of the Internal Revenue Code. It has no parent corporations and no publicly held company owns 10% or more of its stock.

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

NCLC seeks the permission of the court to file an amicus brief in the above referenced appeal. No law firms will appear for NCLC in the case or are expected to appear for NCLC in this court. In the interests of full disclosure, NCLC wishes to advise the court that it has filed appearances on behalf of Barbara Desrosiers in the case of Bowe v. Americquest Mortgage Co., 1:06C2471; Henry Owen and Joan Owen in the case of Belval v. Ameriquest Mortgage Co., 1:06C2469; and Lucinda Milardo in the case of Bailey v. Ameriquest Mortgage Co., 1:06C1733, all of which have been made part of the related action, Multidistrict Litigation Case No. 1715, In re Ameriquest Mortgage Co., currently pending in the United State District Court for the Northern District of Illinois before Chief Judge Aspen.

(3) If the party or amicus is a corporation:
i) Identify all its parent corporations, if any; and NCLC has no parent corporations.
ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:
No publicly held company owns 10% or more of NCLC's stock.

**\*8** CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Public Citizen

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Deepak Gupta and Brian Wolfman (Public Citizen Litigation Group)_

(3) If the party or amicus is a corporation:

I) Identify all its parent corporations, if any; and

_____
_____

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

_____
_____

## *9 CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended

statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Harriet Holder, Steven Bourassa, Scott Ventola, Lynn Gay

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Roddy Klein & Ryan, Gary Klein and Shennen Kavanagh

(3) If the party or amicus is a corporation:

I) Identify all its parent corporations, if any; and NONE

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock: NONE

Note: Page 10 missing in original document

## *i TABLE OF CONTENTS

TABLE OF AUTHORITIES ... iii

INTERESTS OF AMICI CURIAE ... 1

SUMMARY OF ARGUMENT ... 2

I.  CONGRESS HAS NOT EXPRESSLY OR IMPLICITLY RESTRICTED THE RIGHT TO OBTAIN A DECLARATION OF A RIGHT TO RESCIND ON A CLASS BASIS ... 3

 A. The Plain Language of TILA Does Not Prohibit Rule 23 Class Actions ... 3

 B. Congress Deliberately Left Class Rescission Intact In The 1995 TILA Amendments ... 6

 C. Declaratory Relief Is Available Under TILA ... 9

II. Chevy Chase and Its *Amici* Overstate the Potential Impact of Allowing Class Rescission and Ignore the Impact on Consumers ... 11

A. TILA Provides Essential Protections - Including The Right ... 12

1. TILA's Protections Are Particularly Important For Consumers In Complex Mortgage Products Such As Payment Option ARMS ... 15

2. Actual Interest Rates Are Hidden in POARMs ... 15

3. The Payments Due Under POARMS Remain Fixed For Limited Periods, While the Interest Rates Fluctuate More Frequently, Creating Negative Amortization ... 16

B. The TILA Disclosures Made By Chevy Chase Fundamentally Misrepresent the Cost of the Loan ... 17

C. Rescission Provides Consumers the Opportunity to "Undo" Loans Tainted By the Most Critical TILA Violations ... 19

1. TILA Provides Consumers Rescission Relief Only for the Most Significant TILA Violations ... 19

2. Rescission Seeks to Undo the Wrong to the Consumer; It Is Not a Penalty to the Lender ... 20

**ii** 3. Because Rescission Is Not Penal, *Amici's* Due Process Arguments Fail ... 22

CONCLUSION ... 23

**iii** TABLE OF AUTHORITIES

Federal Cases

Bizier v. Globe Fin. Servs., Inc., 654 F.2d 1 (1st Cir. 1981) ... 12

Blum v. Fisher and Fisher,1997 WL 433630 (N.D. Ill. 1997) ... 10

BMW of North America, Inc. v. Gore, 517 U.S. 559 (1996) ... 23

Borcherding-Dittloff v. Transworld Systems, Inc., 185 F.R.D. 558 (W.D.Wis.1999) ... 10

Califano v. Yamisaki, 442 U.S. 682 (1979) ... 3

Cooper Indus., Inc. v. Leatherman Tool Group, 532 U.S. 424 (2001) ... 23

Cowen v. Bank United of Texas, 1995 WL 38978 (N.D. Ill. 1995) ... 9

Curtis v. Secor Bank, 896 F. Supp. 1115 (M.D. Ala. 1995) ... 9

Eby v. Reb Realty Inc., 495 F.2d 646 (9th Cir. 1974) ... 20

Rodash v. AIB Mortgage Co., 16 F.3d 1142 (11th Cir. 1994) ... 6, 7, 8

FDIC v. Hughes Development Co., Inc. 684 F.Supp. 616 (D. Minn. 1988) ... 20

Gammon v. GC Services Ltd. Partnership, 162 F.R.D. 313 (N.D. Ill. 1995) ... 10

Gillespie v. Equifax Information Servs., L.L.C., ... F.3d ... , No. 06-1952, 2007 WL 1287649 (7th Cir. May 3, 2007) ... 13

Handy v. Anchor Mortgage Corp., 464 F.3d 760 (7th Cir. 2006) ... 18, 22

Hickey v. Great Western Mortgage Corp., 158 F.R.D. 603, 613-614 (N.D. Ill. 1994) ... 10

In re Ameriquest Mortg. Co. Mortg. Lending Practices Litig., 2007 WL 1202544 (N.D. Ill. 2007) ... 1, 10

James v. Home Const. Co. Mobile, Inc., 621 F.2d 727 (5th Cir. 1980) ... 21

Johnson v. West Suburban Bank, 225 F.3d 366 (3d Cir. 2000) ... 3

Latham v. Residential Loan Centers of America, Inc.,

No. 03C7094, 2004 WL 1093315 (N.D. Ill. 2004) ... 10

Matter of Sinclair, 870 F.2d 1340 (7th Cir. 1989) ... 6

McKenna v. First Horizon Home Loan Corp., 475 F.3d 418 (1st Cir. 2007) ... 3, 5, 21

Mills v. Home Equity Group, 871 F. Supp. 1482 (D.D.C. 1994) ... 13

Mount v. LaSalle Bank Lake View, No. 92C5645 1994 WL 731006 (N.D. Ill. 1994) ... 10

O'Brien v. J.I. Kislak Mortgage Corp., 934 F. Supp. 1348 (W.D. Fla. 1996) ... 9

Parker v. DeKalb Chrysler Plymouth, 673 F.2d 1178 (11th Cir. 1982) ... 13

Parker v. Time Warner, 331 F.3d 13 (2d Cir. 2003) ... 23

Pavelic & LeFlore v. Marvel Entertainment Group, 493 U.S. 120 (1989) ... 5

Phillip Morris USA v. Williams, 127 S.Ct. 1057 (2007) ... 22

Porter v. Mid-Penn Disc. Co, 961 F.2d 1066 (3rd Cir. 1992) ... 18

Rodash v. AIB Mortgage Co., 16 F.3d 1142 (11th Cir. 1994) ... 5

State Farm Mut. Auto Ins. Co., 538 U.S. 408 (2003) ... 23

Swanson v. Mid Am, Inc., 186 F.R.D. 665 (M.D.Fla.1999) ... 10

Williams v. Chartwell Fin. Servs., Ltd., 204 F.3d 748 (7th Cir. 2000) ... 13

Williams v. Homestake Mortg. Co., 968 F.2d 1137 (11th Cir. 1992) ... 10, 21

Wilton v. Seven Falls Co., 515 U.S. 277 (1995) ... 9

*iv Young v. Meyer & Njus, P.A., 183 F.R.D. 231 (N.D. 111.1998) ... 1

Federal Statutes

15 U.S.C. § 1602(u ) ... 20

15 U.S.C. § 1605(f) ... 8

15 U.S.C. § 1632(a) ... 18

15 U.S.C. § 1635 ... passim

15 U.S.C. § 1635(a) ... 4, 19, 20

15 U.S.C. § 1635(b) ... 21

15 U.S.C. § 1635 (f) ... 5

15 U.S.C. § 1635(g) ... 5

15 U.S.C. § 1635(i) ... 8

15 U.S.C. § 1640 ... 4

15 U.S.C. § 1640(a)(2) ... 4

15 U.S.C. § 1640(b) ... 11

15 U.S.C. § 1649 ... 8

28 U.S.C. § 2201 ... 9

28 U.S.C. § 2202 ... 9

Public Laws

Pub. L. No. 104-12 (May 18, 1995) ... 7

Pub. L. No. 104-29 (Sept. 30, 1995) ... 8

Congressional Record Cites

109 Cong. Rec. 2029 (1963) ... 12

114 Cong. Rec. 1611 (1968) ... 20

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Cong. Rec. S14567 (Sept. 28, 1995) ... 6

1980 U.S.C.C.A.N. 236 ... 19

Federal Rules

Fed. R. Civ. P. 23 ... 5

Federal Regulations

12 C.F.R. § 226.17(a) ... 18

12 C.F.R. § 226.23(a)(3) ... 20

*v12 C.F.R. § 226.24(d)(3) ... 21

Other Authorities

17 Am. Jur. 2d Consumer Protection §1(1990) ... 21

Brian Bucks and Karen Pence, *Do Homeowners Know Their House Values and Mortgage Terms?* Federal Reserve Board (January 2006) ... 14

Cong. Quarterly (April 9, 1995) ... 7

Freddie Mac Primary Mortgage Market Survey 5/3/07 Release ... 21

Marketplace Money, *The Straight Story* (October 20, 2006) ... 15

Elizabeth Razzi, *Mortgage Ignorance Rampant* (March 26, 2007) ... 14

Ralph J. Rohner & Fred H. Miller, The Law of Truth in Lending, 8.01[2] (2d ed. 2000) ... 4, 18

Truth-In-Lending: The Judicial Modification of The Right of Rescission, 1974 Duke L. J. 1227 ... 8, 20

INTERESTS OF *AMICI CURIAE*

This brief is filed with the consent of both parties.

The individual amici Harriet Holder, Steven Bourassa, Scott Ventola and Lynn Gay are plaintiffs in a Multidistrict Litigation proceeding pending in the Northern District of Illinois (No. 05-cv-7097) in which they represent a putative class pursuing a declaratory judgment concerning their right to rescind under the Truth in Lending Act ("TILA"), 15 U.S.C. § 1635. Judge Aspen denied the defendants' motion to dismiss the class claims under TILA in that proceeding, holding that there is "nothing in TILA precluding declaratory relief authorizing class members to individually request rescission where they are legally entitled to do so." *In re Ameriquest Mortg. Co. Mortg. Lending Practices Litig.*, 2007 WL 1202544 at *3 (N.D. Ill. 2007). *Amici* and the class they seek to represent have a direct interest in preserving the benefit of that ruling, and thus, have a direct interest in the outcome of this appeal.

The Ameriquest MDL demonstrates the need for class actions under TILA's rescission provision. More than 750 federal cases have been filed against Ameriquest, virtually all alleging identical TILA violations. The plaintiffs allege that Ameriquest's failure to provide information required by TILA was part of a broader scheme. Absent the possibility of class treatment, the case would be unmanageable.

The organizational *amici*: AARP, Center for Responsible Lending, Public Citizen and National Consumer Law Center, are non-profit public interest organizations that advocate on behalf of low and moderate-income families regarding homeownership, seeking to expose and eliminate abusive lending practices in the mortgage market and to preserve the availability of the class action device to vindicate fundamental consumer protections.

SUMMARY OF ARGUMENT

Nothing in the text of TILA (or its history or structure) precludes class certification under Rule 23 in actions seeking a declaration of a right to rescind. That issue is thoroughly addressed by the Court below and by the Andrews brief. *Amici* do not repeat those well-reasoned arguments here. Instead, we supplement their reasoning. *First,* we discuss the plain language of 15 U.S.C. § 1635 and show why it in no way prohibits class actions. *Second,* we examine the legislative history of the 1995 Amendments to TILA and show that Congress, when given the opportunity, declined to insert the prohibition on class actions that Chevy Chase seeks

here. *Third,* we address Chevy Chase's novel contention that declaratory relief is unavailable under TILA.

Finally, we respond to Chevy Chase and its *amici's* doomsday scenarios, which are without support in the record or in reality and which ignore the importance of TILA's rescission remedy for consumers such as the individual amici and the plaintiffs in *Andrews.* TILA's fundamental purpose-combating deception in the credit marketplace by giving consumers clear and accurate information about the terms of their loans--is accomplished by providing consumers with tools to combat misleading and inaccurate disclosures, including the right to seek a declaratory judgment giving class members the right to rescind their inaccurately disclosed loans. Here, by using its Truth in Lending Disclosure Statement ("TILDS") to create confusion and foster misinformation about its loan product, Chevy Chase's actions pierce the very heart of TILA's statutory scheme and cause significant harm to class members.

Given the seriousness of these violations and the importance of TILA's consumer protections, this Court should not erect a barrier to the efficient class-wide vindication of these Congressionally established-rights based on speculative fears about the economic impact of liability. Such policy arguments are best directed to the elected members of Congress, not to the federal judiciary.

ARGUMENT

I. CONGRESS HAS NOT EXPRESSLY OR IMPLICITLY RESTRICTED THE RIGHT TO OBTAIN A DECLARATION OF A RIGHT TO RESCIND ON A CLASS BASIS.

A. The Plain Language of TILA Does Not Prohibit Rule 23 Class Actions.

"Though the [TILA] clearly contemplates class actions, there are no provisions within the law that create a right to bring them ... The 'right' to proceed to a class action, insofar as the TILA is concerned, is a procedural one that arises from the Federal Rules of Civil Procedure." *See Johnson v. West Suburban Bank,* 225 F.3d 366, 369 (3d Cir. 2000); *see also Califano v. Yamisaki,* 442 U.S. 682, 700 (1979)("In absence of direct expression by Congress of intent to

depart from usual course of trying all suits of civil nature under Rules of Civil Procedure established for such purpose, class relief is appropriate in civil actions brought in federal court ...."). Chevy Chase, however--using the flawed reasoning of the First Circuit in *McKenna v. First Horizon Home Loan Corp.,* 475 F.3d 418 (1st Cir. 2007)-attempts to transform Congressional silence into a scheme that allows some class actions but forecloses other class actions vindicating rights under the same statute.

At bottom, the statutory argument championed by Chevy Chase and *McKenna,* rests entirely on a comparison between 15 U.S.C. §§ 1635 and 1640. In those provisions, Congress did two very different things: in § 1640(a)(2), it limited statutory damages for individuals and classes and, in § 1635, it created a right to rescind exercisable by the borrower for up to three years and judicially enforced through "any action." The absence of a parallel liability cap in § 1635, according to Chevy Chase, suggests that Congress intended to bar all class actions premised on § 1635. These provisions simply cannot bear the weight that Chevy Chase places upon them.

Contrary to Chevy Chase's contention (Brief for Defendant-Appellant Chevy Chase Bank ("Chevy Chase Br.") at 18), § 1635 is not primarily a remedy provision. Its main purpose is to confer substantive rights, *(See* Ralph J. Rohner & Fred H. Miller, The Law of Truth in Lending, 8.01[2], at 598 (2d ed. 2000)), not to spell out the forms of civil actions under which those rights might be vindicated. The comparison with the limitations on remedies in § 1640, therefore, is strained at best. Section 1635 first creates a right to rescind certain transactions during the first three business days for any reason--or no reason at all. 15 U.S.C. § 1635(a). Rescission during this three-day time period cannot fairly be called a "remedy" because it need not be justified by creditor wrongdoing. It is simply an absolute, no-fault cancellation right that, when exercised, prevents full consummation of the transaction. The extended right to rescind is just **\*5** that: an extension of the three-day right that "expire[s]" after three years; it is premised on the notion that the three-day right does not begin to run until the borrower has been provided accurate, material disclosures.[FN1]15 U.S.C. § 1635(f). It is the extension of this right in the specified circumstances, that can be judicially enforced-without qualification--through "any action."

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 1511716 (C.A.7)                                                                                           Page 8

15 U.S.C. § 1635(f),(g). As a practical matter, a remedy emerges only when the creditor has violated the material disclosure or notice rights, extending the three-day unconditional right out to three years.

>FN1. As Chevy Chase admits, creditors can choose to cure a violation by providing new correct disclosures and a new three-day right to rescind during the three-year extended period to all affected borrowers or assume the business risk that a class action will impose the same result.

Neither the First Circuit, nor Chevy Chase, nor its amici, has located a single line of TILA to support the proposition that TILA denies borrowers access to the class action mechanism to determine liability for rescission. There is thus no reason to depart from Supreme Court precedent and settled practice under Rule 23, which makes class relief generally available in federal actions. Ultimately, what Chevy Chase asks this Court to do-and what the First Circuit did in *McKennan*--is to elevate one view of what Congress should have intended above the intent that Congress actually expressed in the words of the statute. *See McKenna, 475 F.3d at 426 n.3* (acknowledging that the class action prohibition created by the court "is not memorialized in the text of the statute.") That is a step the federal courts are forbidden to take. *See Pavelic & LeFlore v. Marvel* http://www.westlaw.com/Find/Default.wl?rs=dfa1.0&vr=2.0&DB=780&FindType=Y&ReferencePositionType=S&SerialNum=1989170496&ReferencePosition=126*Entertainment Group, 493 U.S. 120, 126 (1989)* ("Our task is to apply the text, not to improve upon it."); *Matter of Sinclair, 870 F.2d 1340, 1344 (7th Cir. 1989).*

B. Congress Deliberately Left Class Rescission Intact In The 1995 TILA Amendments.

In the absence of any direct statutory support, Chevy Chase and its industry *amici* rely heavily on quotations from individual legislators to make their case that Congress has long sought to limit the potential financial threat of TILA class rescissions. *See* Chevy Chase Br. at 27-28; Brief of Financial Services *Amici* ("Fin. Serv. Br.") at 5-9. However, when these quotations are set in historical context, they directly contradict *amici's* assertion and establish

that Congress rejected proposals to preclude class actions under TILA's rescission provision.

Most of these Congressional quotations comment on a 1994 decision from the Eleventh Circuit, *Rodash v. AIB Mortgage Co., 16 F.3d 1142 (11th Cir. 1994).* See Fin. Serv. Br. at 5-9. *Rodash* held that two fees charged by the lender to Mrs. Rodash at settlement should have been, but were not, included in the TILA disclosure of the finance charge, entitling her to rescind. *Id.* at 1149. As it happened, lenders commonly excluded these two fees from finance charge disclosures and, although *Rodash* was not a class action, it gave rise to multiple class rescission actions against lenders.[FN2]

>FN2. The mortgage industry cited to "over 50 class action suits" that threatened the health of the U.S. economy with "potential liability that could reach into the billions," *See* Cong. Rec. S14567 (Sept. 28, 1995) (Statement of Sen. D'Amato).

The mortgage industry reacted by appealing to Congress with many of the same dire predictions industry *amici* make in their brief to this Court. The Congressional **\*7** Record establishes one thing clearly: Congress believed that the *Rodash* decision presented the possibility of substantial class action rescission liability for the mortgage industry. Congress responded, initially by enacting a six-month moratorium on certification of TILA class actions based on certain enumerated violations, including those identified in the *Rodash* decision. Pub. L. No. 104-12 (May 18, 1995).[FN3] Although not applicable solely to class actions seeking rescission, the moratorium specifically stayed class certifications based on home mortgage refinancings, which are rescindable under TILA. Significantly, the moratorium did not cover class actions-whether for rescission or for damages--that alleged other violations of TILA, such as those alleged here by the Andrews. Thus, the moratorium did not impose a blanket prohibition on the certification of rescission classes. Pub. L. No. 104-12, § 2(i)(2)(B).

>FN3. The moratorium addressed violations resulting from the incorrect allocation of fees, and violations based on a creditor's use of the incorrect model form disclosing notice of the consumer's right to cancel.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

During the moratorium period, the mortgage industry lobbied heavily for the passage of legislation to prohibit class actions seeking the right to rescind. *See Cong.* Qtrly, April 9, 1995.[FN4] Congress did not enact the class action limitations Chevy Chase or its amici wish for here, but it did impose other deliberate but limited boundaries on the right to rescind. Congress created new tolerances that reduced the availability of rescission for finance charge violations and eliminated rescission for overstatement of the finance charge and related disclosures.[FN5] 15 U.S.C. § 1605(f). Congress also granted retroactive, but not prospective, immunity for a limited group of violations in loans consummated prior to October 1, 1995. 15 U.S.C. § 1649.[FN6] Accordingly, the 1995 Amendments struck a careful balance in crafting narrowly drawn relief for creditors while retaining TILA's core purpose to provide accurate disclosures to consumers. None of these limitations restricted a plaintiff's ability to seek relief on behalf of a class and none impacted the violations alleged by the Andrews class.

> FN4. This is discussed in greater depth in the Brief for Plaintiffs-Appellees Andrews at 42-3.

> FN5. The Amendments also created a smaller finance charge tolerance for rescission of a mortgage in foreclosure. § 1635(i)(2). TILA Amendments of 1995, Pub. L. No. 104-29 (Sept. 30, 1995).

> FN6. The Amendments created a retroactive tolerance for finance charge violations, excused failures to allocate *Rodash* fees, borrower paid broker fees and third party closing fees to the finance charge, and excused use of the incorrect model notice of right to cancel form for previously consummated loans. 15 U.S.C. § 1649.

As the legislative history makes abundantly clear, *Rodash* presented the perfect opportunity for Congress to eliminate class rescission. Congress did not choose that course. Its initial step in passing a moratorium on TILA class certifications was itself a clear statement that TILA rescission classes *are certifiable* and that only Congress could put such certifications on hold. In crafting the ultimate

amendments to TILA to "fix" the *Rodash* problem, Congress was presented a clear opportunity to bar class rescissions and it did not. The 1995 Amendments did not curb the availability of class action rescission as a mechanism to enforce TILA's statutory provisions.

Contemporaneous court decisions provide further insight into this issue: if Congress had eliminated rescission class actions in the 1995 Amendments, surely those courts responsible for the stayed class actions would have taken the opportunity to dismiss the rescission classes. They did not. Instead they engaged in careful and painstaking analysis to determine whether the Amendments eliminated the class violations, and if not, whether those violations were still considered material. *See e.g., O'Brien v. J.I. Kislak Mortgage Corp.,* 934 F. Supp. 1348, 1362 (W.D. Fla. 1996)(this court was responsible for a block of rescission and damages class actions subject to the temporary moratorium.);[FN7] *Cowen v. Bank United of Texas,* 1995 WL 38978 (N.D. Ill. 1995); *Curtis v. Secor Bank,* 896 F. Supp. 1115 (M.D. Ala. 1995).

> FN7. The 1995 Amendments did eliminate class certification where class representatives were unable to meet the newly established and retroactively applicable tolerances. *See* id.,1363-1364 ("After applying the 1995 Amendments, the Snyders and the O'Briens have largely been deprived of the necessary *standing* to represent a class seeking damages and rescission on mortgage loans for the relevant time periods.")

C. Declaratory Relief Is Available Under TILA

Chevy Chase also urges this Court to accept its thoroughly novel argument that declaratory relief is not available under TILA at all. The argument is meritless. Federal courts have the power to grant declaratory relief under federal laws in their sound discretion exercised in the public interest. 28 U.S.C. §§ 2201, 2202. *See Wilton v. Seven Falls Co.,* 515 U.S. 277 (1995). "The two principal criteria guiding the policy in favor of rendering declaratory judgments are (1) when the judgment will serve a useful purpose in clarifying and settling legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

controversy giving rise to **\*10** proceeding." Edwin Borchard, *Declaratory Judgments* at 299 (2d ed. 1941). These criteria are easily met here.

Because rescission is intended to be self-enforcing, the typical means of "clarifying and settling legal relations" is a declaratory judgment that the right was (or was not) properly exercised by the homeowner, thus confirming the creditor's obligations with respect to the rescission. 15 U.S.C. § 1635; *see, e.g. Williams v. Homestake Mortg. Co.,* 968 F.2d 1137 (11th Cir. 1992). Thus, courts in the Seventh Circuit have concluded that declaratory relief is also appropriate to resolve common questions of liability, clarifying whether or not homeowners retain the right to rescind their loans under TILA. *In re Ameriquest Mortg. Co. Mortg. Lending Practices Litig.,* 2007 WL 1202544, at \*3;*see also Latham v. Residential Loan Centers of America, Inc.,* No. 03C7094, 2004 WL 1093315, at \*5 (N.D. Ill. 2004); *Hickey v. Great Western Mortgage Corp.,* 158 F.R.D. 603, 613-614 (N.D. Ill. 1994); *Mount v. LaSalle Bank Lake View,* No. 92C5645 1994 WL 731006, at \*9 (N.D. Ill. 1994). These TILA decisions are consistent with courts' common practice of entering declaratory relief in a wide range of class actions.[FN8] Accordingly, there is no principled basis for distinguishing TILA's rescission provision from any other federal **\*11** statute in which Congress was silent about the availability of declaratory relief.[FN9]

> FN8. *See, e.g Borchering-Dittloff v. Transworld Systems, Inc.,* 185 F.R.D. 558, 566 (W.D.Wis.1999); *Swanson v. Mid Am, Inc.,* 186 F.R.D. 665, 669 (M.D.Fla.1999)(Rule 23(b)(2) certification under FDCPA; plaintiff's damages "flow directly from the notice ... [and so] monetary damages do not predominate over declaratory relief"); *Young v. Meyer & Njus, P.A.,* 183 F.R.D. 231, 234-235 (N.D. 111.1998); *Gammon v. GC Services Ltd. Partnership,* 162 F.R.D. 313, 321 (N.D. Ill. 1995); *Blum v. Fisher and Fisher,1997* WL 433630 (N.D. Ill. 1997).

> FN9. Given that the Court plainly had discretion to enter a declaratory judgment, Chevy Chase appears to be focused on preventing borrowers from receiving notice of the continued existence of their rescission

rights. Withholding information from its borrowers about Chevy Chase's violations of the Act is not a legitimate concern under either TILA or Rule 23. Indeed, as Chevy Chase admits, had it sought to extinguish its potential liabilities following improper disclosures, it was required to issue a corrected notice and offer its borrowers a new three-day period in which to rescind. 15 U.S.C. § 1640(b)(correction of errors by the creditor requires notice to all affected consumers).

II. CHEVY CHASE AND ITS *AMICI* OVERSTATE THE POTENTIAL IMPACT OF ALLOWING CLASS RESCISSION AND IGNORE THE IMPACT ON CONSUMERS.

The record before this Court establishes limited and circumscribed liability for Chevy Chase for rescission of 7000 mortgages. *See* R.81, 17. The cost of rescission is no more or less than that for which Chevy Chase would be liable if each of these homeowners individually rescinded their mortgages. Moreover, there is no record evidence that other mortgage lenders have violated TILA in the same manner and, thus, no basis for this Court to conclude that industry's doomsday predictions have any basis in fact. *Amici's* predictions of dire consequences should this Court uphold the district court decision are less than candid assessments by self-interested groups who have sounded this same alarm repeatedly to excuse their own failures to comply with the law. Such speculation-whatever its merit as a matter of legislative policy-does not provide an appropriate basis for a federal court to categorically foreclose class actions seeking a remedy provided by Congress.

**\*12** Industry amici, moreover, are not the only ones who will feel the impact of the decision of this Court. Homeowners, for whose benefit the statutory right of rescission was created and whose ability to assess the terms of their credit has been undermined by Chevy Chase's confusing and misleading disclosures, will be most directly impacted. Without access to the declaratory relief offered by the class action mechanism, these affected Chevy Chase home borrowers will have no means to discover the violation and will lose the opportunity to use rescission to save their homes from foreclosures or to rescind their mortgages and refinance into affordable ones. Homeowners, not Chevy Chase, will unfairly

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

bear the financial burden caused by Chevy Chase's misinformation about the actual cost of their home loans.

A. TILA Provides Essential Protections-Including The Right To Rescind--To Consumers In The Credit Marketplace.

TILA gives consumers "the right to be informed-to be protected against fraudulent, deceitful, or grossly misleading information, advertising, labeling, or other practices and to be given the facts he needs to make an informed choice." *See* 109 Cong. Rec. 2029 (1963) (remarks of Sen. Douglas). In guaranteeing disclosure of accurate and meaningful credit costs to consumers, TILA was intended to balance the scales thought to be weighted heavily in favor of lenders. *See Bizier v. Globe Fill. Servs., Inc.,* 654 F.2d 1, 3 (1st Cir. 1981). Though TILA is a consumer protection law, it also protects the integrity of the market by supporting honest competition, serving to "invigorate competition" by protecting the "ethical and efficient lender..." *See* 109 Cong. Rec. 2029 (1963)(remarks of Sen. Douglas.)

*13 TILA standardized the format and terminology used to describe the terms of a credit transaction, and mandated that required disclosures be "clear," creating a system of disclosure that improves the bargaining posture of all borrowers, and requires strict technical compliance, regardless of actual injury, benefiting all consumers. *See Handy v. Anchor Mortgage Corp.,* 464 F.3d 760 (7th Cir. 2006); *Parker v. DeKalb Chrysler Plymouth,* 673 F.2d 1178 (11th Cir. 1982). Congress intended that disclosure of "accurate information from creditors in a precise and uniform manner" would enable consumers "to compare the cost of credit." *See Williams v. Chartwell Fin. Servs., Ltd.,* 204 F.3d 748, 751 (7th Cir. 2000). Indeed, this Court has recently reiterated that consumer protection statutes that mandate the clear and accurate disclosure of information to consumers require just that--not only correct information, but correct information in a format that a consumer can understand. *See Gillespie v. Equifax Information Servs., L.L.C.,* -- F.3d --, No. 06-1952, 2007 WL 1287649, at *3 (7th Cir. May 3, 2007).

TILA disclosures are intended to translate the legalese of loan documents to plain and comprehensible terms that enable consumers to understand the obligations imposed by their mortgages. *See Mills v. Home Equity Group,* 871 F. Supp. 1482, 1485 (D.D.C 1994). The importance of these disclosures has grown in recent years because of the emergence of "non-traditional" or exotic mortgage products whose complexity cannot be overstated. The once dominant 30-year, fixed rate mortgage, thought to be complex enough for an average consumer, has been replaced by interest-only adjustable rate mortgages, payment option ARMs, 2/28 and 3/27 ("hybrid-ARMs"), *14 simultaneous first and second lien loans ("piggybacks") to name just a few. In the adjustable rate categories, consumers are called upon to understand:
• their interest rate and how often it changes;
• if the rate is a "teaser," and how long the "teaser" is effective;
• how the changing rate affects their payments;
• how and when their payments adjust;
• what limits are placed on payment adjustments and when limits cease to apply;
• if and when loans will negatively amortize;
• if they will be charged for early repayment; and
• the size of any prepayment penalty.

It is little wonder that ARM borrowers have substantial difficulties understanding the terms of their contracts, or the potential rate and payment shocks they face. *See, e.g.* Elizabeth Razzi, *Mortgage Ignorance Rampant* (March 26, 2007), *available at* htt:p//www.bankrate.com/brm/news/Financial_Litera cy / March07_mortgage_poll__a4.asp?caret=18a. Particularly troubling is evidence that lower- and moderate-income borrowers are less likely to understand the terms of their ARMs, placing them at greater risk, relative to their income, when payments reset. *See,* Brian Bucks and Karen Pence, *Do Homeowners Know Their House Values and Mortgage Terms?* Federal Reserve Board at 20, 24 (January 2006), *available at* http:// www.federalreserve.gov/pubs/feds/2006/200603/200 603pap.pdf. *15 While perhaps an imperfect tool to adequately disclose the hazards of non-traditional products, TILA's mandate to distill material information from the note and mortgage and provide borrowers with a clear and comprehensible disclosure is more important today than ever; TILA disclosures are the only vehicle through which borrowers can begin to understand the terms of these new mortgages.

1. TILA's Protections Are Particularly Important For Consumers In Complex Mortgage Products Such As Payment Option ARMS.

The Andrews' loan is a fairly typical example of the Payment Option Adjustable Rate Mortgage ("POARM") product, which one industry observer has termed, "the most complicated mortgage product ever marketed to consumers." *See* Marketplace Money, *The Straight Story* (October 20, 2006), *available at http://www.marketplacemoney.*publicradio.org/display/web/2006/10/20/straight_story_ trickle_down. The Andrews' (and other class members') POARMs serve as an example of the importance of clear and unambiguous compliance with the law. *See e.g.* Affidavit of Luisa Cordova-Holmes, a tax accountant and putative class member, R.27, Ex. 1, ¶¶ 2, 6-11, 15. ("Due to the information contained in the TILDS, we believed that we were getting a loan that would be fixed for the first five years at a loan interest rate of 2.235%.").

2. Actual Interest Rates Are Hidden in POARMs.

Chevy Chase's POARM prominently featured a low 1.95% "teaser rate" in advertising, in discussions with borrowers *(See* R.57, 25-8, 32, 34-5 & R.58, 41, 45-6, 48-9, 53, 58, 60) and in the critical part of the promissory note. *See* R.29, Ex. 16 ¶2(A) ("I will **\*16** pay interest at the yearly rate of 1.950%. The interest rate I will pay may change."). However, that 1.95% rate was only in effect for 53 days, from the Andrews's closing date (June 8, 2004), until *the first* payment was due (August 1, 2004). The interest rate *does change-every month,* beginning on the date the first payment is due. Since the interest rate applied to the Andrews' loan is calculated by adding a margin of 2.9% to the index--"one month London Interbank Offered Rate (LIBOR)"--after the first payment the interest rate will always be significantly greater than 1.95%. *(See* R.29, Ex. 16, ¶ 2(B,D,E) The first month the Andrews' rate changed to 4.375% *(See* R.29, Ex. 21); the next month to 4.50%, and by the 12th month, the rate was 6%. The index rose steadily each month for 26 months and as of May 2007 the rate is 8.25%. *(See* Spreadsheet, Appendix 1).

3. The Payments Due Under POARMS Remain Fixed For Limited Periods, While the Interest Rates

Fluctuate More Frequently, Creating Negative Amortization.

The so-called "payment option" in the Andrews' Chevy Chase POARM is that, for the first 5 years, they had the "option" of paying a "minimum payment" (here $701.21) or a higher payment sufficient to fully amortize the loan balance. The critical difference for a POARM is that, unlike a typical mortgage in which the minimum monthly payment covers interest and principal owing each month, the minimum payment in a POARM, while sufficient to avoid default, is insufficient to cover the interest accruing each month or to pay down principal. Paying the POARM payment **\*17** accomplishes the reverse of the borrower's expectation-instead of amortizing the loan, it causes the mortgage balance to increase.

Thus, as the Andrews POARM interest rate changes each month, the minimum monthly payment remains the same, making negative amortization certain. After five years of $701.21 payments, the Andrews' payment adjusts dramatically upward as the payment is recalibrated to account for both interest rate changes and the higher principal balance resulting from negative amortization. Moreover, despite Chevy Chase's "guarantee" of five years of fixed minimum payments, (*See* R.81-2) the Andrews' Chevy Chase loan will reach its 110% negative amortization cap of $210,000, after only 3 1/2 years, and their payment will more than double to $1,628.32 based on projected LIBOR rates. *See* Appendix 1; R.29, Ex. 16,¶ 3(F).

Clearly, the Note and Rider which focus on the 1.95% rate and $701 payment are of little help to the ordinary reader. It is only the TILA disclosure that could have given the Andrews some insight into the actual APR on the loan-- could have, that is, if the additional "5-Year fixed Note Interest Rate 1.95%" had not *also* appeared on Chevy Chase's TILA disclosure to them.

D. The TILA Disclosures Made By Chevy Chase Fundamentally Misrepresent the Cost of the Loan.

The express purpose of TILA is to provide consumers with accurate information about the cost of credit. Here, the TILA violations fundamentally misrepresent the terms of the loan - they are not, as

Chevy Chase repeatedly asserts mere "picky and inconsequential errors". *See* Chevy Chase Br. at 25.

**\*18** The interest rate disclosure on the TILDS--here disclosed as a 4.047% APR-is the only place in the loan documents where the impact of the rising interest rate applicable for 358 of the 360 months of the mortgage, is visible to the consumer.[FN10] That APR disclosure, however, was contradicted by Chevy Chase's unique addition of the confusing and misleading reference to "Note Interest Rate: 1.95%" on the TILDS. Chevy Chase's notation reinforced the 1.95% teaser rate and the impression that this rate was effective for five years. *See* R.81-2; *see also* Note, *Truth-In-Lending: The Judicial Modification of The Right of Rescission,* 1974 Duke L. J. 1227, 1235, n.37 ("A recurring theme in the Congressional debates was that the consumer has historically been subjected to the unscrupulous tactics of creditors who would engage in practices which, if not fraudulent, were calculated to confuse consumers.")

> FN10. The APR for an adjustable rate loan with a teaser is a "blended rate." Official Staff Commentary to Regulation Z, § 226.17(c)(1)-10, 12. *See* Rohner & Miller, ¶ 6.05[2] (variable rate disclosures) and ¶ 4.03[2] (explaining formulas for APR calculation).

As the district court determined, Chevy Chase's addition to the TILDS violated TILA and Regulation Z's mandate that required disclosures be made "clearly and conspicuously." 15 U.S.C. § 1632(a); Reg. Z § 226.17(a); R. 81, 11. Because the surplus language rendered the disclosed APR consistent with more than one plausible interpretation, this APR disclosure was not "clear." *See Handy v. Anchor Mortgage,* 464 F.3d 760 (7th Cir. 2006); *see also Porter v. Mid-Penn Disc. Co,* 961 F.2d 1066, 1077 (3rd Cir. 1992). Far from being a mere technical glitch, as Chevy Chase repeatedly asserts, this violation goes to the very heart of the TIL document-the crucial cost information. *The* **\*19** *cost disclosures-- the APR and the finance charge--are held to a higher standard of conspicuousness than any other disclosures.* 15 U.S.C. § 1632(a). Accordingly, Chevy Chase's confusing and improper "mixing and matching" of the APR with a fire-sale teaser rate in effect for only 53 days violates that most fundamental mandate in the statute. Chevy Chase's

violation pierces the very heart of TILA's disclosure regime.

Chevy Chase and its *amici's* portrayal of TILA as highly complex and the violation at issue as minor, are simply diversionary tactics. Criticisms of TILA, in any event, should be directed at Congress, not the courts.

E. Rescission Provides Consumers the Opportunity to "Undo" Loans Tainted By the Most Critical TILA Violations.

1. TILA Provides Consumers Rescission Relief Only for the Most Significant TILA Violations.

Under TILA, the remedy of rescission is only available in one special context where a non-purchase money mortgage is secured by the borrower's principal dwelling. 15 U.S.C. § 1635(a). *See* Renuart & Keest, National Consumer Law Center, Truth in Lending § 6.1 (5th ed. 2003 & 2006 Suppl.)(reflecting "Congress' desire to keep homeowners from placing their homes in jeopardy without a clear understanding of the risks and benefits of the transaction.") In creating the right to rescind, Congress recognized that full, accurate and clear information is most important when potential borrowers are putting their families' homes at risk. Thus, the rescission remedy is an expression of the overarching importance Congress placed on preserving home ownership. S. Rep. No. 368, 96th Cong, 2d Sess. 28, *reprinted in* 1980 U.S.C.C.A.N. 236, **\*20** 264. But even in that context, Congress did not choose to make rescission available for "minor" violations of TILA, nor indeed even to all of the violations which it deemed important enough to justify statutory damages. Instead, rescission is only allowed for violations of six[FN11] of the most "material" violations of TILA. 15 U.S.C. §§ 1602(u), 1635(a); 12 C.F.R. § 226.23(a)(3) n.48. Thus, Congress has been explicit about distinguishing "minor" violations from the critical ones. And Congress determined that an accurate, clear APR price tag is critical.

> FN11. Incorrect notices of the right to cancel also give rise to the extended right to rescind. *See Handy v. Anchor Mort. Corp.* at 761 and discussion *supra* at 8 and n.5.

2. Rescission Seeks to Undo the Wrong to the

Consumer; It is Not a Penalty to the Lender.

Contrary to Chevy Chase and its amici's assertions that rescission would unduly penalize them, rescission is not a penalty--it simply seeks to return homeowners to the status quo ante.[FN12]*See FDIC v. Hughes Development Co., Inc. 684 F.Supp. 616, 625 (D. Minn. 1988). By mandating a release of the security interest in the property and return of any money the consumer has paid as finance charges or other fees, Congress's rescission remedy restores borrowers to the position they would have been in if they *21 had never undertaken the mortgage. 15 U.S.C. § 1635(b); see also Williams v. Homestake Mort., 968 F.2d 1137, 1141 (11th Cir. 1992); 17 Am. Jur. 2d Consumer Protection § 135 (1990). ("[T]he word 'rescission' is used in its legal sense ... as a remedy restoring the status quo."). A creditor that complies with its obligations to honor the rescission is entitled to a return of the amounts it advanced. 15 U.S.C. §1635(b); Reg. Z, § 226.24(d)(3).[FN13]

> FN12. In contrast to rescission, statutory damages are a penalty. See e.g. Note, 1974 Duke L. J. 1226, 1227-28, n.4. (discussing early line of cases on election of remedies. Issue arose because rescission is remedial, and so whether election would be turned on whether civil damages were penalty or remedy.); see also 114 Cong.Rec. 1611 (1968) (remarks of Cong. Cahill), quoted in Eby v. Reb Realty Inc., 495 F.2d 646, 651 (9th Cir. 1974)("The purpose of according borrowers a right of rescission is broader[than civil liability]; not only is it designed to compel disclosure, but it also serves to blunt unscrupulous sales tactics by giving homeowners a means to unburden themselves of security interests exacted by such tactics.").

> FN13. Contrary to Chevy Chase and amici's assertions (See Chevy Chase Br. at 16 (citing James v. Home Const. Co. Mobile, Inc., 621 F.2d 727 (5th Cir. 1980)) & at 31 (citing McKenna, 475 F.3d 418) rescission creates rights in consumers, not creditors. The only right Chevy Chase has is to the return of loan principal after it honors rescission and terminates its mortgage. Courts can modify this process to assure that

both parties receive their due. This is no more or less than allowing repayment of principal to occur simultaneously with termination of the mortgage; it is not highly individualized. Indeed judicial modification is simply an exercise of declaratory authority consistent with TILA and is perfectly amenable to class as well as individual proceedings.

The Andrews provide a case in point. In order to effectuate their rescission they will be required to obtain financing for a new 30 year loan with a principal balance of approximately $168,000.[FN14] They cannot simply revive their former 5.75%, 30 year mortgage or obtain a new loan at their prior interest rate, as that low rate is no longer available in the marketplace. Prime mortgage interest rates are now in the 6 - 6.5% range for borrowers with good credit, like the Andrews. See Freddie Mac Primary Mortgage Market Survey, 5/3/07 Release, supra. Even applying the best available rate *22 to the Andrews' new principal balance, rescission will impose additional costs on the Andrews that exceed the costs of their old mortgage by over $10,000 over the life of the loan.[FN15] Thus, Chevy Chase and its amici's alarmist claims that rescission confers a windfall are simply wrong. Moreover, despite TILA's mandate that " 'rescinding a loan transaction ... requires returning the borrowers to the position they occupied prior to the loan agreement,' " Handy, 464 F.3d at 765 (internal citations omitted), the Andrews will not be made whole. Even with the principal reduction on the new loan that reflects TILA's mandate that all interest and charges be returned to the borrowers, the Andrews will suffer a loss. That is no windfall.

> FN14. This principal balance is based on a conservative addition of approximately $1,500 in closing costs and an average 0.5 discount point to the rescission tender of $165,525. See Freddie Mac Primary Mortgage Market Survey 5/3/07 Release, available at http:/ / www.freddiemac.com/dlink/html/PMMS/disp lay/PMMSOutputWk.jsp?wee k=18&ending=20070503.

> FN15. This calculation takes into account repayment of the Andrews' small home

equity loan of $17,000, that was refinanced into the Chevy Chase loan.

3. Because Rescission Is Not Penal, *Amici's* Due Process Arguments Fail.

As we have shown--contrary to Chevy Chase and its industry *amici's* assertions -- rescission is not a penalty. The members of the class have suffered actual harm. Those who rescind will not receive a "windfall," but rather only be restored to the status quo. Accordingly, *amici's* specter of due process concerns because of potential excessive penalties is groundless. The Supreme Court's due process jurisprudence cited by industry amici *(See* Fin. Serv. Br. at 9-13) makes clear that punitive damages raise due process concerns when they are "grossly excessive" or seek to punish a defendant for speculative harm to a plaintiff not before the court. *See Phillip Morris USA v. Williams,* 127 S.Ct. 1057, 1063 (2007). Critical to the Court's analysis is the fundamental difference between compensatory damages -- which seek to redress the **\*23** defendant's wrongful conduct -- and punitive damages -- which serve as "the jury's moral condemnation" with the purpose of punishment and deterrence. *See State Farm Milt. Auto Ins. Co.,* 538 U.S. 408, 416 (2003); *Cooper Indus., Inc. v. Leatherman Tool Group,* 532 U.S. 424, 432 (2001); BMW of North *America, Inc. v. Gore,* 517 U.S. 559, 568 (1996). Because the purpose of rescission is to undo as much of the actual harm as possible, the fundamental conceptual underpinnings of those cases do not apply. Indeed, one of the Court's key inquiries in each of the cases is the proportionality of the relationship between the nature and extent of actual harm caused by the defendant and the punishment levied through punitive damages. *See BMW,* 517 U.S. at 574-575; 581-583. No such analysis can even be undertaken here because what Chevy Chase views as punishment is, in fact, only the undoing of the unlawful mortgage transaction. No "penalty" is imposed.[FN16]

> FN16. That the aggregated cost of rescission may be substantial does not in any way change the fundamental non-punitive nature of the remedy-the relief is not punitive in nature. As *Parker v. Time Warner,* 331 F.3d 13 (2d Cir. 2003), the case relied on by industry *amici,* makes clear, even if due process concerns were raised in a class action because of aggregation of statutory penalties-the court should not refuse to certify the class but rather may reduce the penalties. *See Parker,* 331 F.3d at 22. Because this case addresses only the undoing of a transaction and the harm done to the borrower, there is no additional penalty for the court to reduce.

CONCLUSION

Because TILA does not prohibit class actions that seek a declaration of the right to rescind, this Court should affirm and remand for further proceedings.

Appendix not available.

SUSAN and Bryan Andrews, and a class of persons similarly situated, Plaintiffs-Appellees, v. CHEVY CHASE BANK, F.S.B., Defendant-Appellant.
2007 WL 1511716 (C.A.7)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.



2007 WL 1407149 (C.A.7)                                                    Page 1

For Dockets See 07-1326

United States Court of Appeals,Seventh Circuit.
SUSAN and Bryan Andrews and a class of persons
similarly situated., Plaintiffs-Appellees,
v.
CHEVY CHASE BANK, F.S.B., Defendant-Appellant.
No. **07-1326**.
April 28, 2007.

FRCP 23(f) Appeal from the United States District Court
for the Eastern District of Wisconsin
No. 05-C-0454-LA
Hon. Lynn Adelman

Brief for Plaintiff-Appellees Susan and Bryan Andrews
and the Class
Kevin J. Demet, Donal M. Demet, Demet & Demet S.C.,
815 N. Cass Street, Milwaukee, WI 53202, Attorneys for
Plaintiff-Appellees, (414) 291-0800.

**\*i** TABLE OF CONTENTS

TABLE OF AUTHORITIES ... iii

JURISDICTIONAL STATEMENT ... 1

STANDARD OF REVIEW ... 2

STATEMENT OF ISSUE ... 3

STATEMENT OF THE CASE ... 3

STATEMENT OF THE FACTS ... 5

 The District Court Found that Chevy Chase Violated
Truth in Lending Requirements ... 6

 The TILA Violations are Not "Picky and
Inconsequential" ... 12

 The Court Found that the Requirements for Class
Certification Have Been Met ... 12

SUMMARY OF THE ARGUMENT ... 14

ARGUMENT ... 18

I. DECLARATORY RELIEF PROVIDING THE
OPPORTUNITY TO RESCIND IS AVAILABLE
UNDER TILA ... 18

 A. TILA Does Not Prohibit FRCP 23 Class Actions
Seeking the Right of Rescission ... 19

 1. The Plain Language of TILA Does Not Prohibit Class
Actions Seeking the Right of Rescission ... 22

 B. The Plain Language of 15 U.S.C. §1635 Does Not
Allow the Court to Deny Rescission Based Upon
Perceived Harm to the Lender or Industry ... 36

 1. 15 U.S.C. §1635 Does Not Contain Any Exception for
Harm to the Lender or Harm to the Industry ... 37

**\*ii** 2. There is No Record of Any Harm to Defendant or
the Industry ... 38

 3. The Harm Suggested is Overblown ... 39

 C. Congress Did Not Intend to Prohibit Class Actions ...
40

 1. Courts Cannot Use Legislative History to Rewrite
Statutes ... 40

 2. TILA's Legislative History Supports the Relief
Granted by The District Court ... 41

II. DECLARATORY RELIEF IS AVAILABLE UNDER
THE TRUTH IN LENDING ACT ... 48

 A. Federal Court Authority is Contrary to Defendant's
Position, Allowing TILA Class Actions for Declaratory
Judgment ... 48

 B. Defendant's Attempt to Show TILA Bans Class
Actions by Analogy Fails ... 51

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

III. JUDICIAL EFFICIENCY COMPELS A CLASS RESOLUTION ... 53

IV. DEFENDANT IS NOT ENTITLED TO EXPANDED REVIEW OF THE FINDING THAT THE CLASS MET THE REQUIREMENTS OF RULE 23, BECAUSE IT WAS NOT REQUESTED IN THE PETITION ... 55

V. IF ADDITIONAL REVIEW IS GRANTED, THE DISTRICT COURT ERRED WHEN IT FAILED TO CERTIFY A CLASS FOR STATUTORY DAMAGES UNDER § 1640(2) ... 56

CONCLUSION AND RELIEF SOUGHT ... 58

*iii TABLE OF AUTHORITIES

CASES

Allen v. International Truck and Engine, 358 F.3d 469 (7th Cir. 2004) ... 21,22,55,56

In re Ameriquest Mortgage Co. Mortgage Lending Practices Litigation, Case No. 05-CV-7097 (N.D. Ill. 423, 2007) ... 28

Berger v. Xerox Retirement Income Guar. Plan, 338 F.3d 755 (7th Cir. 2003) ... 22

Bishop v. Gainer, 272 F.3d 1009 (7th Cir. 2001) ... 22

Brown v. Payday Check Advance, 202 F.3d 987, 911 (7th Cir. 2000) ... 35-6

Califano v. Yamasaki, 442 U.S. 682 (1979) ... 34

Cobb v. Monarch Finance Corp., 913 F. Supp. 1164, 1170 (N.D.Ill. 1995) ... 56

Crawford v. Equifax Payment Servs., Inc., 201 F.3d 877, 882 (7th Cir. 2000) ... 51

In re Consolidated Non-Filing Ins. Fee Litigation, 195 F.R.D. 684, 694-5 (M.D. Ala. 2000) ... 28,48

Fairley v. Turan-Foley Imports, Inc., 65 F.3d 475, 479-80 (5th Cir. 1995) ... 2

FDIC v. Hughes, 684 F. Supp. 616 (D. Minn. 1998) ... 38

Gibbons v. Interbank Funding Group, Inc., 208 F.R.D. 278 (N.D. Cal. 2002) ... 29,37

Goldman v. First Nat'l Bank, 532 F.2d 10, 16 (7th Cir. 1976) ... 21

Gratz v. Bollinger, 539 U.S. 244 (2003) ... 22

*iv Haroco, Inc. v. American Nat'l. Bank & Trust Co., 121 F.R.D. 664, 669 (N.D.Il1. 1988) ... 56

Haynes v. Logan Furniture Mart, 503 F.2d 1161 (7th Cir. 1974) ... 20-1

Hickey v. Great Western Mortgage Corp., 158 F.R.D. 603, 613 (N.D. Ill. 1994) ... 28

Highsmith v. Chrysler Credit Corp., 18 F.3d 434 (7th Cir. 1994) ... 52

In re: Household International Tax Reduction Plan, 441 F.3d 500, 501 (7th Cir. 2006) ... 2,55

James v. Home Const. Co. of Mobile, Inc., 621 F.2d 727(5th Cir. 1980) ... passim

Jefferson v. Security Pac. Fin. Servs., Inc., 161 F.R.D. 63 (N.D. Ill 1995) ... 29

J.I. Case v. Borak, 377 U.S. 426 (1964) ... 52

Johnson v. West Surburban Bank, 225 F.3d 366 (3rd Cir 2000) ... 29

LaLiberte v. Pacific Mercantile Bank, 147 Cal.App.4th 1, (Cal. App. 2007) ... 29

Latham v. Residential Loan Centers of America, Inc., No. 03C7094, 2004 WL 1093315, at *5 (N.D. Ill. May 6, 2004) ... 28

Legal Services Corporation v. Velazquez, 531 U.S. 533 (2001) ... 47

Mayo v. Sears, Roebuck & Co., 148 F.R.D. 576 (S.D. Ohio 1993) ... 29

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*McKenna v. First Horizon Home Loan Corp.,* 475 F.3d 418 (1st Cir. 2007) ... passim

*In re Metlife Demutualization Litigation,* 156 F. Supp.2d 254 (E.D.N.Y. 2001) ... 52, 53

**\*v***Mount v. LaSalle Bank Lake View,* 1994 WL 731006, at \*9 (N.D. Ill. Mar. 31, 1994) ... 28

*Murray v. America's Mortgage Banc, Inc., No.* 0C5811, 03C6186, 2005 WL 1323364 (unpublished) (N.D. Ill. 2005) ... 33

*Nelson v. United Credit Plan, Inc.,*77 F.R.D. 54 (E.D. La. 1978) ... 29

*Paton v. County of Kane,* 308 F.3d 673, 680 (7th Cir. 2002) ... 52

*Rodash v. AIB Mortgage Co.,* 16 F.3d 1142 (11th Cir. 1994) ... 34, 42, 43, 47

*In re Sinclair,* 870 F.2d 1340, 1344 (7th Cir. 1989) ... 22

*Swain v. Brinegar,* 517 F.2d 766, 780 (7th Cir. 1975) ... 52

*Tcherepnin v. Franz,* 461 F.2d 544 (7th Cir. 1972) ... 52

*Tcherepnin v. Franz,* 389 U.S. 332 (1967) ... 52

*Tower v. Moss,* 625 F.2d 1161 (5th Cir. 1980) ... 17,31,33,34,49

United States v. Chevy Chase Federal Savings Bank et al., No. 1:94-CV-01829-JLG (D.D.C. 1994) ... 54

*U.S. v. Logan,* 453 F.3d 804, 808 (7th Cir. 2006) ... 40-41

*United States v. Ron Pair Enters.,* 489 U.S. 235, 240-241 (1989) ... 23

*Veprinsky v. Flour Daniel, Inc.,* 87 F.3d 881, 897 (7th Cir. 1996) ... 23

*Washington v. CSC Credit Services, Inc.,* 199 F.3d 263, 268 (5th Cir. 2000) ... 51

*Weiss v. Regal Collections,* 385 F.3d 337, 341 n.7 (3rd Cir. 2004) ... 51

*Welmakerv. W.T. Grant Co.,* 365 F.Supp. 531, 545 (N.D. Ga. 1972) ... 48

*Wells v. Chevy Chase Bank,* 377 Md. 197 (2003) ... 54

**\*vi***Wernsing v. Dept. of Human Services,* 427 F.3d 466, 469 (7th Cir. 2005) ... 41

*Wilcox v. Commerce Bank,* 474 F.2d 336, 343-344 (10th Cir. 1973) ... 20

*Williams v. Empire Funding Corp.,* 183 F.R.D. 428, 436 (E.D. Pa. 1998) ... 28

FEDERAL STATUTES

15 U.S.C. § 1601 et seq., Truth in Lending Act ("TILA") ... passim

§ 1635 ... passim

§ 1635(a) ... 2,24,30

§ 1635(b) ... 24,33,37

§ 1635(e) ... 24

§1635(f) ... 24

§1635(g) ... passim

§ 1638 ... 56,57

§ 1640 ... passim

§1640 (a)(1) ... 16

§ 1640(a) (2) ... 16,25,56

§ 1640(a)(2)(A) ... 15,25,26

§ 1640(a)(2)(B) ... 1, 15, 18, 25, 38, 57

§ 1640(a)(3) ... passim

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

15 U.S.C. 1681 et seq., *Fair Credit Reporting Act* ... 51

15 U.S.C. 1692 et seq., *Fair Debt Collection Practices Act* ... 51

28 U.S.C. 1331, Federal Question ... 1

28 U.S.C. §2201, Declaratory Judgment Act. ... 15,23 & 26

United States Constitution, Article III ... 52

**\*vii** PUBLIC LAWS

*Pub. L. No. 96-221,* The Truth in Lending Simplification and Reform Act, (Adopted 3/31/1980, but effective 30 months later, as of 1982) ... 24,25,29,31 47

H.R.1380, which became *Public Law 104-12* ... 42

H.R. 2399, which became *Public Law 104-29* ... 43

*Public Law 104-29* (Adopted 9/30/1995) ... 43

CONGRESSIONAL RECORD CITES

141 Cong. Rec. S14566-03 ... 43

141 Cong. Rec. S14566-8, 9/28/1995 (Senate) ... 44

141 Cong. Rec. H9513-H9516, 9/27/1995 (House) ... 44-5

H.R. 1858, a bill that never passed 104th Congress ... 42

FEDERAL REGULATIONS

*Regulation Z, 12 C.F.R. Part 226* ... 3, 11

FEDERAL RULES

*FRCP 23* ... passim

*23(b)(2)* ... 4,14,21,33,55

*23(b)(3)* ... 33,55

*23(f)* ... 1, 2, 3, 21

*FRCP 26.1 and CR 26.1* ... 2

**\*viii** OTHER REFERENCES

Board of Governors of the Federal Reserve System, *-82nd Annual Report to Congress of the Federal Reserve Board,* dated 1995, pp. 227-8 ... 45-6

*- Report to the Congress on Finance Charges for Consumer Credit under the Truth in Lending Act,* April 1996, pp. 12-14 ... 46

Congressional Quarterly

April 9, 1995 ... 42

June 24, 1995 ... 43

Sept. 30, 1995 ... 43

Sept. 28, 1996 ... 46-7

Congressional Quarterly Almanac, 1995, p. 2-89 ... 43

National Consumer Law Center, *Truth in Lending,* § 8.4 (5th ed. & Supp.) ... 48

Ralph J. Rohner, *The Law of Truth in Lending,* Para. 8.03[2][b], at 8-36 (1984) ... 41-2

Norman J. Singer, 2A Sutherland Statutory Construction, 6th ed. (2006)

§45.12 ... 34-5

§46.1, 6th ed. (2006) ... 22

JURISDICTIONAL STATEMENT

The Appellant's jurisdictional statement is incorrect. The District Court obtained jurisdiction over this case pursuant to *28 U.S.C. 1331,* because plaintiffs' claims arise under federal law, namely, the Truth in Lending Act, *15 U.S.C. § 1601 et seq.* In the District Court, Plaintiffs sought a *FRCP 23* class action, seeking the following remedies as an award: rescission for themselves and the opportunity for rescission for each class member who so

desired, pursuant to *15 U.S.C. § 1635(g)*; an award of costs and attorney's fees per *15 U.S.C. § 1640(a)(3)*; and, statutory damages of $500,000, per *15 U.S.C. § 1640(a)(2)(B)*. The district court entered an order certifying the class on January 16, 2007, along with a summary judgment decision granting the opportunity for rescission for each class member and an award of costs and attorney's fees. On January 25, 2007, Chevy Chase filed a *FRCP 23(f)* Petition for relief, requesting that this court review one issue: "Whether a class bringing claims under the Truth in Lending Act may be certified to seek rescission." The Petition was granted on January 31, 2007. Defendant improperly suggests that an additional issue is before this court.

To the extent this Court has jurisdiction[FN1,] based on the Court's recent decision, *In re: Household International Tax Reduction Plan,* 441 F.3d 500 (7th Cir. 2006), the question before the court is limited to that presented by the defendant in seeking this review, namely: "Whether a class bringing claims under the Truth in Lending Act may be certified to seek rescission."

> FN1. Plaintiffs are aware of another possible jurisdictional issue. To obtain *FRCP 23(f)* jurisdiction, Petitioner must file a *FRCP/CR 26.1* disclosure statement within the time period provided in *CR 26.1(c)*. While Defendant has filed several disclosure statements, each of them appears to be inaccurate. Defendant does not disclose in section 3(i), the name of any parent corporations. According to the official public records of the Office of Thrift Supervision (www.ots.treas.gov), Defendant has four parent companies, namely: B.F. Saul Company, B.F. Saul Real Estate Investment Trust, Chevy Chase Property Company and Westminster Investing Corporation. Each is listed as a Thrift Holding Company of Defendant with the OTS. No public companies are disclosed in section 3(ii). According Securities and Exchange Commission filings (www.sec.gov), one parent company, B.F. Saul Real Estate Investment Trust, is publicly traded under the name "Saul Centers," and the symbol "BFS." Defendant may have failed to comply with *FRCP/CR 26.1,* in the time period required by *CR 26.1(c),* which could impair jurisdiction.

**STANDARD OF REVIEW**

TILA is a remedial statute, and consistent with its purpose, the statute is meant to be construed liberally in favor of the consumer. *Fairley v. Turan-Foley Imports, Inc.,* 65 F.3d 475, 479-80 (5th Cir. 1995). As Defendant states, a class certification is reviewed under the abuse of discretion standard.

**STATEMENT OF ISSUE**

Whether a class bringing claims under the Truth in Lending Act may be certified to seek rescission? See: Petition for *FRCP 23(f)* Review.

**STATEMENT OF THE CASE**

Plaintiffs Bryan and Susan Andrews, on behalf of the class, filed this action in April 2005 seeking a remedy under the *Truth in Lending Act* ("TILA"), *15 U.S.C. § 1601 et seq.,* to obtain the opportunity for rescission for each class member, statutory damages, attorneys' fees and other equitable relief against Defendant for engaging in unfair or deceptive acts or practices in violation of *TILA, 15 U.S.C. § 1601 et seq.,* and its implementing *Regulation Z, 12 C.F.R. Part 226.* The Plaintiffs moved to certify the class under *FRCP 23.* While the certification motion was pending, Defendant moved for summary judgment and Plaintiffs cross- moved for summary judgment on the issue of liability under TILA. Class certification was granted by the District Court, pursuant to *FRCP 23(b)(2).* Summary judgment was awarded to the Plaintiffs, finding that Defendant's disclosures materially violated TILA in at least three different respects (APR misrepresented; "5 year fixed" rate misrepresented; Payment Schedule missing intervals and due dates for payments). The District Court declared that Plaintiff class members were entitled to rescind their loans, based upon the material disclosure violations.

The Defendant petitioned for appeal of the order certifying the class on the single issue of whether a class could be certified seeking individual rights of rescission. This court accepted review. Defendant opposed any notice to the class members in the District Court. The District Court stayed further proceedings pending the resolution of the appeal. Because of the stay, the class members have not been identified, have not received any notice of the action or appeal, and their rights may be expiring as this appeal proceeds. This was discussed by the District Court in a Memorandum (A32 at n.1 and A34).

**STATEMENT OF THE FACTS**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The facts as found by the District Court are found in the Decision and Order dated January 16, 2007. R.81, Al. Plaintiffs Susan and Bryan Andrews are a married couple who reside in Cedarburg, Wisconsin. They obtained a mortgage from Chevy Chase in June 2004 to refinance their residence.2 Prior to the Chevy Chase refinance, the Andrews had a fixed rate loan through the Port Washington State Bank. The District Court found that the Defendant provided the Andrews with preliminary disclosures, and at closing, provided the Andrews with the Adjustable Rate Note ("ARN"), a Truth in Lending Disclosure Statement ("TILDS") and an Adjustable Rate Rider ("ARR"). Al. The closing documents the District Court relied upon are reproduced in the Supplemental Appendix to this brief. TILDS: R.29-2, SA1, with the 2nd page attached; ARN: R.29-1, SA3; and, ARR: R.45, Ex. 3 at p. 76, SA8.

> FN2. Chevy Chase misstates the amount of the Mortgage in question. At page 7 of their brief, Defendant states that the Andrews loan was for $147,597. The actual loan was for $191,000.00. R.29-1, SA3.

**The District Court Found that Chevy Chase Violated Truth in Lending Requirements**

The TILA violations in this case are evident upon reviewing the documents the District Court relied upon in reaching its decision. In the "Truth In Lending Disclosure Statement" for the Andrews' loan, Defendant's computer system added the following language on the top right-hand side of the form follows:

**"WS Cashflow 5-Year Fixed Note Interest Rate: 1.950%"**

See: SA1.

Chevy Chase dismisses this language as a "product tracking notation" at page 8 of their brief. However, the plain meaning and implication of the above language is that the Plaintiffs were to receive a loan at a fixed interest rate of 1.95% for the first five years. Chevy Chase has never offered or provided such a loan. A detailed examination of the Adjustable Rate Note, ARN, (SA3), shows that it was a loan that carried 1.95% interest *for only one month. After one month, the rate of interest more than doubled* and has adjusted, and will continue to adjust, to a much higher interest rate each and every month thereafter for the next 30 years. This has caused

the loan of the Representative Plaintiffs to negatively amortize and is causing them to pay a substantially higher interest rate. By February of 2006, the interest rate was 7.5%. R. 34-3, SA17) The note also had an addendum that imposed a graduated 3 year pre-payment penalty beginning at 3% of principal. R.45 Exhibit 3, page 76, SA14.

The following Definition is stated by Defendant in the TILDS, p. 2:

**"ANNUAL PERCENTAGE RATE**

This is not the Note rate for which the borrower applied. The Annual Percentage Rate (APR) is the cost of the loan in percentage terms taking into account various loan charges of which interest is only one such charge. Other charges which are used in calculation of the Annual Percentage Rate are Private Mortgage Insurance or FHA Mortgage Insurance Premium (when applicable) and Prepaid Finance Charges (loan discount, origination fees, prepaid interest and other credit costs). The APR is calculated by spreading these charges over the life of the loan which results in a rate higher than the interest rate shown on your Mortgage/Deed of Trust Note. **If interest was the only Finance Charge, then the interest rate and the Annual Percentage Rate would be the same."**

See: SA2 [Emphasis added].

The District Court specifically referred to this language and pointed out that this misleading statement could only add to an ordinary customer's confusion. A10. Here Chevy Chase tells a borrower that the Note rate and the Annual Percentage Rate ("APR") are "the same," absent the other charges (closing costs) which are not at issue in this case. Since the Note rate is misrepresented at the 1.95% teaser rate for the first 5 years of the loan in the TILDS, the APR is also being misrepresented for the first 5 years. The borrowers are told on the top of page 1 of the TILDS form that the Note interest rate, and hence the APR by Chevy Chase's own definition on page 2, is fixed for the first 5 years at 1.95% (except for the closing costs). This Note rate information misrepresents the APR for the first 5 years as the District Court held. A10.

The Adjustable Rate Note ARN, also contains additional misleading teaser language, such as: **"I will pay interest at the yearly rate of 1.95%"** which the District Court pointed to in its decision. A9, SA3. The Court noted that the Adjustable Rate Rider (ARR) contained the same

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 1407149 (C.A.7)                                                                                  Page 7

misleading language. A9, SA8. The Court noted that the 1.95% was a teaser rate, and not the interest rate on the loan. A10. The borrower later discovers that *there is no year in which this "yearly rate of 1.95%" is even applicable.*

The District Court pointed out that both the ARN and the ARR misleadingly stated that in August 2004, the interest rate "may" change, rather than, as Defendant well knew, it would change in the second month of the loan without any underlying change in the index rate. A12, SA3, SA8.

Other documents in the record support the Court's determination. The 1st Monthly Statement Coupon the Andrews received also discloses the teaser **"Interest rate: 1.95%"** and a monthly payment of $701.21 in the first month of the loan, but it fails to show the fully amortized payment on the loan. SA15, R.29-4, R.30- 4.

The 2nd Monthly Statement Coupon for the first time shows the monthly adjustable rate, the rate increase from the teaser rate of 1.95% to 4.375% and the fully amortized payment. This was not mailed to the Andrews until two months after closing. (SA 16, R.29-5 and R.30-5).

The District Court found that the 1.95% rate was "a teaser rate and not the interest rate on the loan." A10. In fact, the interest rate on the Andrews loan increased to 4.375% by the second month of the loan. SA16. The Court found that programmed language also misleads the customer into believing that the variable feature of the loan did not take effect until after the first five years of the loan. Al 1. The Court also found that by placing the "5-year fixed" language immediately above the statement that the interest rate was 1.95%, the Defendant strengthened the

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS |
|---|---|
| 60 | 701.21 |
| 300 | 983.49 |

When read literally the borrower only has two payment dates, with multiple payments (60 and 300) due on those stated dates. The payment schedule is defective. The District Court so found. A5-8. The payment schedule further departs from TILA Model Form H-15, because it fails to show the range of payments, a payment at the

implication that the five year fixed language applied to the interest rate. A11-12.

The District Court also found that the reference to the 1.95 % rate caused the loan to appear more attractive than it actually was, and served no useful purpose. A13. The District Court refused to accept the Defendant's argument that this was "product tracking language."

The Defendant attempted to argue that the Andrews should be held to a sophisticated party standard. The District Court properly noted that the sufficiency of the disclosures is to be viewed from the standpoint of an ordinary consumer. A4. The Court did not have to rely solely on the Andrews testimony. Class member Louisa Cordova-Holmes is a tax accountant with a master's degree in taxation from Walsh College of Troy Michigan. R.31 at p.2. Expert Thomas Groble is a CPA with an MBA degree from the University of Illinois, and a Chief Financial Officer with a corporation. SA18-23, R.54 & R.33 Expert Mark Vandeventer has 18 years of experience in the mortgage industry. R.32 at p.2-3 These financially sophisticated parties were all fooled by Chevy Chase's documents. Groble's affidavit and report are reproduced at SA 18-23. Defendant, with all its resources, was unable to produce even one expert who could posit an innocent, non-misleading interpretation of these documents.

In addition to the above discussed TILA violations, the Court found that the payment schedule on the TILDS fails to accurately describe the payment due dates, a required disclosure. A5-8. Thus, the Andrews'

TILDS payment schedule literally calls for:

PAYMENTS ARE

DUE

BEGINNING

08/01/2004

08/10/2009

current rate and the maximum note rate, in months 61-360, when the minimum payment period ends. *Compare* SA1-2, with *Reg. Z Model Form H-15* at SA24, R.80-1.

Chevy Chase's documents are impossible to understand, but easy for a broker or loan closer to misrepresent.[FN3]

FN3. David Rehberg, the owner of the mortgage broker firm involved in the Andrews loan, admitted in his testimony that the Andrews' TILDS suggested a 1.95% interest rate for 5 years and that it failed to explain that the interest rate would change in the second month of the loan. (Rehberg Deposition) R.56 at p. 60-62. Under the federal Uniform Residential Loan Application form, a broker is the agent of the lender for underwriting.

**The TILA Violations are Not "Picky and Inconsequential"**

This TILDS has the effect of misleading the borrower into believing they have obtained a loan that is far different from the loan they actually obtained. The differences are real and significant. By February of 2006, the interest rate on the Andrews loan was 7.5%. R. 34-3, SA17. This is a 385% increase in the interest rate. By then, even though the borrowers made extra principal payments, the loan had negatively amortized to a point that the principal balance on the loan had risen from the original loan amount of $191,000.00 to $194,184.45. The annual interest on this balance at 1.95% is $3,787.00. The annual interest actually being imposed on the Andrews at 7.5% was $14,564.00. The annual difference is $10,777.00. This may be a picky and inconsequential amount to Chevy Chase, but it is certainly consequential to the Andrews.

**The Court Found that the Requirements for Class Certification Have Been Met**

There is no factual dispute that the Andrews' documents, discussed above, are typical and representative of those of the entire Class. Chevy Chase put forth no evidence to dispute this. Chevy Chase even admits that "its loan origination system was programmed to include ... In the upper right hand corner of the TILDS," the five year fixed and 1.95% language that the District Court found violated TILA. Defendant's Brief at pp. 7-8, Decision at A8-9.

The Court found Defendant's conduct toward the class was uniform, and presented common issues. A18. The Defendant's disclosures of the payment schedule, the cost of the loan as an annual percentage rate and the variable rate feature of the loan presented questions common to the class. A18. The Court rejected Defendant's argument that rescission was so personal and equitable a remedy that it would defeat commonalties, since the remedy was

to allow each class member to elect rescission, at which time Defendant would be entitled to exercise any right it had under the statute. A18. In other words, the common issues of establishing that the Defendant uniform loan documents contained material violations of TIL could be dealt with on a class wide basis. Allowing the class members the right to elect to exercise rescission allows the class members to make the personal choice to exercise, and preserves the Chevy Chase's right to raise defenses to the manner, form and procedure of electing rescission. A18. The Court found that typicality existed based upon its finding that "the plaintiffs' claims and those of the putative class arise out of the same documents and are based on the same legal theory." A19.

The Court certified the class under FRCP 23(b)(2), finding that the Defendant has contested the Plaintiffs' TILA claims, and that Defendant's arguments would be largely the same with respect to each class member. A21. The Court went on to find that a declaratory judgment would settle the issue of whether Defendant violated TILA, and if so, whether such violations gave rise to a right to rescind. A21.

SUMMARY OF THE ARGUMENT

This case presents an issue of first impression in this Court: Whether a District Court may certify a class seeking the individual opportunity to rescind for uniform TILA material disclosure defects? The District Court awarded the class members the right to rescind, at the option of the borrower, plus attorney's fees and costs. The plain language of TILA, the legislative history, and several District Court opinions agree with the decision of the District Court.

Section 1635(g) of *TILA* provides that **"In any action ...** in addition to rescission the court may award relief under section 1640 of this title ..." *15 U.S.C. § 1635(g).* Rescission is the primary relief provided in TILA. According to the text of § 1635(g), "Additional relief" is provided in § 1640. The text of § 1640(a)(3) clearly allows a court to award "*in any action* in which a person is determined to have a right of rescission under section 1635 of the title, the costs of the action, together with reasonable attorneys fees as determined by the court." *15 U.S.C. § 1640(a)(3)[Emphasis added].* While § 1640(a)(2)(A) &(B) limit certain "additional relief" remedies of *TILA* in "an individual action" and "a class action," the rescission remedy of § 1635(g) and the attorney's fees and costs remedy of § 1640(a)(3) are

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

available in "any action." Congress did not limit rescissions to an individual action in *§1635*. As the district court found, nothing in the text or legislative history of *TILA* prohibits the use of *FRCP 23* in class actions. A16, A28. The availability of class relief derives from *TILA's* express language allowing a court "in any action" to award "rescission," "costs" and "attorney's fees," along with the procedural rights afforded by *FRCP 23* and the *Declaratory Judgment Act, 28 U.S.C. §2201*.

Defendant, for the first time on appeal, asserts the relief sought will harm it and the lending industry. The plain language of *15 U.S.C. §1635* imposes strict liability on the creditor. Under the plain text of TILA, "resources of the creditor" are not to be considered when awarding either rescission under *§1635* or the award of actual damages under *§1640 (a)(1)*. Section*l635* simply does not permit the court to consider the "resources of the creditor" when considering rescission, whereas the court must consider the "resources of the creditor" when it is imposing statutory damages as an item of "Additional relief" under *§ 1640(a)(2)*.

Defendant does not cite the several district court opinions that agree with the District Court. Two Circuits have opined on the issue.

Although the First Circuit recently issued an opinion, *McKenna v. First Horizon Home Loan Corp., 475 F.3d 418 (1st Cir. 2007)* refusing the opportunity for rescission in a TILA class action, that decision abandons the plain language and the legislative history of TILA. In evaluating a *§1635* claim, *McKenna* mistakenly substitutes the term "individual action" as a limit on the rescission relief available in "any action" in *§1635(g)*. *McKenna* mistakenly superimposes the "resources of the creditor" analysis that is expressly reserved for statutory damages awards as "additional relief" under *§ 1640*. *McKenna* reflects the First Circuit's frustration over a plaintiff seeking to invalidate a class of mortgages for a minor, technical violation of *TILA* which the court might not have considered material.

The Fifth Circuit opinion on this issue, *James v. Home Const. Co. of Mobile, Inc., 621 F.2d 727 (5th Cir. 1980)*, issued in 1980, is different. James sought to rescind every loan in the class, rather than a declaratory judgment seeking the individual opportunity to rescind. James was issued in early 1980. *James* and its progeny cases never discuss the 1980 amendments to TILA, and specifically *§ 1635(g)* (adopted in 1980 and effective in 1982) which

plainly allows for "any action" to enforce the right of rescission. James and its progeny fail to discuss or acknowledge that *§ 1640(a)(3)* awards attorney's fees and costs upon rescission in "any action." *James* and its progeny do not take into account the proposed amendments to ban class actions for rescission that Congress rejected in 1995. Several months after the *James* decision was issued, the same panel of the Fifth Circuit approved a class action settlement awarding optional rescission and permitting an individual claimant to intervene to prove that she individually qualified for the optional remedy of rescission in a class action. *Tower v. Moss, 625 F.2d 1161(5th Cir. 1980)*. Thus, the *James* opinion was limited by the Fifth Circuit. *James* and *McKenna* do not bind the Seventh Circuit.

Unlike *McKenna,* the disclosure violations found by the District Court in this case caused real harm. Defendant misrepresented that their loans had a low fixed interest rate for five years- instead of only one month. Defendant's disclosures made it impossible for borrowers to understand the loans. TILA was enacted to combat deception. Rescission is designed to assure informed borrowing. Defendant's TILA disclosures misinform the class as to the true terms of the loans.

The plain language of TILA, the legislative history, and district court cases all support the decision of this District Court to certify a class action seeking a declaratory right of rescission. The District Court properly exercised its discretion in certifying a class of borrowers whose disclosure documents uniformly misrepresented material terms of the transaction, finding an optional right for class members to rescind their mortgages. Accordingly, this Court should affirm the District Court.[FN4]

> FN4. The only error of the District Court was its failure to additionally certify the class for statutory damages under *§ 1640(a)(2)(B)*.

### ARGUMENT

### I. DECLARATORY RELIEF PROVIDING THE OPPORTUNITY TO RESCIND IS AVAILABLE UNDER TILA

The District Court issued an order certifying a class with a right to rescind. The sole grounds upon which Defendant makes this appeal is **\*19** the false argument that the opportunity for individual rescission is not available as a means of relief in a TILA class action.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The plain meaning of the text of *TILA* and *FRCP 23* permit a declaratory judgment awarding individual rescission rights. Defendant contrives a legislative history that ignores the text of TILA and the actual Congressional amendments to the text of TILA, particularly the amendments that were adopted in 1980 and those that were rejected in 1995. The primary relief in TILA is rescission. TILA does not permit the court to deny *1635* rescission because of implied harm to the lender or the lending industry; those defenses are reserved for claims for under the "additional relief" provisions of TILA found in *§ 1640*. *Section 1635* imposes strict liability in rescission "in any action" when material disclosures are inadequate. Class actions are not excluded from the relief afforded in *§ 1635*

### A. TILA Does Not Prohibit *FRCP 23* Class Actions Seeking the Right of Rescission.

As explained by the cases cited by the District Court, *FRCP 23* allows class actions unless they are precluded by statute or agreement. A30. *FRCP 23* provides a vehicle for plaintiffs to bring class actions under TILA. Defendant dismisses several cases cited by the District **\*20** Court out of hand by stating each of those cases involved claims for damages and that litigating claims individually is consistent with TILA. As stated in *Wilcox v. Commerce Bank, 474 F.2d 336, 343-344 (10th Cir. 1973):*

"Apart from any inherent incongruity between the remedies provided by the Truth in Lending Act and *Rule 23, we agree that there is nothing in the Act itself, the Rule, or the notes of the Advisory Committee on Rules of Civil Procedure with respect to it which expressly or impliedly precludes class actions in this type of case. The legislative history of the Act throws scant light on the problem. To find any congressional intent to preclude at all events treatment of such cases under*Rule 23* would be a work of clairvoyance and not of construction or interpretation."

Similarly, the court in *Haynes v. Logan Furniture Mart, 503 F.2d 1161 (7th Cir. 1974),* (which relied on *Wilcox)* concluded that because TILA did not prohibit class actions, they are allowed under the Act. In the opinion, the Seventh Circuit specifically rejected the argument that Defendant makes here: that because TILA provides individual remedies to consumers, a class action is precluded:

"[t]he argument that the incentive for individual litigation precludes class action litigation assumes that the incentive

solely relates to consumer motivation to sue rather than to creditor compliance with the Act. To the contrary, the purpose of enacting the statutory minimum damage provision was as much to induce creditor compliance with the Act as to provide incentives for private litigants."

**\*21***Haynes, 503 F.2d at 1165*. Likewise, *in Goldman v. First Nat'l Bank, 532 F.2d 10, 16 (7th Cir. 1976)* the Seventh Circuit found it was an abuse of the trial court's discretion not to certify a class in a TILA case because the requirements of *FRCP 23* were met.

As explained by the District Court, *FRCP 23(b)(2)* permits class actions for declaratory or injunctive relief where "the party opposing the class has acted or refused to act on grounds generally applicable to the class." See: *Allen v. International Truck and Engine, 358 F.3d 469 (7th Cir. 2004)*(Judicial efficiency of having one action versus several hundred). Judges have significant flexibility to use the *FRCP 23(b)(2)* class mechanism to afford relief. *Allen,* like the present case, was a discretionary review under *FRCP 23(f)*. The district court refused to allow plaintiffs to represent a class in a *FRCP 23(b)(2)* Title VII employment discrimination case, due to the presence of individual claims for damages, finding that "issues common to the class as a whole are subordinate to the specific circumstances surrounding each individual Plaintiffs' [sic] claim for compensatory and punitive damages." *Id* at 471. This Court reversed, concluding that even where large value individual damages claims would present individual issues, the class issues were sufficient to certify "... a class proceeding for equitable relief vindicates **\*22** the Seventh Amendment as fully as do individual trials, is no more complex than individual trials, yet produces benefits compared with the one-person-at-a-time paradigm." *Id.* at 472. See also: *Berger v. Xerox Retirement Income Guar. Plan, 338 F.3d 755 (7th Cir. 2003)* (Employee benefit plan involving similar contracts and several hundred millions in relief); *Gratz v. Bollinger, 539 U.S. 244 (2003)*; *Bishop v. Gainer, 272 F.3d 1009 (7th Cir. 2001)*( Declaratory class relief - individual claims remain after judgment).

### 1. The Plain Language of TILA Does Not Prohibit Class Actions Seeking the Right of Rescission.

Seventh Circuit precedent and fundamental principles of statutory interpretation require this Court to look at the plain meaning of the text of the statute. A28-34. *In re Sinclair, 870 F.2d 1340, 1344 (7th Cir. 1989)* [the District Court quotes from this case extensively]; Norman J.

Singer, 2A *Sutherland Statutory Construction §46.1,* 6th ed. (2006) ("when the language of the statute is clear and not unreasonable or illogical in its operation, the court may not go outside the statute to give it a different meaning"). Where as here, there is no direct expression of an intent to ban TILA rescission from enforcement under *FRCP* 23 and the **\*23***Declaratory Judgment Act,* the prohibition cannot be inserted by the court. *28 U.S.C. §2201.* Indeed, the Seventh Circuit has made clear it is not the role of the Court to insert prohibitions in statutes that do not exist: "From the sidelines courts can observe and comment upon the legislative process. * * [W]e nevertheless cannot insert such language in a statute as if we had a vote in Congress. We only interpret the law." *Veprinsky v. Flour Daniel, Inc.,* 87 F.3d 881, 897 (7th Cir. 1996). Instead of following these core principles of construction, Defendant seeks to insert language into TILA and ignore the plain meaning.[FN5]

> FN5. Defendant (at p. 22) cites *United States v. Ron Pair Enters.,* 489 U.S. 235, 240-241 (1989) as authority for the proposition that the "plain meaning" of TILA is that rescission is not available for declaratory relief on a classwide basis. The case cited, however, is not a TILA case, but rather a bankruptcy case that simply states that a court should give a statute its plain meaning.

*15 U.S.C. § 1635.* Right of rescission as to certain transactions, provides in part:
"(a) Disclosure of obligor's right to rescind
Except as otherwise provided in this section, *in the case of any consumer credit transaction* (including opening or increasing the credit limit for an open end credit plan) in which a security interest, including any such interest arising by operation of law, is or will be retained or acquired in any property which is used as the principal dwelling of the person to whom credit is extended, *the obligor shall have the right to rescind the transaction ...*" [Emphasis added]

**\*24** TILA effectively deems all loans[FN6] subject to its provisions per se voidable. *See 15 U.S.C. § 1635(a).* If a creditor fails to make "the material disclosures required under this subchapter," the rescission period is extended to 3 years after consummation of the loan. *15 U.S.C. §§ 1635(a) & (f).* Rescission, as contemplated in the statute, is not a penalty; it is merely a "Return of money or property" of the debtor. See *15 U.S.C. 1635(b).* In essence, rescission disgorges the lender of wrongfully

collected profits where there has been a TILA material disclosure violation.

> FN6. Defendant did not argue prior to summary judgment that any loan in the class qualified for a statutory exceptions to rescission. After summary judgment, the District Court *sua sponte* indicated it will further narrow the class to eliminate exempt transactions, per § 1635(e).

*15 U.S.C. 1635(g),* which was adopted by Congress in the *Truth in Lending Simplification and Reform Act,* Pub. L. No. 96-221 (Adopted 3/31/1980, but effective 30 months later, as of 1982) clarifies that the rescission is available "in any action" and that the damages provisions of *15 U.S.C. § 1640* are "additional relief":
"*Additional relief. In any action* in which it is determined that a creditor has violated this section, *in addition to rescission the court may award relief under* section 1640 of this title for violations of this subchapter not relating to the right to rescind." [Emphasis added]

**\*25** Thus, it is apparent from the text of *15 U.S.C. §1635(g)* that the primary relief afforded by TILA is §1635 rescission and that *15 U.S.C. 1640* is supplementary or "additional relief." Congress also clarified, in the text of *§ 1635(g),* adopted in 1980, that "rescission" could be awarded "in any action." *Pub. L. No. 96-221.* Congress did not use the words "any individual action" in *§ 1635,* as Defendant contends. While Congress did use that language to limit and distinguish some of the additional relief that is elsewhere in TILA, the term "individual action" was conspicuously left out of *§ 1635(g).*

Defendant relies heavily on *§ 1640* to bootstrap the missing ban on class actions seeking the right to rescind. It is important to review *§1640,* to understand that Defendant is attempting to turn TILA upside down. Clearly, in *§ 1640,* Congress limits certain additional relief, capping statutory damages in "individual actions" at $2,000, and in "class actions" at $500,000. *§ 1640(a)(2)(A) & (B).* But in the same section, Congress goes on to say that costs and attorney fees are available in "any action" for rescission. *§ 1640(a)(3).* By choosing the limiting language in *§ 1640(a)(2),* but not placing it on "any action" for rescission in *§§1635(g)* Congress was clarifying that rescission is available in "any action," which would plainly include a class action.

**\*26** The District Court awarded attorneys fees and costs

to the class. The text of § 1640(a)(3), also adopted in 1980, clearly provides that:

"any creditor who fails to comply with any requirement imposed under this part, including any requirement under section 1635 of this title ... is liable to such person in an amount equal to the sum of ... in any action in which a person is determined to have a right of rescission under section 1635 of this title, the costs of the action, together with reasonable attorney fees as determined by the court."

Here again, it is important to point out that the Congress provides the costs and fees relief in "any action," and does not limit costs and fees to "an individual action," as it does for statutory damages immediately above in § 1640(a)(2)(A) and immediately below in the remainder of the text of §1640(a). The absence of a ban on rescission class actions in §1635 and § 1640(a)(3) does not suggest a ban on class actions. The plain language of those sections invites "any action" to enforce. "Any action" plainly includes a class action.

The right to a class action declaring rights comes from FRCP 23 and the Declaratory Judgment Act,28 U.S.C. §2201. Section 1640 simply limits "damages" for certain types of TILA damages, in both "class actions" and "an individual action." As the District Court pointed out, the absence of a ban is not a ban. A30-31. If Congress wanted to limit *27 rescissions to "an individual action," § 1635(g) and § 1640(a)(3) would not be worded so broadly to encompass "any action" for rescission. Congress, in its own words, plainly states that rescission is to be awarded "in any action."

There is no ambiguity whatsoever in § 1635(g) and § 1640(a)(3). The Defendant creates ambiguity where none exists and chastises the District Court for awarding the very relief that the TILA provides. Defendant attempts to take the plain limits on some of the "additional relief" provided in certain sub-parts of § 1640, and to apply those limits to the primary remedy of the statute, which is §1635 rescission. Rescission contains no such limits. Rescission is available in "any action." Likewise, § 1640(a)(3) clearly provides for an award of "fees" and "costs" ... in "any action" for rescission.

No words contained in the text of the Truth in Lending Act support the proposition that the TILA bars courts from certifying classes that seek the opportunity for rescission. Congress enacted TILA in 1968, and significantly amended it in 1974, 1980 and 1995. In no instance did Congress add any language limiting TILA

class actions seeking rescission.

*28 Although they are not mentioned in Defendant's brief, several district courts have reached the same decision as the Andrews' case. In re Ameriquest Mortgage Co. Mortgage Lending Practices Litigation, Case No. 05-CV-7097 (N.D. Ill. April 23, 2007). This case, citing the Andrews' opinion, finds declaratory right of rescission is appropriate when there is a uniform infirmity in loan disclosures, so long as the individual borrower is given the decision to rescind. See also: Latham v. Residential Loan Centers of America, Inc., No. 03C7094, 2004 WL 1093315, at *5 (N.D. Ill. May 6, 2004); Williams v. Empire Funding Corp., 183 F.R.D. 428, 436 (E.D. Pa. 1998); Hickey v. Great Western Mortgage Corp., 158 F.R.D. 603, 613 (N.D. Ill. 1994); Mount v. LaSalle Bank Lake View, 1994 WL 731006, at *9 (N.D. Ill. Mar. 31, 1994); In re Consolidated Non-Filing Ins. Fee Litigation, 195 F.R.D. 684, 694-5 (M.D. Ala. 2000). See e.g., cases cited in McKenna at 423. Several class actions have come from this circuit.[FN7]

> FN7. The First Circuit had several cases permitting the relief prior to the McKenna decision.

The District Court rejected the reasoning of the James and rejected McKenna because those cases employ a type of statutory construction that the Seventh Circuit expressly condemns. A28.

*29James, was an opinion issued by the Fifth Circuit before the effective date of 15 U.S.C. 1635(g) and 1640(a)(3). In view of the express language in §1635(g) and 1640(a)(3), James and its progeny[FN8] are weak precedent and should be narrowly interpreted to apply only to those cases where the relief sought is court imposed rescission for every loan in a class. The James opinion does not consider or discuss the then recently adopted text of 15 U.S.C. 1635(g) or 1640(a)(3), where Congress clarified that "rescission," "costs" and "attorney's fees" are available as remedies "in any action." Section 1635(g) and § 1640(a)(3) did not become effective until 1982 (See annotated history of § 1640, stating: "EFFECTIVE DATE OF 1980 AMENDMENT Amendment by Pub.L. 96-221 effective on expiration of two years and six months after Mar. 31, 1980"). Pub. L. No. 96-221. The delay in implementation of the 1980 *30 amendments may be the reason James did not discuss the text of those then new subsections.

FN8. The progeny of *James* all fail to follow the literal text of § 1635(g) and § 1640(a)(3) or to even discuss the subsequent Tower case. See: *LaLiberte v. Pacific Mercantile Bank,* 147 Cal.App.4th 1, (Cal. App. 2007), *Gibbons v. Interbank Funding Group, Inc.,* 208 F.R.D. 278 (N.D. Cal. 2002), and *Jefferson v. Security Pac. Fin. Sews., Inc.,* 161 F.R.D. 63 (N.D. Ill 1995); *Mayo v. Sears, Roebuck & Co.,* 148 F.R.D. 576 (S.D. Ohio 1993), all following the "individual remedy" analysis from *James*. The fact that TILA was uniformly violated does not impair the individual decision about whether to rescind. The District Court allows individual decisions, as TILA suggests.

*Nelson v. United Credit Plan, Inc.,* 77 F.R.D. 54 (E.D. La. 1978), predates 1980 TILA amendments, so it is abrogated.

*Johnson v. West Surburban Bank,* 225 F.3d 366 (3rd Cir 2000), involves a class action waiver in an arbitration clause. The Andrews' loan documents contain no such provision, so *Johnson* has nothing to do with this case.

The plaintiff in *James* sought to impose actual rescission upon the whole class rather than declaratory relief, which the District Court discusses. A32-33. *James* uses only two paragraphs on whether *TILA* allows class actions. The entire analysis of the case is quoted in Defendant's brief. *James* calls the rescission right something "which the creditor has with each individual obligor"[FN9] and thus a class action would contradict Congressional intent about "the nature of" a rescission action. The *James* analysis is based, then, entirely on the individual nature of the steps of the rescission process after rescission is requested - something that is not implicated in *Andrews* by granting declaratory relief. The Fifth Circuit did not otherwise engage in any analysis of the statutory text or legislative history. Critically, as discussed above, the *James* case does not discuss the 1980 amendments (effective in 1982) adding § 1635(g) and 1640(a)(3), wherein Congress expressly states that "rescission," "costs" and "attorney's fees" are available as awards in "any **\*31** action," and that the provisions of § 1640 are "additional relief." *See:* Pub. L. No. 96-221.

FN9. 15 U.S.C. 1635(a) provides borrowers the right to rescind. The creditor has no right to rescind.

Several months after *James,* the Fifth Circuit permitted a

class action settlement awarding optional rescission and it allowed an individual claimant to intervene for purposes of sorting out whether the class action rescission remedy was available for her individual rescission claim. *Tower v. Moss,* 625 F.2d 1161 (5th Cir. 1980). The Fifth Circuit also recognized in *Tower* that private enforcement of individual rescission rights was appropriate in a class action. Thus, the same panel of the Fifth Circuit provided a rescission remedy in a class action, because the district court had fashioned an order that allowed debtors to individually decide whether to rescind. Therefore, there is a critical difference between the *James* line of cases, which attempt to impose rescission on the entire class, and the *Tower* line of cases, which declare a right to rescind but preserve the individual decision for the debtor. The Fifth Circuit limited *James* in the *Tower* case. Both of these Fifth Circuit cases were issued in the same year as the 1980 TILA amendments, but neither one discusses the amended language.

The District Court in this case accommodated James and Tower by preserving the individual decision to rescind. *Tower* illustrates how **\*32** simple it will be to fashion a remedy in this case. Even *McKenna* acknowledges that "the mechanics of rescission are uncomplicated." *McKenna* at p. 424. Thus, the District Court's remedy will be relatively simple to implement. Perhaps that is why the Defendant submitted a proposed final judgment order to the District Court within a week after the District Court decision was issued. R.82.

The statutory authority conferred on courts to modify the rescission process makes this class action particularly appropriate. Following a declaration of the right to rescind, the Court can establish individual rescission procedures that will meet the needs of individual class members, while at the same time assist Defendant in recovering loan principal without an immediate loss of security interest. Optional TILA rescission will accommodate individual decisions by borrowers and Defendant can assert individual defenses.

Nowhere does the language of TILA contain any words indicating that rescission is a "personal remedy." At page 16 of its brief, the Defendant cites *James* for the proposition that rescission is a "purely personal remedy." The *James* court created this doctrine to explain its refusal to *impose* a rescission on absent class members. The *James* Court's decision that rescission is a "purely personal remedy" is a judicial **\*33** doctrine. *James* at pp. 730-31 (5th Cir. 1980). Footnote 6 of the *James* decision

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

contains the text of then § 1635(b) of TILA, which stated that a creditor has 10 days after receipt of a notice of rescission to return money and property wrongfully received, and to effect a cancellation of the wrongfully obtained security interest. How does it follow from this language that this "purely personal remedy" cannot be accommodated through a declaratory judgment in a class action? In fact, the 5th Circuit did just that in *Tower*. The District Court in the present case issued declaratory relief that Defendant's standardized documents violate the requirements of TILA, that it will give proper notice to the class, and each class member will make their own individual decision as to whether to opt for rescission. The fact that a creditor is given time in which to respond to such a notice does not speak in any way to the availability of class relief. The *James* progeny ignore *Tower* and overplay a judicial limit.[FN10] The District Court here fashioned a remedy, declaring the **\*34** individual right to rescind consistent with *Tower*, yet preserves the individual decision making discussed in *James*.

> FN10. Defendant cites *Murray v. America's Mortgage Banc, Inc.,* No. 0C5811, 03C6186, 2005 WL 1323364 (unpublished) (N.D. Ill. 2005). Murray finds that the class meets all of the FRCP 23 requirements for purposes of liability, damages, costs, and fees. Plaintiffs sought rescission class certification under FRCP 23(b)(3) - which the District Court found to be problematic (at p. 11) because FRCP 23(b)(2) is the provision that provides for declaratory relief for a class. *Murray* concludes that the class should not be certified, citing concerns (at p. 11) that plaintiffs sought to impose actual rescission for the class rather than a declaration that individuals had a right to rescind. This is the same defect the Fifth Circuit found in *James*. These concerns are resolved in the *Andrews'* declaratory relief order preserving a personal decision to rescind.

*McKenna* admits that the decision is not based upon the text of the statute when it states at footnote 3:
"We add, moreover, that *even though it is not memorialized in the text of the statute,* we find an express congressional intent to exempt rescission actions from class treatment in the TILA's structure and its legislative history." [Emphasis added]

The District Court explicitly outlined its reasoning for

rejecting *McKenna* and points out many of the faults in the First Circuit's logic which will not be repeated here. A28-33. The *McKenna* court misses the point in its rejection of *Califano v. Yamasaki, 442 U.S. 682* (1979) See: *McKenna* at p. 423. It is clear that the TILA rescission right was enforced through federal class action litigation when the *Rodash* based amendments were made in 1995. See: *Tower*. "In the absence of a *direct expression* by Congress of its intent to depart from the usual course of trying "all suits of a civil nature" under the Rules established for that purpose, class relief is appropriate in civil actions brought in federal court." *Califano v. Yamisaki,* 442 U.S. 682, 700 (1979). *See also* Norman J. Singer, 2A *Sutherland Statutory Construction §45.12,* 6th ed. (2006) ("Courts should not presume that the legislature in the enactment of a statute intends to **\*35** overthrow long-established principles of law unless that intention is made clearly to appear either by express declaration or by necessary implication.")

*McKenna* apparently reflects the First Circuit's frustration over a plaintiff seeking to invalidate a class of mortgages for a minor, technical violation of *TILA*. The same outcome could have been reached if the First Circuit had simply stated that the violation was not a "material disclosure" violation under §1635. In evaluating a §1635 claim, *McKenna* mistakenly adopts analysis reserved for §1640 claims. The fact that "TILA already provides significant incentives for creditors" *(McKenna* at 426) reflects a bias in favor of the lender, whereby the court creates a class action ban that does not appear §1635. It is for Congress, not the courts to decide that there are too many remedies in TILA. In *McKenna,* the Court guts the primary relief afforded by TILA, which is rescission in "any action," and limits the consumer to merely the "additional relief" remedies in TILA.[FN11]

> FN11. Defendant cites *Brown v. Payday Check Advance,* 202 F.3d 987, 911(7th Cir. 2000). *Brown* was a § 1640 "additional relief" case. Brown did not even consider rescission under § 1635. In *Brown,* the court limited § 1640 additional relief per the limiting language of § 1640(a). In contrast, § 1635 permits "any action" for rescission Indeed, if Congress wanted to prevent rescission class actions, it could have done so by including a provision precluding them (i.e., "whether Congress should have included ... [a ban on class actions seeking rescission] ... or would have done so had it thought more fully, does not affect interpretation

of the law it actually enacted"). See: *Brown, 202 F.3d at 992*.

**\*36** "Rescission," "costs" and "attorney's fees" are available as remedies "in any action." *15 U.S.C. § 1635(g)* and *§ 1640(a)(3)*. Those provisions have never been limited. Defendant does not even discuss or mention *1635(g)* or *§ 1640(a)(3)* in its analysis. The plain language of *§ 1635* is clear. Rescission is available in "any action," so long as the borrower's right to elect the remedy is preserved. This Court need go no further in affirming the correct opinion of the District Court.

### B. The Plain Language of *15 U.S.C. §1635* Does Not Allow the Court to Deny Rescission Based Upon Perceived Harm to the Lender or Industry

For the first time on appeal, Defendant argues that both it and the lending industry will suffer substantial harm if the District Court is affirmed. There is no evidence to support this in the record.[FN12] The plain language of TILA does not provide for such an exception to *§1635* rescission. The Defendant failed to assert this in the District Court before the class was certified and summary judgment was granted.

> FN12. A 4/20/2007 10-Q filing of the bank's parent company, B.F. Saul Real Estate Investment Trust, at www.sec.gov, merely says affirming could affect the bank's "income."

### **\*371. 15 U.S.C. §1635 Does Not Contain Any Exception for Harm to the Lender or Harm to the Industry

The plain language of *15 U.S.C. §1635* imposes strict liability for rescission on the lender. It contains no language permitting the court to except the rescission remedy based upon a perceived harm to the lender or the lending industry. Defendant is erroneously attempting to superimpose onto *§1635* the "... resources of the creditor" language that limits some of the *§1640(a)* "Additional relief." Compare: *15 U.S.C. §1635 (g); 15 U.S.C. §1640(a)*. *McKennaa* at p. 424 erroneously denies relief because of the "vast recoveries" that could exist under *§1635* as perceived punishment to lenders. *Gibbons v. Interbank Funding Group, Inc., 208 F.R.D. 278 (N.D. Cal. 2002)* also refuses to allow rescission because it wants to protect the lender from the financial burdens of rescission. These cases create exceptions to rescission that do not appear in *§1635*.

TILA rescission is merely a return of the debtor's property; it imposes no penalty. Defendant and the *McKenna* line of cases fail to admit that TILA rescission, by its literal terms, is not punitive, it is a "return of money or property" of the debtor. *15 U.S.C. 1635(b)*. Rescission is the borrower's right to walk away from a deal for the **\*38** lender's failure to disclose honest information. Rescission returns plaintiffs to where they were prior to the Defendant's wrong, as much as possible, and it disgorges the Defendant of a wrongfully obtained profit. *See e.g., FDIC v. Hughes*, 684 F. Supp. 616 (D. Minn. 1998).

TILA's only punishment for the lender is statutory damages, which Congress did limit to $500,000 in a class action per *15 U.S.C. 1640(a)(2)(B)*. Congress, in *15 U.S.C. 1640(a)*, proscribes that the court consider "... the resources of the creditor ..." before imposing statutory damages. Critically, there is no equivalent provision granting the court authority to take such considerations into account when considering rescission. *15 U.S.C. §1635*. The plain language of *§1635* dictates that the court provide strict liability rescission in "any action" where the material disclosures have not been given.

### 2. There is No Record of Any Harm to Defendant or the Industry

Apparently, Defendant hopes that the Court will infer harm without any proof. There is no record of harm to the Defendant or the industry in this record. Defendant had 2 years of "due process" in the District Court. At no time did they make a record that rescissions would cause Defendant or the industry any harm at all. This is not the type of **\*39** defense that may be properly raised on appeal or by amici. Of course, the class is unable to attack Defendant's exaggeration because there is no record to respond to. This is a sideshow unsupported by any record.[FN13]

> FN13. In this case, we have about 7,000 loans. If each of them involves similar damages to the Andrews, the relief would be valued at approximately $30,000 per loan, perhaps $210 million in total returned profits if every class member elects rescission. That is not 'billions.'

### 3. The Harm Suggested is Overblown

The potential liability is also overstated. Defendant does not experience a loss of principal in rescission, only the return of property wrongfully received from the customer.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Defendant asks the Court to infer catastrophic harm to itself, and the lending industry, in the event that the Court affirms the District Court. The rescission relief here is limited to those class members who exercise rescission. They will repay all principal to Chevy Chase. There is no windfall. In fact, many class members might decline rescission because market rates have risen. Refinancings are not as attractive as they were 2 years ago. The remedy is hardly unfair or disproportionate. If Defendant had to restore class members to their former loans, it might be a lot more expensive than rescission. Defendant also fails to discuss the incredible difficulty of an individual borrower challenging the legal resources of a large lender who **\*40** holds a lien on their house. One consequence of doing business in a dishonest manner is the possibility that a lender might have to refund income not lawfully collected.

It is misleading to say that billions are at issue, as though lenders will lose principal. Defendant and the amici refer to Congressional Reports involving proposed legislation that died on the vine. Defendant intentionally offered an odd loan product with sneaky disclosures. The remedy corresponds to the Defendant's conduct.

### C. Congress Did Not Intend to Prohibit Class Actions.

Defendant and its industry amici misrepresent the legislative record in the hopes of getting the Court to adopt a ban on class actions that is missing in the plain language of _§ 1635._

#### 1. Courts Cannot Use Legislative History to Rewrite Statutes

This Court cannot insert a ban on class actions into the text of _§ 1635._ Binding precedent prohibits "imaginative reconstruction- the idea that a court may implement what it is sure the legislature would have done (had it faced the question explicitly) rather than what the legislature actually did. The Supreme Court has rejected that approach **\*41** as democratically illegitimate, for it sets up the judiciary as the effective lawmakers." _U.S. v. Logan, 453 F.3d 804, 808 (7th Cir. 2006)._ "Congress makes legal rules through statutes rather than pure 'intent' demonstrated by statements in committee reports or on the floor." _Wernsing v. Dept. of Human Services, 427 F.3d 466, 469 (7th Cir. 2005)._ The District Court refused to insert a ban by this method. A31-33.

#### 2. TILA's Legislative History Supports the Relief

### Granted by The District Court

Even when _TILA's_ legislative record is considered, it supports the Plaintiffs' position. The legislative history of TILA does not support a ban on class actions for rescissions, although Congress did consider and reject such limits.

The District Court addresses TILA legislative history prior to 1980, when Congress clarified that "rescission," "costs" and "attorney's fees were available "in any action." A28-30; _15 U.S.C. §§ 1635(g) and 1640(a)(3)._ One commentator stated the following after the 1980 amendments: "An early argument was made that the right of rescission and damages for disclosure violations were incompatible, since the basis for imposing disclosure liability disappeared when the consumer rescinded the transaction upon which it depended. **\*42** Whatever logic the argument may have had, the weight of authority soon was to the contrary. The statute itself now expressly codifies that rule."

Rohner, The _Law of Truth in Lending,_ Para. 8.03[2][b], at 8-36 (1984).

In 1994, the 11th Circuit ruled in _Rodash v. AIB Mortgage Co., 16 F.3d 1142 (11th Cir. 1994),_ that homeowners could rescind mortgages where there have been material non-disclosures under TILA. After this opinion was issued, Congress recognized that hundreds of Class actions seeking rescission were being filed.

In response to Rodash, the lending lobbyists petitioned the 104th Congress for relief in 1995. Rep. McCollum of Florida introduced, and the House passed H.R.1380, a temporary moratorium on certain class action lawsuits, until Oct. 1, 1995. See: _Public Law_ 104-12. The 14th Congress then considered legislation that would address the class action issue permanently. See: _Congressional Quarterly,_ April 9, 1995. Rep. McCollum introduced H.R. 1858 to radically overhaul TILA and prevent class actions, requiring, among things, proof of individual reliance to make TILA rescission claims. _H.R. 1858_ would have prevented class actions under TILA. There were several disputes over the text of the law and _H.R. 1858_ eventually died in committee. See: **\*43**_Congressional Quarterly,_ June 24, 1995; Congressional Quarterly Almanac, 1995, p. 2-89.

Eventually, a compromise, _H.R. 2399,_ was negotiated

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

with the cooperation of the Clinton administration and Congress. See: *Congressional Quarterly,* September 30, 1995. During the compromise proceedings, Senator D'Amato commented: "The *Rodash* case produced an onslaught of over 50 class action suits. There [were] dozens of *Rodash*-styled class action suits pending." Sen. D'Amato also stated that the majority of these suits demanded "rescission." *141 Cong. Rec. S14566-03.* These statements reflect Congress' unmistakable awareness that there were several class action rescission cases pending following *Rodash.*

*H.R. 2399,* which became Public Law 104-29 on September 30, 1995, increased the tolerance for mistakes in disclosures of certain finance charges, but left open TILA's broad allowance of a rescission remedy and provided no ban upon class actions seeking declaratory rescission rights. The plain text of *15 U.S.C. §1635(g)* and *§ 1640(a)(3)* were not altered.

*McKenna,* cites the floor arguments of Sen. D'Amato about the compromise amendments to TILA that were passed in 1995. The **\*44** language of TILA said absolutely nothing about eliminating class actions for rescission. See: *McKenna at pp. 424-5.* If Congress had wanted to ban class actions in the rescission context, it could have. The First Circuit either ignored, missed, or failed to acknowledge most of the *Congressional Record.* For example, Senator Paul Sarbannes stated the following when the bill was passed in the Senate:
"The bill before the Senate today improves significantly the measure passed by the House Banking Committee. Under the original House bill, consumers would have lost the right of rescission for a whole class of loans even if the most egregious violations of the Truth in Lending Act were committed. The bill before the Senate preserves that vital consumer protection."

141 Cong. Rec. S14566-8, 9/28/1995 (Senate)

Rep. Gonzalez, in speaking in support of the bill, stated:
"Second, I want to emphasize that this bill is a compromise. It is not a perfect product, but it does address a legitimate concern of the mortgage banking industry about the Truth in Lending Act. In crafting this legislation, pains were taken to ensure that important consumer safeguards were not dismantled. The right of rescission is an extraordinary right that TILA provides for consumers to safeguard their homes. I am pleased that this right was largely preserved and that the consumer will be able to rescind loans where the lender has made an

egregious error or in particular circumstances against foreclosure."

Likewise, Republican Rep. Marge Roukema stated the following in support of the bill:
**\*45** "This legislation that we are considering here today addresses the Rodash problem by exempting a number of charges from inclusion in the finance charge and provides a tiered tolerance approach on finance charge miscalculations. The bill does not extend any exemptions from the right of rescission."

141 Cong. Rec. H9513-H9516, 9/27/95 (House, Gonzalez & Roukema).

In their 82nd *Annual Report to Congress,* the Board of Governors of the Federal Reserve System described the 1995 changes as follows:
The Truth in Lending Act Amendments of 1995 (TILA), Public Law 104-9, was enacted on September 30, 1995. TILA is intended to address concerns of mortgage lenders arising out of a 1994 court decision, *Rodash v. AIB Mortgage Co.,* 16 F.3d 1142 (11th Cir. 1994). In Rodash the U.S. Court of Appeals ruled that in connection with a mortgage refinancing, the creditor incorrectly disclosed $22 in courier fees and a state intangibles tax of approximately $200, with the result that both the finance charge and the annual percentage rate were understated. Because of these and other errors, the consumer was permitted to rescind the loan and recover all fees and finance charges that had been paid. A number of class action lawsuits filed subsequent to *Rodash* alleged violations for the failure to disclose certain fees as finance charges and sought the remedy of rescission for thousands of loans. Many of these lawsuits were put on hold in May 1995, when the Congress enacted a temporary moratorium on such litigation. The moratorium expired October 1, 1995, and has now been replaced by the TILA amendments. Those lawsuits will now proceed under the new law, which limits the lenders' liability. TILA limits lender liability for mortgage transactions consummated before September 30, 1995, except where borrowers sought to assert their legal rights before the dates specified in the act. For these transactions, creditors will have no civil, administrative, or criminal liability and borrowers will have no right to rescind their loans based on an inaccurate finance charge disclosure if the lender understated the finance charge by $200 or less or if the lender overstated the actual finance charge. In addition, for purposes of the borrower's right to rescind a mortgage loan, the disclosed finance charge will be considered **\*46**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

accurate if it did not vary from the actual charge by more than 1 percent of the amount of credit extended for most refinancings in which no new money is advanced (or by more than 1.2 percent for other rescindable mortgage loans). The act is intended to prevent litigation concerning future mortgage loans that involve relatively minor disclosure violations and creates a separate set of tolerance rules for new loans secured by real property or dwellings. For these transactions, the act considers the disclosed finance charge to be accurate and absolves lenders from any type of liability if the disclosed amount is understated by $100 or less or if it is overstated. Borrowers who can establish a violation of the Truth in Lending Act under the new tolerance levels may, however, receive larger damage awards under the new law.

*82nd Annual Report to Congress of the Federal Reserve Board,* dated 1995, pp. 227-8.

Later, after studying the issue for 6 months as ordered by Congress, the Federal Reserve declined to pursue a ban on TILA class actions for rescission. See: *Board of Governors of the Federal Reserve System, Report to the Congress Finance Charges for Consumer Credit under the Truth in Lending Act,* April 1996, pp. 12-14. As stated by one commentator, "The banking lobby's desire to win a sweeping rollback of bank regulations and pro-consumer laws had died long ago, as the White House had made clear it would veto any such effort and Senate Democrats vowed to kill it." See: *Congressional Quarterly,* Sept. 28, **\*47** 1996.[FN14] Congress explicitly considered *Rodash* and a ban on class actions seeking rescission. Likewise, the Federal Reserve considered the issue of *Rodash* class actions for rescission. Congress, in the end, declined to remove the remedy of rescission from TILA class actions. Rescission is thus available "in any action," as *15 U.S.C. § 1635(g)* so clearly states, and has stated since that provision was adopted in 1980. Pub. L. No. 96-221. No ban on the rescission remedy in class actions can be found anywhere in the text of TILA. McKenna admits that. McKenna at p. 426, n. 3. McKenna also defers to the industry amici brief more than is the tradition in this Court.15

> FN14. Congress is well aware of its ability to ban class action lawsuits. See: *Legal Services Corporation v. Velazquez,* 531 U.S. 533 (2001). It chose not to do so in TILA.

> FN15. *McKenna* begins its analysis by thanking

the amici for their input, stating: "The amici, whose assistance we appreciate, have filed an erudite brief in support of this claim. We start there." *McKenna* at page 422.

The legislative history overwhelmingly agrees with the decision of the District Court.

## 48II. DECLARATORY RELIEF IS AVAILABLE UNDER THE TRUTH IN LENDING ACT

### A. Federal Court Authority is Contrary to Defendant's Position, Allowing TILA Class Actions for Declaratory Judgment

In making a sweeping assertion that TILA does not provide for injunctive or declaratory relief, Defendant fails to mention controlling authority, which is the express text of §1635(g) and §1640(a)(3). Likewise, *McKenna* "strains credulity" by adding an additional limit to a statute which has been extensively amended, when no express limit on class actions is stated in *§1635. McKenna* at pp. 424, 426, n.3. "Any action" is contemplated by *§1635(g) and §1640(a)(3).*

Defendant cites no case where courts have found TILA does not provide declaratory relief and points to no language in TILA to show that Congress intended to limit declaratory or injunctive relief. See: *NCLC Truth in Lending § 8.4* (5th ed. & Supp.)(Cases holding that declaratory and injunctive relief is available under TILA); In re Consolidated Non-Filing Ins. Fee Litigation, 195 F.R.D. 684, 694-5 (M.D. Ala. 2000); *Welmakerv. W.T. Grant Co.,* 365 F.Supp. 531, 545 (N.D. Ga. 1972).

Here, the declaratory judgment serves both the defendant and the plaintiffs by avoiding further accrual of damages. If these are **\*49** rescindable mortgages, those who so choose should all take steps to rescind them in a timely fashion to prevent further harm to all involved.

Rescission is more amenable to class treatment and declaratory relief than statutory damages claims. Adequacy concerns raised by the cap on statutory damages are not a problem with availability of rescission for all class members. Class liability permits judicial efficiency. Individuals can still choose what action to take and individual defenses are preserved. No insurmountable disputes should arise if the class is properly defined only to include those persons eligible to rescind. If there is an

expectation that disputes will arise, they can be dealt with by a resolution process as was done by the Fifth Circuit in *Tower.*

Defendant's brief fails to address or answer a significant question. Namely, what possible good is served by requiring each and every borrower under a uniform loan program to file an action in Federal court to prove that the language in their TILDS, identical in every single material respect to that of the Andrews, violates TILA? There is no proper advancement of the administration of justice. It merely allows the Defendant to evade legal responsibility by tying the borrowers up in court for years. In the present case, the Andrews spent 2 years, involving substantial attorney efforts and the hiring of 2 expert witnesses, in **50** obtaining a summary judgment determination on the merits regarding clearly misleading documents. How many borrowers have the resources and wherewithal to undertake such an effort? Effectively, a decision to prohibit a class remedy could mean that there is no remedy at all. The task of suing a bank in federal court is beyond the means of most borrowers. The Class members should receive the benefits of the *Andrews'* decision.

To carve out this special exception to declaratory judgment in the name of providing a consumer a more "personal remedy" is not a truthful analysis of the situation. The order of the District Court clearly preserves the personal decision to rescind. The Declaratory judgment of the District Court follows the precedent of the Seventh Circuit for declaratory judgments. Therefore, the class certification order should be affirmed.

**\*51B. Defendant's Attempt to Show TILA Bans Class Actions by Analogy Fails**

At pp. 21-22 Defendant argues that courts construing *Fair Debt Collection Practices Act,*15 U.S.C. 1692, and *Fair Credit Reporting Act,*15 U.S.C. 1681, have refused to allow litigants declaratory relief not specified in the statute. Defendant overstates and bends the authorities involving statutes that provide money damages as the sole remedy. See: *Crawford v. Equifax Payment Servs., Inc.,* 201 F.3d 877, 882 (7th Cir. 2000); *Weiss v. Regal Collections,* 385 F.3d 337, 341 n.7 (3rd Cir. 2004); and *Washington v. CSC Credit Services, Inc.,* 199 F.3d 263, 268 (5th Cir. 2000). Also, as noted by the decisions, there is not unanimity that these statutes do not allow declaratory relief.

Under TILA, § 1635, the primary statutory relief is the equitable right of rescission, and it serves a different purpose.

As noted in *Washington,* the default position is that federal courts have the right to issue injunctive and declaratory relief absent "'clear and unambiguous'" Congressional intent to the contrary. *Washington* at 268.

Defendant (at p. 32) makes an argument that "declaring a right to rescind on the part of borrowers who have no wish to rescind amounts to an impermissible 'advisory opinion.'" Other than the TILA rescission **52** cases, the cases are inapposite.[FN16] TILA was violated for all class members so clearly there is a case and controversy. The declaration of class members rights and notification of the class informs them of the violation and their option; it is up to them to act upon it or not as they choose. This does not destroy *Article III* standing, but is simply an efficient method for resolving a common dispute anticipated by FRCP 23.

> FN16. In *Highsmith v. Chrysler Credit Corp.,* 18 F.3d 434 (7th Cir. 1994), representative plaintiff did not have standing to seek declaratory relief because he did not want to terminate his agreement. He could not seek declaratory relief for the class that he was not pursuing for himself. In *Paton v. County of Kane,* 308 F.3d 673, 680 (7th Cir. 2002), the court, which speaks favorably of class treatment, remands for class certification to be reconsidered. The thorny issue was whether the class representative was appropriate. In *Swain v. Brinegar,* a case challenging the construction of a highway, 517 F.2d 766, 780 (7th Cir. 1975) plaintiffs sought class certification for a class that encompassed persons for whom no relief was sought in the complaint.

A better rescission analogy is Federal securities law. Federal courts have traditionally allowed class actions for rescission in financial matters. This is the primary mechanism under which the securities laws are enforced. See, for example: *J.I. Case v. Borak,* 377 U.S. 426 (1964); *Tcherepnin v. Franz,* 461 F.2d 544 (7th Cir. 1972); *Tcherepnin v. Franz,* 389 U.S. 332 (1967). Rescissions are allowed in securities class action cases in the Seventh Circuit and nationwide. The issue here is what a reasonable person was entitled to have disclosed by the defendant under TILA, which, if deficient, allows

for rescission. See: **53**_In re Metlife Demutualization Litigation,_ 156 F. Supp.2d 254 (E.D.N.Y. 2001) (Rescission action involving securities non-disclosures).

The opportunity for rescission of a financial transaction is appropriate for classwide declaratory relief. Lenders are not entitled to a judicially created special protection from a declaratory judgment finding uniform disclosures and the opportunity to rescind in a _FRCP 23_ class action.

### III. JUDICIAL EFFICIENCY COMPELS A CLASS RESOLUTION

As the District Court found, Defendant issued uniformly misrepresenting loan documents to 7,000 loan customers. Does the Court want thousands of duplicate, individual cases involving the same defects, or one simple case that cleans up the problems caused by one noncompliant lender? For those who sue, the Courts will be entertaining duplicated defenses by the same few lenders who, time and again defy TILA. What purpose is served by multiple individual cases? Is it delay or intimidation? Banning class actions will prevent many people from asserting their rights. It also punishes the lenders who comply with the law by causing honest lenders to lose business to

**54** dishonest lenders, thereby letting the noncompliant lenders escape their TILA obligations without any recourse. The Andrews had a fixed rate loan at 5.75% from a local bank. After they were bamboozled by Defendant, they got a variable rate far exceeding that and far exceeding the teaser rate suggested by Defendant.[FN17] The Andrews paid closing costs and were subjected to a 3% prepayment penalty. Does the Court honestly want to see more deceptive loan documents and more dishonest lenders evading TILA, individually, case by case, at the expense of honest lenders and unwary borrowers? Most lenders comply with TILA. The bad apples in the industry should not receive special protection from the courts. If _McKenna_ is followed by the Seventh Circuit, it will lead to lender non-compliance. The Court should decline this invitation to require individual lawsuits, involving one lender's uniformly misleading documentation loan documents.

> FN17. Defendant is a notoriously bad player in lending. In 1994, Defendant signed a consent decree with the United States for refusing to lend to African-Americans. See: _United States v. Chevy Chase Federal Savings Bank et al.,_ No. 1:94- CV-01829-JLG (D.D.C. 1994) (Decree

involving pattern and practice of refusal to lend to African-Americans in violation of the Fair Housing Act). Later, Defendant put illegal amendments in its credit card agreements and then moved its home office from Maryland to Virginia in an unsuccessful stunt to impose the illegal amendments on customers. _Wells v. Chevy Chase Bank,_ 377 Md. 197 (2003).

### **55**IV. DEFENDANT IS NOT ENTITLED TO EXPANDED REVIEW OF THE FINDING THAT THE CLASS MET THE REQUIREMENTS OF RULE 23, BECAUSE IT WAS NOT REQUESTED IN THE PETITION

Defendant asks the Court to expand review to the issue of whether the court abused its discretion in considering the general Rule 23 factors in certifying the class. Based on this Court's recent decision _In re: Household International Tax Reduction Plan,_ 441 F.3d 500, 501 (7th Cir. 2006), the question before the court is limited to that presented by the defendant in its Petition: "Whether a class bringing claims under the Truth in Lending Act may be certified to seek rescission." Petition, p. 1.

The District Court certified under _Fed.R.Civ.P. 23(b)(2),_ which does not require Plaintiffs to establish Predominance or Superiority as required by _Rule 23(b)(3),_ A17-A21. Defendant apparently now argues not only that both must be proven, but predominance and superiority must exist at every phase of the resolution of relief to the class members. The commonality found by the District Court will not overcome any individual aspect of relief. Defendant seeks a standard that all of the class members have cases which are absolutely identical from beginning to end. This is contrary to established class action law. _See Allen v. International Truck and Engine Corporation,_ 358 F.3d 469 (7th Cir. 2004). **56** ("a class proceeding for equitable relief vindicates the Seventh Amendment as fully as do individual trials, is no more complex than individual trials, yet produces benefits compared with the one-person-at-a-time paradigm." _Id._ at 472.)

The claims all involves the same forms, which Defendant admitted were produced by a computer program and designed to contain identical language. As has been noted on several occasions, "claims arising out of form contracts are particularly appropriate for class action treatment." Cobb v. Monarch Finance Corp., 913 F. Supp. 1164, 1170 (N.D.Ill. 1995); _Haroco, Inc. v. American Nat'l. Bank & Trust Co.,_ 121 F.R.D. 664, 669 (N.D.Ill. 1988) (Noting that claims arising out of a standard form

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

presents a "classic case for treatment as class action").

### V. IF ADDITIONAL REVIEW IS GRANTED, THE DISTRICT COURT ERRED WHEN IT FAILED TO CERTIFY A CLASS FOR STATUTORY DAMAGES UNDER §1640(2)

If the Court is going to expand the scope of review, as requested by the Defendant, it should consider one additional issue. The District Court erred when it failed to certify the class for "Additional relief" under *15 U.S.C.§1640(a)(2)*. According to *15 U.S.C. §1638*, Defendant was **57** required to disclose "(4) The finance charge expressed as an "annual percentage rate," using that term ..." and (6) The ... due dates or period of payments scheduled to repay the total of payments." The District Court found that the APR was misrepresented (A9-11, A12-13) and that the interval and due dates of payments in the payment schedule were missing (A5-8). According to 15 U.S.C. §1640(a), "... a creditor shall have a liability determined under paragraph (2) only for failing to comply with the requirements of section 1635 of this title ... or of paragraph (4) ... (6) ... " The District Court found that the annual percentage rate was misrepresented, as was the payment schedule. The class should have been certified for consideration of a $500,000 "additional relief" award against the Defendant under *15 U.S.C. § 1640(a)(2)(B)*. Defendant offered literally no evidence that it should not pay the "additional relief." Even though the size of the recovery is relatively small in relation to the size of the class, statutory damages is the punishment given by Congress for two of Defendant's violations. It was clear error for the District court to deny statutory damages. Therefore, if additional review is granted, Plaintiffs' hereby request that the class be certified on the basis of that provision as well, as plaintiffs demanded in the District Court.

### 58CONCLUSION AND RELIEF SOUGHT

Plaintiff-Appellees request that the Court affirm the order certifying the Class.

SUSAN and Bryan Andrews and a class of persons similarly situated., Plaintiffs-Appellees, v. CHEVY CHASE BANK, F.S.B., Defendant-Appellant.
2007 WL 1407149 (C.A.7)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

For Dockets See 07-1326

United States Court of Appeals,Seventh Circuit.
Susan and Bryan Andrews and a class of persons
similarly situated, Plaintiffs-Appellees,
v.
CHEVY CHASE BANK, F.S.B., Defendant-
Appellant.
No. **07-1326**.
April 4, 2007.

Appeal from the United States District Court for the
Eastern District of Wisconsin No. 05-C-0454-LA
Hon. Lynn Adelman

Brief of Financial Services Amici Curiae In Support
of Defendant-Appellant Chevy Chase Bank, F.S.B.
And Reversal

Alan S. Kaplinsky, Jeremy T. Rosenblum, Martin C.
Bryce, Jr., Ballard Spahr Andrews &, Ingersoll, LLP,
1735 Market Street, 51st Floor, Philadelphia, PA
19103, Attorneys for Financial Services Amici,
Curiae.

**\*i TABLE OF CONTENTS**

INTEREST OF AMICI CURIAE ... 1

SUMMARY OF ARGUMENT ... 3

ARGUMENT ... 5

 A. Congress Has Repeatedly Expressed Its Concern
About Undue TILA Liability For Violations That
Give Rise To No Actual Damages ... 5

 B. The Prospect Of Excessive Rescission Liability
For Technical TILA Violations Is Of Constitutional
Dimension. ... 9

 1. The Due Process Clause Imposes Limits on
Statutory Remedies. ... 10

 2. The Due Process Problems Resulting From
Certification Of A Rescission Class Cannot Readily
Be Fixed. ... 13

 3. TILA Should Be Construed To Avoid Due
Process Problems ... 15

 C. Plaintiffs Cannot Evade The Insuperable
Problems That Would Result From Rescission Class
Actions Through The Expedient Of Requesting
Declaratory Relief. ... 16

 1. Rescission Is An Individual Remedy. ... 16

 2. Rescission Is Effected By Filing A Notice, Not By
Bringing An Action For Declaratory Relief.
Accordingly, Pre-Rescission Declaratory Relief Is
Not Available Under TILA. ... 19

 3. There Is No Proper Purpose For Declaratory
Relief Here. ... 20

 D. An Order Directing Notice To The Class At This
Time Would Create Severe Practical Problems. ... 21
... 23

 1. Notice To The Class Threatens To Short-Circuit
The Appellate Process And Unduly Increase The
Stakes Of The Litigation. ... 23

**\*ii** 2. Class Notice At This Time Would Require The
Courts And The Parties To Prematurely Address
Difficult And Potentially Academic Issues. ... 25

CONCLUSION ... 27

**\*iii** TABLE OF AUTHORITIES

CASES

American Machine & Metals, Inc. v. De Bothezat
Impeller Co., 166 F.2d 535 (2nd Cir. 1948) ... 21

Apaydin v. Citibank Federal Sav. Bank (In re
Apaydin), 201 B.R. 716 (Bankr. E.D. Pa. 1996) ... 15

BMW of North America, Inc. v. Gore, 517 U.S. 559
(1996). ... 10, 11

*Belini v. Wash. Mutual Bank F.A.,* 412 F.3d 17 (1st Cir. 2005). ... 15, 17

*Blair v. Equifax Check Services, Inc.,* 181 F.3d 832 (7th Cir. 1999). ... 24

*Castano v. America Tobacco,* 84 F.3d 734 (5th Cir. 1996) ... 23

*Cooper Industries, Inc. v. Leatherman Tool Group, Inc.,* 532 U.S. 424 (2001) ... 10

*Crawford v. Equifax Payment Services,* 201 F.3d 877 (7th Cir. 2000) ... 19

*Croysdale v. Franklin Sav. Association,* 601 F.2d 1340 (7th Cir. 1979) ... 15

*Gibbons v. Interbank Funding Group,* 208 F.R.D. 278 (N.D. Cal. 2002) ... 8, 18

*Gomez v. United States,* 490 U.S. 858 (1989) ... 16

*Highsmith v. Chrysler Credit Corp.,* 18 F.3d 434 (7th Cir. 1994). ... 20

*James v. Home Construction Co. of Mobile, Inc.,* 621 F.2d 727 (5th Cir. 1980) ... .3, 7, 17, 18, 26

*Jefferson v. Security Pacific Finance Services,* 161 F.R.D. 63 (N.D. Ill. 1995) ... 8, 18

*Johnson v. West Suburban Bank,* 225 F.3d 366 (3d Cir. 2000). ... 5

*Jones v. United States,* 526 U.S. 227 (1999) ... 16

McKenna v. First Horizon Loan Corp., 975 F.3d 418 (1st Cir. 2007) ... 4, 8, 18

**\*iv***Nelson v. United Credit Plan, Inc.,* 77 F.R.D. 54 (E.D. La. 1978) ... 6

*Nucor v. Aceros,* 28 F.3d 572 (7th Cir. 1994) ... 21

*Parker v. Time Warner Entertainment Co.,* 331 F.3d 13 (2d Cir. 2003) ... 12, 13, 16

*Philip Morris USA v. Williams,* 127 S. Ct. 1057 (2007) ... 11

*In re Rhone-Poulenc Rorer Inc.,* 51 F.3d 1293 (7th Cir. 1995) ... 23

*Rodash v. AIB Mortg. Co.,* 16 F.3d 1142 (11th Cir. 1994) ... 6

*Saint Louis, Iron Mountain & Southern Railway Co. v. Williams,* 251 U.S. 63 (1919) ... 11

*State Farm Mutual Automobile Insurance Co. v. Campbell,* 538 U.S. 408 (2003) ... 10

*United States v. Bajakajian,* 524 U.S. 321 (1998) ... 11

FEDERAL STATUTES AND LEGISLATIVE HISTORY

12 U.S.C. § 1818 ... 19

15 U.S.C. § 1602(w) ... 8

15 U.S.C. § 1607(a) ... 19

15 U.S.C. § 1635 ... Passim

15 U.S.C. § 1640 ... Passim

47 U.S.C. § 551 ... 11

141 Cong. Rec. H4120, (1995); ... 7

141 Cong. Rec. S14568 (1995) ... 7

141 Cong. Rec. S14566, (1995). ... 7, 8

28 U.S.C. § 2201 ... 22

**\*v**H.R. Conf. Rep. No. 93-1429 (1974) ... 5

S. Rep. No. 94-590, at 8 (1976) ... 5

Truth in Lending Act Amendments of 1995, Pub. L. No. 104-29, § 3, 109 Stat. 271, 272-73 ... 6

Truth in Lending Class Action Relief Act of 1995, Pub. L. No. 104-12, § 2, 109 Stat. 161, 161-62. ... 6

**INTEREST OF AMICI CURIAE**

This brief is filed, with the consent of both parties, by the American Bankers Association, American Financial Services Association, America's Community Bankers, Consumer Bankers Association, Consumer Mortgage Coalition, and Mortgage Bankers Association (collectively, the "Financial Services Amici").

The ABA is the largest national trade association of banks in the country. The ABA represents banks of all sizes in all fifty states and the District of Columbia, including community, regional, and money center banks and holding companies as well as savings associations, trust companies and savings banks. ABA members hold approximately 95% of the U.S. banking industry's domestic assets. The ABA frequently appears as an amicus curiae or party in litigation where the issues in dispute are of widespread importance or concern to the banking industry.

Founded in 1916, the AFSA is the trade association for a wide variety of market-funded providers of financial services to consumers and small businesses. AFSA members are important sources of credit to the American consumer, providing over 20 percent of all consumer credit.

ACB is the national trade association committed to shaping the future of banking by being the innovative industry leader strengthening the competitive position of community banks. ACB members, whose aggregate assets are more than $1.5 trillion, pursue progressive, entrepreneurial and service-oriented strategies in providing financial services to benefit their customers and communities.

Member institutions of the CBA are the leaders in consumer financial services, including mortgage and home equity lending, nationwide. They include most of the nation's largest bank holding companies, as well as regional and super community banks that collectively hold two-thirds of the industry's total assets. CBA frequently appears as an amicus curiae

or a party in litigation where issues in dispute are of widespread importance or concern to the banking industry.

The CMC is a trade association of national mortgage lenders, mortgage servicers and mortgage origination-service providers committed to the nationwide rationalization of consumer mortgage laws and regulations. The CMC regularly appears as amicus curiae in litigation with implications for the national mortgage lending marketplace.

The MBA is a non-profit corporation headquartered in Washington, D.C. Its members include mortgage companies, mortgage brokers, commercial banks, thrifts, credit unions, savings and loan associations and savings banks. The MBA is devoted exclusively to the field of mortgage and real estate finance. The MBA has more than 3,000 member companies representing all facets of the real estate finance industry.

The Financial Services Amici frequently appear in litigation where the issues raised are of widespread importance and concern to their members. That is the case here because the district court's decision to certify a rescission class under the federal Truth-in-Lending Act ("TILA"), 15 U.S.C. §§ 1601, et seq., means that many of the organizations' members (and/or their affiliates) face potentially devastating liability from disclosure infractions that cause no consumer injury.

**SUMMARY OF ARGUMENT**

Chevy Chase Bank ("Chevy Chase") has demonstrated in its brief that a rescission class action is incompatible with TILA's statutory language and legislative history. Accordingly, the other Circuits that have considered the issue have held that rescission class actions, whether for affirmative or declaratory relief, are improper, and that a contrary result here would create confusion and market disruption. *See McKenna v. First Horizon Loan Corp.,* 975 F.3d 418 (1st Cir. 2007); *James v. Home Constr. Co. of Mobile, Inc.,* 621 F.2d 727, 730 (5th Cir. 1980). Financial Services Amici fully endorse Chevy Chase's arguments.

In recognition of the fact that this is an amicus curiae brief, Financial Services Amici will not duplicate

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Chevy Chase's arguments. Rather, Financial Services Amici write to make the following points:

Class certification of rescission claims would saddle the mortgage lending industry and secondary market with billions of dollars of class action exposure for supposed violations of TILA that do not give rise to any actual damages. The adverse consequences of such a result would be felt not only by the industry but also by homeowners seeking mortgage financing. Certification of a rescission class would contravene the manifest intent of Congress, as well as Due Process constraints on penalties courts may award.

By purporting to seek a declaratory judgment rather than actual rescission on behalf of the class, Plaintiffs seek inappropriate relief. Rescission is intended to be a self-executing remedy invoked in the first instance by the borrower's delivery to the creditor of a notice that the borrower intends to rescind the loan. Plaintiffs delivered the requisite rescission notice to Chevy Chase but have not alleged that a single class member has done so. Thus, Plaintiffs seek a declaratory judgment remedy for the class (but not themselves) that was never contemplated by TILA. Not only is this remedy unwarranted under TILA, it does not further the purposes of the Declaratory Judgment Act.

The notice to the class the District Court contemplates at this time would compound the problems associated with class rescission and would prematurely raise a number of difficult issues, with the attendant waste of judicial and party time and resources.

ARGUMENT

**A. Congress Has Repeatedly Expressed Its Concern About Undue TILA Liability For Violations That Give Rise To No Actual Damages**

In word and deed, Congress has repeatedly expressed its intent that harmless TILA violations not give rise to massive, unlimited liability. Section 1640 of TILA was first amended in 1974 to cap statutory damages recoverable in a class action at the lesser of $100,000 or 1% of the creditor's net worth. The purpose of this limitation was "'to protect small business firms from catastrophic judgments.'" H.R. Conf. Rep. No. 93-1429 (1974) (quoted in *Johnson v. West Suburban*

*Bank,* 225 F.3d 366, 372 (3d Cir. 2000)). Congress increased the $100,000 threshold to $500,000 two years later in 1976, reasoning that the "$500,000 limit, coupled with the 1% formula, provides ... a workable structure for private enforcement. Small businesses are protected by the 1% measure, while a potential half million dollar recovery ought to act as a significant deterrent to even the largest creditor." S. Rep. No. 94-590, at 8 (1976) (quoted in *Johnson,* 225 F.3d at 373). During this *6 time period, class actions seeking rescission were *nonexistent. See Nelson v. United Credit Plan, Inc.,* 77 F.R.D. 54, 58 (E.D. La. 1978) ("[W]e note that there is not a single precedent in which class certification was broached, must less granted or denied, in a case where rescission pursuant to 15 U.S.C. § 1635 was the relief prayed for.") (footnotes omitted).

Congress subsequently confronted the threat that trivial disclosure errors could result in devastating TILA rescission liability, *see Rodash v. AIB Mortg. Co.,* 16 F.3d 1142 (11th Cir. 1994), by enacting a moratorium on class actions, see Truth in Lending Class Action Relief Act of 1995, Pub.L. No. 104-12, § 2, 109 Stat. 161, 161-62, and higher tolerance levels for variances between actual and disclosed finance charges. *See* Truth in Lending Act Amendments of 1995, Pub.L. No. 104-29, § 3, 109 Stat. 271, 272-73. In taking these steps, a key proponent of the legislation expressed an awareness, acknowledged by others during the floor debate, that the "threat of wholesale rescissions presents a real danger to our modern system of home financing: potential liability could reach into the billions." 141 Cong. Rec. S14566, 14567 (1995) (Statement of Sen. D'Amato). The amendments, Senator D'Amato stated, were specifically "intended to curtail the devastating liability that threatens our housing finance system." *Id.*

*7 Another Senator explained that "[t]he granting of wholesale rescissions ... could be devastating to both mortgage lenders, and the secondary markets that provide the mortgage market with liquidity." *Id.* at S5614-S5616 (Statement of Sen. Kyl). *See also* 141 Cong. Rec. H4120, 4121 (1995) (Statement of Rep. Roukema) ("If the courts were to permit borrowers to rescind loans as part of a class action lawsuit, based on technical disclosure and notice violations, the potential disruption to the secondary mortgage market and the liability that lenders face ... may be

enormous."); 141 Cong. Rec. S14568 (1995) (Statement of Sen. Sarbanes) (class rescissions "seriously threatened the viability of residential mortgage lending in this country including the mortgage-backed securities markets"). Congress acted "to avert what could [have] be[en] a financial disaster in the mortgage industry." *Id.* (Statement of Sen. Mack).[FN1]

> FN1. A construction of TILA allowing for the certification of rescission classes would clearly fly in the face of Congress' concern for the safety and soundness of the mortgage lending industry and the secondary mortgage market. It would also ignore that section 1635 "is not penal in the tendency of courts that have interpreted [TILA] to emphasize the remedial character of the Act." *James,* 621 F.2d at 730. The remedial purpose of TILA "would be undone by allowing a class of plaintiffs to rescind their agreements against an individual defendant when the cost of recovery would exceed the harm done by the technical violation. A declaratory judgment permitting classwide rescission ... would turn Section 1635(b) into a penal provision, a result certainly never explicitly authorized by Congress." *Jefferson v. Security Pacific Fin. Servs.,* 161 F.R.D. 63, 69 (N.D. Ill. 1995); *accord Gibbons v. Interbank Funding Group,* 208 F.R.D. 278, 286 (N.D. Cal. 2002). As recently concluded by the First Circuit: "It is nose-on-the-face plain that unrestricted class action availability for rescission claims would open the door to vast recoveries ... The notion that Congress would limit liability to $500,000 with respect to one remedy while allowing the sky to be the limit with respect to another remedy for the same violation strains credulity." *McKenna,* 475 F.3d at 424.

**\*8** In 1995, the House of Representatives observed that the "potential cost of rescinding all refinanced mortgages made in the last three years (the time allowed under TILA to exercise the rescission right) has been estimated to be as high as *$217 billion.*" *See* H.R. Report 104193, at 52 (1995) (emphasis added). And the financial stakes to the industry of potential wholesale rescissions have grown dramatically in the

intervening years. According to publicly available statistics compiled by the MBA in the ordinary course of its business, the volume of mortgage loan refinancings nearly quintupled from *$669 billion* in the three-year period ending December 31, 1994 to *$3,135 billion* in the most recent three-year period for which data is available, ended September 30, 2006.[FN2] *See* Appendix attached hereto at **\*9** http: / / www. mortgagebankers.org/ Researchand Forecasts/ MarketEnvironment/1-4 FamilyMortgageOriginations 19902005.htm).

> FN2. In estimating rescission exposure, the focus is necessarily on refinancing volume since purchase money loans are not subject to rescission. *See* 15 U.S.C. § 1635(e) (exempting "residential mortgage transactions" from section 1635) and 15 U.S.C. § 1602(w) (defining "residential mortgage transaction" as a dwelling secured transaction used to finance the purchase or initial construction of the dwelling).

A mortgage lending industry and secondary mortgage market hobbled by catastrophic rescission remedies would be able to supply less credit to homeowners. Due to the increased risk profile of refinance and other transactions subject to rescission, the risk-reward trade-off for this type of lending would result in further contraction. *See, e.g.,* Appendix, "Remarks by John D. Hawke, Jr., Comptroller of the Currency, Before the Exchequer Club, Washington, D.C. (Apr. 16, 2003), OCC NR 2003-30 (discussing generally the contraction of credit resulting from state and local predatory lending laws). Thus, the approval of rescission class actions would likely cause serious harm to consumers, not just mortgage lenders and the purchasers of mortgage loans and mortgage backed securities.

### B. The Prospect Of Excessive Rescission Liability For Technical TILA Violations Is Of Constitutional Dimension.

The problem Congress sought to avoid is one of constitutional dimension; an evaluation of Congress' intent regarding rescission class **\*10** actions should be informed by the serious Due Process problems that would result from authorization of rescission class actions which expose lenders to tens of millions of dollars of liability for violations that, as here,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 1110047 (C.A.7)                                                                    Page 6

frequently involve *no* demonstrated actual damages.

**1. The Due Process Clause Imposes Limits on Statutory Remedies.**

In recent years, the Supreme Court has repeatedly held that punitive damages awards must conform with Due Process limitations. Thus, in *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 580 (1996), the Supreme Court applied the Due Process Clause to strike down a punitive damages award, noting that the "most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff." Subsequently, in *State Farm Mutual Auto. Ins. Co. v. Campbell,* 538 U.S. 408 (2003), the Supreme Court instructed that the "Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." *Id.* at 416. It went on to instruct that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Id.,* 538 U.S. at 425. *See also Cooper Industries, Inc. v. Leatherman Tool Group, Inc.,* 532 U.S. 424, 436 (2001) (holding that "courts of appeals should apply a de novo standard of review when passing on district **\*11** courts' determinations of the constitutionality of punitive damages awards"); *United States v. Bajakajian,* 524 U.S. 321, 324 (1998) (punitive forfeiture of $ 357,144 for violating reporting requirement was "grossly disproportional" to the gravity of the offense). Most recently, the Supreme Court reiterated that "the Constitution imposes certain limits, in respect both to procedures for awarding punitive damages and to amounts forbidden as 'grossly excessive.'" *Philip Morris USA v. Williams,* 127 S. Ct. 1057, 1062 (2007).

The same constitutional principles that limit punitive damages awards likewise restrict excessive statutory remedies. Indeed, in *BMW,* the Supreme Court explicitly relied on an earlier Supreme Court decision applying a Due Process analysis to a statutory penalty. *See BMW,* 517 U.S. at 575 (citing *Saint Louis, Iron Mountain & Southern Ry. Co. v. Williams,* 251 U.S. 63, 66-67 (1919) for the proposition that a "punitive award may not be 'wholly disproportioned to the offense.'")[FN3] Likewise, the Second Circuit raised Due Process concerns about the application in a class action of a statutory penalty under the federal Cable Communications Policy Act (the "Cable Act"), codified at **\*12** 47 U.S.C. § 551. *See Parker v. Time Warner Entertainment Co.,* 331 F.3d 13 (2d Cir. 2003).

> FN3. *Williams* declined to invalidate on Due Process grounds a $75 statutory penalty assessed *in an individual action* on account of a $0.60 overcharge.

In *Parker,* the plaintiff brought a class action on behalf of cable television subscribers, alleging that the cable provider violated the subscriber privacy provisions of the Cable Act. Section 551(f) of the Cable Act authorized the award of damages, but not less than $100 per day for each day of violation or $1,000, whichever is higher.

The District Court dismissed the class claims in *Parker* based on its conclusion that the statutory damages award would be disproportionately large compared to the actual harm suffered by class members and, therefore, failed to satisfy the "superiority" requirements of Rule 23(b)(3). The Second Circuit remanded the case after concluding that the District Court's decision to deny Rule 23(b)(3) class certification was premature and lacked factual support. 331 F.3d at 22. In doing so, however, the Second Circuit acknowledged that the District Court had a "legitimate concern" about the magnitude of the statutory remedy when applied in a class action. It observed that the remedies provided by the Cable Act, when applied in a class action, might "come to resemble punitive damages - yet ones that are awarded as a matter of strict liability, rather than for the egregious conduct typically necessary to support a punitive damages award." According to the Second Circuit, "in **\*13** a sufficiently serious case the due process clause might be invoked ...." *Id.*

Respectfully, Financial Services Amici submit that this lawsuit, involving the mistaken certification below of a rescission class, presents precisely the kind of "serious case" where the Due Process Clause must be invoked. This is a lawsuit without any allegations of actual damages but with exposure running into tens of millions of dollars. Chevy Chase Brief, p. 29. In *State Farm,* the Supreme Court established a rule of thumb that punitive damages should not exceed actual damages by more than a

factor of ten. In the context of rescission class actions, the cost of the remedial relief available to the class is wholly unmoored from any actual damages the class may have suffered, and the resulting Due Process problem is manifest.

### 2. The Due Process Problems Resulting From Certification Of A Rescission Class Cannot Readily Be Fixed.

The Second Circuit in *Parker* suggested that the appropriate response to the constitutional problem it identified would be to reduce the aggregate damage award rather than to deny class certification. 331 F.3d at 22. This option was feasible because all it required was a reduction in the minimum award. Class members could simply opt out of the class if they were dissatisfied with the relief allocated to them.

**\*14** In the instant case, the course of action contemplated by the *Parker* Court is not available because, *inter alia*: (1) there is no clear statutory basis for a court to reduce the recovery available to any borrower rescinding his or her loan and no guidance how any such reduction should be effected; (2) the District Court certified an non-opt out class under Rule 23(b)(2); and (3) it is not possible for the Court to determine how much each class member's rescission windfall would need to be cut back in order to produce a constitutionally acceptable result.

The District Court contemplates that, after the instant appeal is resolved, a notice to class members will promptly go out describing class members' right to rescind their loans. But what will such notice say? If the recoveries for individual borrowers must be scaled back to prevent constitutional problems, the cut-back must be described to borrowers so they can decide whether or not to exercise their individual rescission rights. In order to figure the cut-back, the District Court must first ascertain the constitutionally permissible rescission cost and Chevy Chase's aggregate rescission exposure. It must then estimate the percentage of the class that will exercise the (modified) rescission rights. However, this will be only the roughest kind of guess, and if more borrowers rescind than expected the result would still present a constitutional problem, requiring a new round of notices. This kind of **\*15** iterative process is wholly unworkable. The practical difficulties of the scale-back of relief contemplated by *Parker* are

insurmountable in the present case.

### 3. TILA Should Be Construed To Avoid Due Process Problems.

Fortunately, there is a solution to this constitutional conundrum. This Court merely needs to recognize, as argued by Chevy Chase in its brief, that rescission is inherently an individual, consensual right unsuited for resolution in a class action. Congress did *not* contemplate or desire class rescission actions and should not be deemed to have created a statutory framework raising Due Process concerns of this type.[FN4]

> FN4. Given that the statutory provisions in question are not even designed to punish, stretching Rule 23 and TILA to permit class rescission would produce an unintended and perverse result. *See Apaydin v. Citibank Fed. Sav. Bank (In re Apaydin),* 201 B.R. 716, 724 (Bankr. E.D. Pa. 1996) (observing that "rescission, as an equitable remedy, is not meant to be punitive"); *see also Belini v. Wash. Mut. Bank F.A.,* 412 F.3d 17, 28 (1st Cir. 2005) (referencing the "remedial provisions accompanying suits for rescission under TILA"); *Croysdale v. Franklin Sav. Ass'n,* 601 F.2d 1340, 1347 (7th Cir. 1979) (referencing the "remedial purpose of the TILA").

Instead of attempting somehow to cut back on the relief available to any consumer entitled to rescind his or her loan, this Court can - and should -simply hold that the District Court erred in certifying a class in this case. "It is ... settled policy to avoid an interpretation of a **\*16** federal statute that engenders constitutional issues if a reasonable alternative interpretation poses no constitutional question." *Gomez v. United States,* 490 U.S. 858, 864 (1989). The doctrine that statutes should be construed so as to avoid constitutional questions rests on "respect for Congress, which we assume legislates in the light of constitutional limitations." *Jones v. United States,* 526 U.S. 227, 239 (1999). What is needed here, then, is "a sensible interpretation of a statute, construed against a background of possible constitutional concerns ...." *Parker,* 331 F.3d at 27 (Newman, J., concurring). "Where an otherwise acceptable construction of a statute would raise serious

constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Id.,* 331 F.3d at 28 (quoting *Edward J. DeBartolo Corp. v. Florida Gulf Coast Building and Construction Trades Council,* 485 U.S. 568, 575 (1988)). This course should be followed here.

### C. Plaintiffs Cannot Evade The Insuperable Problems That Would Result From Rescission Class Actions Through The Expedient Of Requesting Declaratory Relief.

#### 1. Rescission Is An Individual Remedy.

Section 1635 of TILA requires a borrower seeking to rescind a mortgage loan to notify the creditor of his or her exercise of the rescission right. *See* 15 U.S.C. § 1635(b). Section 1635(b) then gives the creditor **\*17** twenty days to respond. A creditor may agree to rescind, refuse to rescind entirely or agree to rescission while seeking equitable modifications. If the creditor agrees, it must return money or property and terminate any security interest. Where the creditor agrees to rescind, an injured borrower is required to repay his or her mortgage loan and generally must obtain new financing to do so, in some cases on less attractive terms than the financing already in place. Thus, depending upon the consumer's individual economic circumstances and prevailing economic conditions, rescission may or may not be advantageous or even feasible.

In short, "TILA contemplates that '*individuals* must choose to assert the right to rescind, on an *individual* basis and within *individual* time frames, before filing suit.'" *Gibbons,* 208 F.R.D. at 285 (citation omitted) (emphasis added). "[T]he purpose of the rescission remedy is to restore the parties, as much as possible, to the status quo ante." *James,* 621 F.2d at 730 (affirming refusal to certify a class). *See Belini,* 412 F.3d at 25 (section 1635 "is written with the goal of making the rescission process a private one, worked out between creditor and debtor without the intervention of the courts"). Thus, "the rescission remedy [is] a **\*18** 'purely personal remedy'." *James,* 621 F.2d at 731.5 For this reason, among others, it is clear that rescission classes may *not* be certified under TILA. *See McKenna; James,* 621 F.2d 727 at 730.

FN5. A number of courts have reached this same conclusion and have consequently refused to certify rescission classes under TILA. *See, e.g., Gibbons,* 208 F.R.D. at 285;*Jefferson v. Security Pacific Fin. Servs.,* 161 F.R.D. at 68-69.

In recognition of the fact that rescission is a personal remedy that depends upon the particular financial circumstances and predilections of each consumer, Plaintiffs attempt to execute an end-run around Rule 23 by seeking a class-wide declaration that rescission is available. In rejecting "[t]his bit of legal legerdemain" regarding an identical request for a declaratory judgment class, the First Circuit observed: "Both of the primary reasons for denying class treatment to actual rescission claims - Congress's manifest intent to shield residential lenders from crushing liability and the highly personal nature of the rescission remedy - apply with equal force to the proposed formation of declaratory rescission classes." *McKenna,* 475 F.3d at 426; *accord Gibbons,* 208 F.R.D. at 285 ("The distinction drawn in the relief sought by plaintiff - a declaration authorizing rescission rather than an order enforcing rescission rights - seems to be one of form more than substance.").

### **\*19** 2. Rescission Is Effected By Filing A Notice, Not By Bringing An Action For Declaratory Relief. Accordingly, Pre-Rescission Declaratory Relief Is Not Available Under TILA.

Significantly, there is not a shred of textual support in TILA suggesting that a plaintiff-borrower may obtain declaratory relief before seeking rescission and having the request rejected by the lender. To the contrary: While administrative agencies have a host of powers at their disposal in the event of a TILA violation, *see, e.g.,* 15 U.S.C. § 1607(a) (regarding creditors generally); 12 U.S.C. § 1818 (regarding banks and savings institutions), rescission and damages are the sole remedies available to private parties under TILA. *See* 15 U.S.C. §§ 1635, 1640. This limitation of powers in private actions is not inadvertent.

Courts, including this Court, construing both the Fair Debt Collections Practices Act and the Fair Credit Reporting Act (which, like TILA, are parts of the Consumer Credit Protection Act) have concluded that

neither statute permits a private litigant to seek declaratory or injunctive relief as those statutes only expressly allow governmental agencies to seek such relief. *See, e.g., Crawford v. Equifax Payment Servs., 201 F.3d 877, 882 (7th Cir. 2000)* (observing that "all private actions under the Fair Debt Collection Practices Act are for damages. *See* 15 U.S.C. sec. 1692k and *Sibley v. Fulton DeKalb Collection Service, 677 F.2d 830, 834 (11th Cir. 1982).*"); *Krey v. Castle Motor Sales, Inc.,* *20 No. 06 C 4173, 2007 U.S. Dist. LEXIS 20880, *6-7 (N.D. Ill. Mar. 21, 2007) ("[T]his Court finds that the express delineation between legal remedies available to an individual through a private action, § 1681n-o, and injunctive remedies enforceable through administrative enforcement, § 1681s, conveys a legislative intent to limits courts' equitable powers when considering FCRA claims. *See In re Trans Union Corp. Privacy Litig., 211 F.R.D. 328, 340 (N.D. Ill. 2002); see also Washington v. CSC Credit Servs. Inc., 199 F.3d 263 (5th Cir. 2000).*"). The same logic applies to TILA.

Under section 1635(a), rescission is accomplished through the simple expedient of the borrower "notifying the creditor ... of his intention" to rescind. No judicial intervention is necessary to rescind a loan nor is contemplated prior to the borrower's delivery of the requisite notice. Thus, the sole legitimate purpose of declaratory or injunctive relief in the context of a borrower's effort to rescind a loan is to enforce a valid claim for rescission or deny an invalid claim. No case or controversy exists as to rescission unless and until a borrower attempts to rescind a loan and the lender rejects the request or fails to honor the request within the time periods prescribed by TILA. *Cf. Highsmith v. Chrysler Credit Corp., 18 F.3d 434, 437 (7th Cir. 1994)* (in class action regarding lawfulness of lease early termination charges, no standing for *21 plaintiff who had neither terminated lease nor alleged an intent to terminate lease). Plaintiffs have not alleged that there are *any* members of the class certified by the District Court who have actually sought to rescind their loans.[FN6]

> FN6. In the absence of any class members who are similarly situated with Plaintiffs, the class does not meet Rule 23(a)'s numerosity and typicality prerequisites.

**3. There Is No Proper Purpose For Declaratory Relief Here.**

Not only does a declaratory judgment class composed of borrowers who, unlike Plaintiffs, have not attempted to rescind their loans conflict with TILA (and Rule 23), it directly contravenes the purpose of the Declaratory Judgment Act ("DJA"), 28 U.S.C. § 2201. Congress enacted the DJA "to avoid accrual of avoidable damages to one not certain of his right...." *Nucor v. Aceros, 28 F.3d 572, 577 (7th Cir. 1994).* A declaration of contract rights is appropriate only when it will "serve a very real practical need of the parties for guidance in their future conduct" and prevent the accrual of avoidable damages. *See, e.g., American Machine & Metals, Inc. v. De Bothezat Impeller Co., 166 F.2d 535, 536-537 (2nd Cir. 1948)* (involving "irrevocable choice as the termination of the contract" and distinguishing cases in which parties did not face such irrevocable choice). Because any absent class *22 members who want to rescind their loans suffer no detriment by delivering a simple cancellation notice to Chevy Chase, there is absolutely no need for declaratory relief for the class.

And as Chevy Chase has noted in its brief (pp. 40-41), due to TILA's fee-shifting provision, which makes the creditor liable for court costs and reasonable attorneys' fees if a borrower asserts a successful TILA claim, 15 U.S.C. § 1640(a)(3), class actions are not required for borrowers to vindicate their rescission rights. According to computer searches of the LexisNexis CourtLink(R) database, 688 TILA cases, of which only 17 were class actions, were filed in the federal courts in 2006; 492 TILA cases, of which only 19 were class actions, were filed in the federal courts in 2005; 574 TILA cases, including only 20 class actions, were filed in 2004; 513 TILA cases, of which only 39 were class actions, were filed in 2003; and 576 TILA cases, of which only 37 were class actions, were filed in 2002. The foregoing figures do not include state-court actions, bankruptcy proceedings, counterclaims and rescissions effected without judicial intervention. Thus, it is apparent that consumers are willing and able to bring individual actions to vindicate their rights under TILA.[FN7]

> FN7. CourtLink does not distinguish between rescission and damages cases.

**23D. An Order Directing Notice To The Class At This Time Would Create Severe Practical Problems.**

If its class certification order is affirmed, the District Court will schedule briefing and a hearing on the question of the appropriate notice to the class. *See* District Court Decision and Order, p. 22. In reality, *any* notice to the class at this time would compound the problems associated with certification of a rescission class and create additional practical difficulties.[FN8]

> FN8. For classes certified under Rule 23(b)(2), the court "*may* direct *appropriate* notice to the class." Rule 23(c)(2). TILA does *not* require any notice to affected consumers. Indeed, TILA is quite clear that disclosure of past TILA violations is entirely elective with the creditor. *See* 15 U.S.C. § 1640(b).

### 1. Notice To The Class Threatens To Short-Circuit The Appellate Process And Unduly Increase The Stakes Of The Litigation.

It is well-recognized that certification of a class can place "insurmountable pressure" on a defendant to settle a case, *Castano v. Am. Tobacco,* 84 F.3d 734, 746 (5th Cir. 1996), even where it has a good chance of succeeding on the merits.

Many corporate executives are unwilling to bet their company that they are in the right in big-stakes litigation, and a grant of class status can propel the stakes of a case into the stratosphere. *In re Rhone-Poulenc Rorer Inc.,* 51 F.3d 1293 (7th Cir. 1995), observes not only that class actions can have this effect on risk-averse corporate executives (and corporate counsel) but also that **\*24** some plaintiffs or even some district judges may be tempted to use the class device to wring settlements from defendants whose legal positions are justified but unpopular. Empirical studies of securities class actions imply that this is common. Class certifications also have induced judges to remake some substantive doctrine in order to render the litigation manageable.

*Blair v. Equifax Check Services, Inc.,* 181 F.3d 832, 834 (7th Cir. 1999) (citations omitted).

Mandating delivery of notices before a final judgment and the resolution of appeals risks advising class members of rights they do not have and placing mortgage lenders in the untenable position of dealing with a flood of rescinding borrowers whose "right" to rescission remains uncertain. The pressure to settle, and concomitant damage to the mortgage lending industry, would be particularly pronounced here, because, if a lender refuses to grant immediate rescission to borrowers responding to pre-appeal notice of their right to rescind, the lender's exposure automatically increases by $2,000 per borrower. *See* 15 U.S.C. § 1640(a)(2). Further, hasty notice would inevitably generate customer confusion and ill will, as well as reputational harm to a lender caught up in this nightmare.

### *252. Class Notice At This Time Would Require The Courts And The Parties To Prematurely Address Difficult And Potentially Academic Issues.

Finally, notice at this time would force the District Court to grapple prematurely with a number of important procedural and substantive issues. These issues would include the following, without limitation:

What must the notice say?

As a result of the Due Process concerns described above, will the notice provide for an adjustment in the relief available to class members and, if so, how will the adjustment be determined and described? As noted above, there are no ready answers to these questions.

Will the notice to the class be accompanied by TILA disclosures that do not contain the deficiencies (wrongly) perceived by the District Court? Creditors that violate TILA clearly have the substantive right under TILA to provide corrective disclosures to borrowers to eliminate their exposure in regulatory and private actions, *see* 15 U.S.C. § 1640(b), and to start running the normal three-business day period that **\*26** borrowers have to rescind their loans. 15 U.S.C. § 1635(a).

Will class members be required under 15 U.S.C. § 1635(d) to tender the principal balance of their loans at the same time the lender tenders the interest, fees and charges it has collected? If so, how long a period will class members be afforded to make this tender?

While lenders are not entitled to retain any interest or charges on rescinded loans, the purpose of rescission is to restore the parties to the *status quo.* *James,* 621 F.2d at 730 Borrowers who have used some or all of the proceeds of their loans to refinance existing mortgages not only get an interest-free loan, they also save the interest they would have had to pay

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

on the refinanced loan. A court considering the terms of a notice to class members in a rescission case would also need to resolve the question of first impression whether the lender is entitled to some form of *quantum meruit* compensation for these interest savings. Additionally, the court would need to decide whether, and to what extent, a lender advancing new funds is entitled to such compensation.

### 27CONCLUSION

For the reasons discussed above and in Chevy Chase's brief, Financial Services Amici respectfully request that this Court reverse the decision of the District Court and hold that a rescission class may not be certified under the TILA.

Susan and Bryan Andrews and a class of persons similarly situated, Plaintiffs-Appellees, v. CHEVY CHASE BANK, F.S.B., Defendant-Appellant.
2007 WL 1110047 (C.A.7)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

For Dockets See 07-1326

United States Court of Appeals,Seventh Circuit.
Susan and Bryan Andrews and a class of persons
similarly situated, Plaintiffs-Appellees,
v.
CHEVY CHASE BANK, F.S.B., Defendant-
Appellant.
No. **07-1326**.
March 26, 2007.

Appeal from the United States District Court for the
Eastern District of Wisconsin
No. 05-C-0454-LA
Hon. Lynn Adelman

Brief for Defendant-Appellant Chevy Chase Bank,
F.S.B.

Michele L. Odorizzi, Jeffrey W. Sarles, Lucia Nale,
Shauna L. Fulbright, Mayer, Brown, Rowe & Maw
LLP, 71 South Wacker Drive, Chicago, Illinois
60606, (312) 782-0600, Attorneys for Defendant-
Appellant.

**\*i** TABLE OF CONTENTS

TABLE OF AUTHORITIES ... ii

JURISDICTIONAL STATEMENT ... 1

STATEMENT CONCERNING ORAL
ARGUMENT ... 1

ISSUES PRESENTED FOR REVIEW ... 2

STATEMENT OF THE CASE ... 2

STATEMENT OF FACTS ... 3

SUMMARY OF ARGUMENT ... 11

STANDARD OF REVIEW ... 14

ARGUMENT ... 15

I. The Only Two Courts Of Appeals To Address This
Issue Have Held That TILA Rescission Classes May
Not Be Certified ... 15

II. Certification Of Rescission Classes Would Be
Inconsistent With The Text, History, And Purpose Of
TILA's Remedy Provisions ... 18

A. Certification of rescission classes would be
inconsistent with the text of TILA's remedy
provisions ... 18

B. Certification of rescission classes would be
inconsistent with the history and purpose of TILA's
remedy provisions ... 22

III. Alternatively, The Proposed Class Does Not
Satisfy The Requirements Of Rule 23 ... 29

A. The district court erred by certifying this class
under Rule 23(b)(2) ... 30

B. Plaintiffs have not satisfied the predominance and
superiority requirements of Rule 23(b) (3) ... 33

1. Individual issues would predominate over
common issues in any class-wide rescission ... 33

2. A class action is not the superior means to
adjudicate rescission claims ... 39

CONCLUSION ... 43

**\*ii** TABLE OF AUTHORITIES

Cases

AFS Fin., Inc. v. Burdette, 105 F. Supp. 2d 881 (N.D.
Ill. 2000) ... 36

Amchem Prods., Inc. v. Windsor, 521 U.S. 591
(1997) ... 29, 33

American Mortgage Network v. Shelton, 2006 U.S.

Dist. LEXIS 23180 (W.D.N.C. Apr. 6, 2006) ... 34

*Anderson v. Capital One Bank,* 224 F.R.D. 444 (W.D. Wis. 2004) ... 22

*Anderson v. Rizza Chevrolet, Inc.,* 9 F. Supp. 2d 908 (N.D. Ill. 1998) ... 3

*Beach v. Ocwen Fed. Bank,* 523 U.S. 410 (1998) ... 19

*In re Bridgestone/Firestone, Inc.,* 288 F.3d 1012 (7th Cir. 2002) ... 37, 39

*Brown v. Payday Check Advance, Inc.,* 202 F.3d 987 (7th Cir. 2000) ... 21, 25

*Carmichael v. The Payment Center, Inc.,* 336 F.3d 636 (7th Cir. 2003) ... 41

*Castano v. American Tobacco Co.,* 84 F.3d 734 (5th Cir. 1996) ... 37

*Cirone-Shadow v. Union Nissan,* 955 F. Supp. 938 (N.D. Ill. 1997) ... 3

*Clay v. Johnson,* 264 F.3d 744 (7th Cir. 2001) ... 41

*Crawford v. Equifax Payment Servs., Inc.,* 201 F.3d 877 (7th Cir. 2000) ... 22

*Dailey v. Leshin,* 792 So. 2d 527 (Fla. App. 2001) ... 35

*Doe v. Smith,* 470 F.3d 331 (7th Cir. 2006) ... 19

*Eisen v. Carlisle & Jacquelin,* 417 U.S. 156 (1974) ... 39

*Frahm v. Equitable Life Assurance Soc'y,* 137 F.3d 955 (7th Cir. 1998) ... 40

**\*iii***General Home Capital Corp. v. Campbell,* 800 N.Y.S.2d 917 (Dist. Ct. Nassau County 2005) ... 36

*Gibbons v. Interbank Funding Group,* 208 F.R.D. 278 (N.D. Cal. 2002) ... 31, 32, 37

*Goldman v. First Nat'l Bank,* 532 F.2d 10 (7th Cir.

1976) ... 17

*Gombosi v. Carteret Mortgage Corp.,* 894 F. Supp. 176 (E.D. Pa. 1995) ... 35

*Granholm v. Heald,* 544 U.S. 460 (2005) ... 16

*Handy v. Anchor Mortgage Corp.,* 464 F.3d 760 (7th Cir. 2006) ... 41

*Hardy v. City Optical Inc.,* 39 F.3d 765 (7th Cir. 1994) ... 39

*Harris v. Tower Loan,* 609 F.2d 120 (5th Cir. 1980) ... 37

*Haynes v. Logan Furniture Mart, Inc.,* 503 F.2d 1161 (7th Cir. 1974) ... 17

*Hefferman v. Bitton,* 882 F.2d 379 (9th Cir. 1989) ... 35

*Highsmith v. Chrysler Credit Corp.,* 18 F.3d 434 (7th Cir. 1994) ... 32

*Humphries v. CBOCS West, Inc.,* 474 F.3d 387 (7th Cir. 2007) ... 16

*James v. Home Constr. Co.,* 621 F.2d 727 (5th Cir. 1980) ... 15, 16

*Jefferson v. Security Pac. Fin. Servs., Inc.,* 161 F.R.D. 63 (N.D. Ill. 1995) ... 34, 38

*Johnson v. West Suburban Bank,* 225 F.3d 366 (3d Cir. 2000) ... 17, 42

*Kovalik v. Delta Inv. Corp.,* 611 P.2d 955 (Ariz. App. 1980) ... 35

*LaLiberte v. Pacific Mercantile Bank,* 53 Cal. Rptr. 3d 745 (App. 2007) ... 19, 25, 38

*Large v. Conseco Fin. Serv. Corp.,* 292 F.3d 49 (1st Cir. 2002) ... 36

*Lemon v. International Union of Operating Eng'rs,* 216 F.3d 577 (7th Cir. 2000) ... 33

*Livingston v. Associate Fin., Inc.,* 339 F.3d 553 (7th Cir. 2003) ... 17, 29

**\*iv**_Mace v. Van Ru Credit Corp.,_ 109 F.3d 338 (7th Cir. 1997) ... 14

*Matter of Sinclair,* 870 F.2d 1340 (7th Cir. 1989) ... 16

*Mayo v. Sears, Roebuck & Co.,* 148 F.R.D. 576 (S.D. Ohio 1993) ... 41

*McKenna v. First Horizon Home Loan Corp.,* 475 F.3d 418 (1st Cir. 2007) ... passim

*Mortgage Source, Inc. v. Strong,* 75 P.3d 304 (Mont. 2003) ... 36

*Murry v. America's Mortgage Banc, Inc.,* 2005 WL 1323364 (N.D. Ill. May 5, 2005), aff'd, 2006 WL 1647531 (N.D. Ill. June 5,2006) ... 19, 31, 34

*Nagel v. ADMInv. Servs., Inc.,* 217 F.3d 436 (7th Cir. 2000) ... 33, 40

*Nelson v. United Credit Plan,* 77 F.R.D. 54 (E.D. La. 1978) ... 32, 41

*Ortiz v. Fibreboard Corp.,* 527 U.S. 815 (1999) ... 29

*Oshana v. Coca-Cola Co.,* 472 F.3d 506 (7th Cir. 2006) ... 29

*Payton v. County of Kane,* 308 F.3d 673 (7th Cir. 2002) ... 32

*Regency Sav. Bankv. Chavis,* 776 N.E.2d 876 (Ill. App. 2002) ... 37

*In re Rhone-Poulenc Rorer, Inc.,* 51 F.3d 1293 (7th Cir. 1995) ... 40

*Rockford League of Women Voters v. United States Nuclear Regulatory Comm'n,* 679 F.2d 1218 (7th Cir. 1982) ... 17

*Rodash v. AIB Mortgage Co.,* 16 F.3d 1142 (11th Cir. 1994) ... 26

*Ruizv. R&G Fin. Corp.,* 383 F. Supp. 2d 318 (D.P.R. 2005) ... 34

*Semarv. Platte Valley Fed. Sav. & Loan Ass'n,* 791 F.2d 699 (9th Cir. 1986) ... 34

*South Austin Coalition Community Council v. SBC Communications, Inc.,* 274 F.3d 1168 (7th Cir. 2001) ... 16

*Swain v. Brinegar,* 517 F.2d 766 (7th Cir. 1975) ... 32

*Szabo v. Bridgeport Machs., Inc.,* 249 F.3d 672 (7th Cir. 2001) ... 29

*Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11 (1979) ... 24

**\*v**_United States v. Neal,_ 46 F.3d 1405 (7th Cir. 1995), aff'd, 516 U.S. 284 (7th Cir. 1996) ... 18

*United States v. Ron Pair Enters.,* 489 U.S. 235 (1989) ... 22

*Universities Research Ass'n v. Coutu,* 450 U.S. 754 (1981) ... 18

*Washington v. CSC Credit Servs., Inc.,* 199 F.3d 263 (5th Cir. 2000) ... 22

*Weiss v. Regal Collections,* 385 F.3d 337 (3d Cir. 2004) ... 22

*Westbank v. Maurer,* 658 N.E.2d 1381 (111. App. 1995) ... 37

*Wilcoxv. Commerce Bank,* 474 F.2d 336 (10th Cir. 1973) ... 17

*Williams v. Homestake Mortgage Co.,* 968 F.2d 1137 (11th Cir. 1992) ... 38

*Yamamotov. Bank of N.Y.,* 329 F.3d 1167 (9th Cir. 2003) ... 36, 38

Statutes, Regulations, and Rules

15 U.S.C. § 1601 ... 1, 2, 3

15 U.S.C. § 1602(w) ... 4

15 U.S.C. § 1607 ... 42

15 U.S.C. § 1635 ... passim

15 U.S.C. § 1640 ... passim

28 U.S.C. § 1292(e) ... 1

28 U.S.C. § 1331 ... 1

Consumer Leasing Act of 1976, Pub. L. No. 94-240, 90 Stat. 257 ... 24

Rules Enabling Act, 28 U.S.C. § 2072(b) ... 29

Truth in Lending Act Amendments, Pub. L. No. 93-495, tit. IV, § 407, 88 Stat. 1500 (1974) ... 23

*vi Truth in Lending Act Amendments of 1995, Pub. L. No. 104-29, 109 Stat. 271 ... 26

Truth in Lending Class Action Relief Act of 1995, Pub. L. No. 104-12, 109 Stat. 161 ... 26

Truth in Lending Simplification and Reform Act, Pub. L. No. 96-221, tit. VI, § 615(a)(1), 94 Stat. 132 (1980) ... 25

Federal Reserve Board, Official Staff Interpretations, 12 C.F.R. Part 226 Supp. 1 ... 35, 36, 37

12 C.F.R. Part 226 ... 5, 35

Fed. R. App. P. 5(a) ... 1

Fed. R. Civ. P. 23 ... passim

Other Authorities

141 Cong. Rec. H4120-04, 4121 (Apr. 4, 1995) ... 26

141 Cong. Rec. H9513-01, 9515 (Sept. 27, 1995) ... 27

141 Cong. Rec. S14566, 14567 (Sept. 28, 1995) ... 26

H.R. Rep. No. 104-193 (1995) ... 26

*Joint Policy Statement on Administrative Enforcement of the Truth in Lending Act - Restitution* (1999), in Truth in Lending Comptroller's Handbook 105 (2006) ... 42

Office of Thrift Supervision, *Consumer Affairs Laws and Regulations* § 1310 & App. A ... 42

Ralph J. Rohner & Fred H. Miller, Truth in Lending (2000 & Supp. 2006) ... 19, 26, 27, 32, 36, 37

S. Rep. No. 93-278 (1973) ... 23

S. Rep. No. 94-590 (1976), reprinted in 1976 U.S.C.C.A.N. 431 ... 24

S. Rep. No. 96-368 (1979), reprinted in 1980 U.S.C.C.A.N. 236 ... 25, 34

7AA Charles A. Wright, Arthur R. Miller, & Mary K. Kane, Federal Practice & Procedure (3d ed. 2005) ... 30

**JURISDICTIONAL STATEMENT**

The district court had jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because plaintiffs' claims arise under federal law, namely, the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.* The district court entered an order certifying a class on January 16, 2007. Chevy Chase filed a timely Petition for Leave to Appeal Pursuant to Rule 23(f) on January 25, 2007, which this Court granted on January 31, 2007. This Court has jurisdiction over this appeal pursuant to Fed. R. Civ. P. 23(f), Fed. R. App. P. 5(a), and 28 U.S.C. § 1292(e).

**STATEMENT CONCERNING ORAL ARGUMENT**

Pursuant to Circuit Rule 34(f), defendant-appellant respectfully requests oral argument. This appeal raises an important issue of federal law that this Court has not previously addressed and that has divided district courts in this Circuit. Oral argument

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

will enable the parties adequately to address these issues and respond to the Court's questions and concerns.

## ISSUES PRESENTED FOR REVIEW

1. Whether, in a Truth in Lending Act case, a class may be certified to seek rescission of the putative class members' mortgages.

2. If so, whether the district court erroneously ruled that plaintiffs' proposed class satisfies the requirements of Fed. R. Civ. P. 23.

## STATEMENT OF THE CASE

In April 2005, plaintiffs-appellees Susan and Bryan Andrews ("plaintiffs" or "the Andrews") filed this purported class-action lawsuit against defendant-appellant Chevy Chase Bank, F.S.B. ("Chevy Chase"), claiming, *inter alia,* violations of the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.* ("TILA"). R.1. After twice amending their complaint, plaintiffs filed a Third Amended Complaint ("Complaint"), containing a single count alleging TILA violations, on June 22, 2006. R.75. On January 16, 2007, the district court granted plaintiffs' motion for summary judgment and certified a class of thousands of borrowers whom it authorized to rescind their mortgages. A1-A24. On January 25, 2007, this Court granted Chevy Chase's petition for leave to appeal pursuant to Rule 23(f). R.88. On February 5, 2007, the district court granted Chevy Chase's motion for a stay of district court proceedings pending the appeal. A25-A26. On February 14, 2007, the district court issued a separate memorandum explaining its decision to grant Chevy Chase's motion for a stay of proceedings. A27-A34.

## STATEMENT OF FACTS

**Statutory Framework.** The purpose of TILA is to promote "meaningful disclosure of credit terms." 15 U.S.C. § 1601(a). Toward that end, TILA requires lenders to make specified disclosures by specified means when making loans to consumers.

Creditors who violate certain disclosure requirements may be ordered to pay statutory damages. 15 U.S.C. § 1640(a). In an individual action relating to a

mortgage loan, the court may award statutory damages of at least $200 and no more than $2,000. In a class action or series of class actions arising out of the same disclosure violation, no minimum recovery of statutory damages applies to individual class members, but the court may award in the aggregate no more than the lesser of $500,000 or one percent of the creditor's net worth. *Ibid.*[FN1]

> FN1. TILA also authorizes the recovery of actual damages. 15 U.S.C. § 1640(a)(1). However, plaintiffs in this case did not seek such damages, which would have required them to demonstrate, *inter alia,* "detrimental reliance." See, *e.g., Anderson v. Rizza Chevrolet, Inc.,* 9 F. Supp. 2d 908 (N.D. Ill. 1998); *Cirone-Shadow v. Union Nissan,* 955 F. Supp. 938 (N.D. Ill. 1997).

TILA also provides borrowers with a right of rescission in the case of certain types of mortgage loans. 15 U.S.C. § 1635(a). Rescission is available only on certain consumer mortgage loans secured by the borrower's principal residence. *Id.* § 1635(a), (e). It is not available for mortgage loans to finance the acquisition or initial construction of a residence. *Id.* §§ 1635(e), 1602(w). Thus, the right to rescind arises most commonly with respect to refinancings of purchase money mortgage loans and to home equity and home improvement loans. TILA authorizes the borrower to rescind the transaction until midnight of the third day following consummation of the loan, assuming the lender has delivered the required notice of the right to rescind and all material disclosures. *Id.* § 1635(a). To provide the lender with an incentive to provide those materials promptly, the right to rescind can be extended until the lender provides them, but not beyond three years after consummation of the loan. *Id.* § 1635(f).

If the borrower exercises his or her right to rescind by providing notice to the creditor, the creditor has 20 days in which to return all the interest, charges, and fees collected from the borrower. In particular, it "shall return to the obligor any money or property given as earnest money, downpayment, or otherwise, and shall take any action necessary or appropriate to reflect the termination of any security interest created under the transaction." 15 U.S.C. § 1635(b). Once the creditor has done so, the borrower must tender any property delivered by the creditor back to the creditor, "except that if return of the property in kind

would be impracticable or inequitable, the obligor shall tender its reasonable value." *Ibid.* In most cases, this provision requires the borrower to return the loan principal. By providing that these procedures "shall apply except when otherwise ordered by a court" *(ibid.),* section 1635 makes clear that courts may tailor the terms of a rescission to the particular factual context.[FN2]

> FN2. The TILA remedy provisions, 15 U.S.C. §§ 1635 and 1640, are set forth in full in the attached addendum to this brief. The Federal Reserve Board has implemented and interpreted TILA through its Regulation Z (12 C.F.R. Part 226) and through its Official Staff Interpretations ("Commentary") *(id.* Supp. 1). The provisions of Regulation Z that govern rescission for closed-end loans (such as the mortgage loans at issue here) are found at 12 C.F.R. § 226.23.

**Factual Background.** Chevy Chase is a federally chartered savings institution that offers a variety of mortgage loan products to residential customers throughout the country. It offers these loans both directly and through independent mortgage brokers who serve as the borrower's agent and offer products from a variety of lenders. R.45, Exh. 1 ¶¶ 2-3. If the borrower chooses a Chevy Chase product, the mortgage broker sends the application to Chevy Chase, which then agrees to fund the loan if the borrower meets its credit requirements. *Id.* ¶ 3.

In June 2004, the Andrews refinanced their mortgage on a property located in Cedarburg, Wisconsin, obtaining a new loan from Chevy Chase through a broker. R.45, Exh. 1 ¶ 7. Mr. Andrews runs his own home remodeling business and the Andrews are experienced mortgagors, having taken out eleven original or refinancing mortgage loans on their various residential and investment properties. R.58 at 11, 13-24, 29-44.

The Andrews opted for a "cashflow payment option" loan, one of a number of innovative types of mortgage loans available in today's market that provide borrowers with greater flexibility than more traditional fixed or adjustable rate mortgage loans. Chevy Chase's cashflow payment option loan fixes the minimum monthly payment for an initial term, such as five years in the case of the Andrews' loan,

based on a low initial interest rate. That interest rate adjusts each month based on an established index, but the minimum monthly payment remains fixed until the initial term expires or the outstanding principal balance exceeds 110% of the original principal balance, whichever occurs first. R.45, Exh. 1 ¶ 4.[FN3] Borrowers also have the option each month to make payments larger than the minimum. *Id.* ¶ 5. By offering multiple payment options, these loans provide flexibility for borrowers, such as self-employed individuals like Mr. Andrews, whose monthly cash flow can be subject to significant fluctuations.

> FN3. The outstanding principal balance can exceed the original principal balance through "negative amortization," which adds unpaid interest to the principal of the loan.

The Andrews, who planned to sell their home within five years (R.57 at 36, 43-44), obtained a mortgage loan in the amount of $147,597. Each month, the Andrews received a statement allowing them to choose one of four options for that month's payment. They could make the required minimum monthly fixed payment based on the initial 1.95% interest rate (an option available for the first five years of the loan or until the 100% negative amortization limit was met); an interest-only payment based on the fully-indexed interest rate; a payment sufficient to amortize the loan over a 15-year period; or a payment sufficient to amortize the loan over a 30-year period. R.45, Exh. 1 ¶5; R.78, Att. 1 ¶ 2.

Shortly after their broker submitted the Andrews' loan application, Chevy Chase provided them with the documents and disclosures required by TILA, including a Truth in Lending Disclosure Statement ("TILDS"). A24; R.58 at 120-21. At closing, the Andrews again were provided with a full package of disclosure documents, including the required notice of their right to rescind. R.45, Exh. 3 at Exhs. 13-19. These documents disclosed a minimum monthly payment capped at $701.21 for the first 60 months of the loan, which was based on an initial 1.95% adjustable interest rate, and a fully amortizing monthly payment of $983.49 for the final 300 months, which (as required by TILA and Regulation Z) was based on the 4% fully indexed interest rate in effect at the time the loan was consummated. R.45, Exh. 1 ¶¶ 9-13.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Because Chevy Chase offers several dozen different mortgage products, its loan origination system was programmed to include a product tracking notation in the upper right-hand corner of the TILDS. The product tracking notation in the TILDS provided to the Andrews stated:

*DATE* 06/08/2004

*LOAN NO.* 554067397

*Type of Loan* WS Cashflow 5-year Fixed Note Interest Rate: 1.950%.

A24. The court found that this optional tracking notation rendered misleading certain of the required disclosures that were accurately set forth in the TILA-mandated disclosure format (the boxes that appear on the TILDS). A5-A6, A12-A13.

**District Court Proceedings.** Plaintiffs filed suit against Chevy Chase in April 2005. The operative Third Amended Complaint ("Complaint") contains a single count for "selling and originating mortgages in violation of the Truth in Lending Act." R.75 at 4. The Complaint alleges that certain of Chevy Chase's disclosures to the Andrews were misleading or unclear, particularly as to whether the initial interest rate was fixed and whether mortgage payments were due monthly.

In a January 16, 2007 Order, the district court granted plaintiffs' motion for summary judgment. The court ruled that Chevy Chase violated TILA's disclosure requirements because it failed to disclose "clearly and conspicuously" that mortgage "payments were due monthly" (A5-A6); its "disclosure of the cost of the loan as an annual percentage rate was unclear" because of a supposed discrepancy between the correctly computed APR and the product tracking notation (All); although Chevy Chase checked the required box indicating that "[t]his loan has a variable rate feature," it did not clearly disclose that the loan had a variable interest rate feature (A11-A 12); and it added information to its TILDS (namely, the product tracking notation referenced above) that was not "directly related to required information" (A12-A13). As a remedy, the court declared that "plaintiffs may avail themselves of the remedy of rescission" pursuant to 15 U.S.C. § 1635. A15.

In that same order, the district court granted plaintiffs' motion for class certification under Rule 23(b)(2). A21. The court certified a class that includes all persons who obtained an adjustable rate mortgage from Chevy Chase on their primary residence between April 20, 2004 and January 16, 2007 and who received a TILDS containing any of the language that the court found deficient. A22.

The district court declared that all class members would have the right to rescind their mortgages. A15-A22. Recognizing that other courts have barred class-wide rescission, the court nevertheless concluded that "a TILA plaintiff seeking a declaration that she may rescind a loan may represent a class." A16. The court reasoned that TILA contains no language precluding the use of class actions; did "not find it significant" that Congress had referenced class actions when amending the TILA damages provision but not when it amended the TILA rescission provision; and opined that "public policy strongly favors allowing class actions in cases like the present one." *Ibid.* The court then ruled that notice must be provided to all members of the certified class of their right to rescind and established a briefing schedule to enable the parties to address the form and content of that notice. A22.

After this Court granted Chevy Chase's petition for leave to appeal pursuant to Rule 23(f), the district court stayed its proceedings pending the appeal. In a subsequent memorandum, the district court explained that it granted the stay based on "the need to clarify whether a court could certify a class whose members have a right to rescind." A34. The district court defended its class certification order, notwithstanding the subsequent decision by the First Circuit in *McKenna v. First Horizon Home Loan Corp., 475 F.3d 418 (1st Cir. 2007),* which held that TILA rescission classes may not be certified. The district court recognized that "the Seventh Circuit may disagree with me and agree with a sister circuit." A33.

The district court also recognized that it "likely defined the class too broadly, and that if the class action survives, the class definition will have to be narrowed" to include "only borrowers who refinanced a loan with a different lender or refinanced a loan with the same lender but secured it with

different collateral." A33-A34.

## SUMMARY OF ARGUMENT

As the only two courts of appeals to address this issue have held, the text, history, and purpose of the TILA remedy provisions demonstrate that TILA rescission classes may not be certified. Declaring that a class of thousands of borrowers may rescind their mortgages and thereby obtain an interest-free loan for up to three years would impose intolerable liability on lenders for violations of TILA's technical disclosure requirements and confer unwarranted windfalls on thousands of borrowers. In addition, rescission is a personal remedy that by its very nature requires highly individualized inquiries, which cannot be avoided by issuing a declaratory judgment. For these and other reasons, the class certified by the district court fails to satisfy the requirements set forth in Fed. R. Civ. P. 23.

### I.A

The only two appellate courts to address this issue have held that TILA rescission classes may *not* be certified. Both the First and Fifth Circuits have rejected such classes as inconsistent with the TILA text, history, and purpose and with the personal character of the rescission remedy. In the face of these well-reasoned opinions, this Court should not create a circuit split.

### I.B

Certification of a TILA rescission class would not be compatible with the plain meaning of the text of TILA sections 1635, which governs rescission, and 1640(a), which governs damages. Whereas section 1640(a) expressly references class actions, section 1635 makes no mention of them. Moreover, class actions are addressed in section 1640(a) with respect to a damages cap that prevents disproportionate liability for violations of TILA's complex disclosure requirements. The omission of any comparable reference or cap in section 1635 demonstrates that Congress did not contemplate class-wide rescissions and thus saw no need to cap rescission liability. The fact that section 1635 confers equitable authority on courts to modify the rescission process described in TILA - and makes the details of that process depend on what is "appropriate," "practicable," and

"equitable" - confirms that rescission is a personal remedy not suitable for a class-wide award.

Furthermore, TILA limits available relief for statutory violations to damages and rescission. It does not authorize declaratory relief, even in individual actions. Thus, the district court's declaration of a class-wide right to rescind is incompatible with TILA.

### I.C

Although the plain meaning of the statutory text is sufficient to show that TILA does not authorize rescission classes, the amendment history of the TILA remedy provisions confirms that conclusion. In amendment after amendment, Congress has sought to protect the credit industry against disproportionate TILA liability. Allowing a court to impose the enormous liability that would result from a rescission class action, which would authorize the refund of three years' worth of interest, finance charges, and fees to thousands of borrowers at the stroke of a pen, would defeat Congress's intent.

### II.

The certified class does not satisfy the requirements of Rule 23. Even if all the putative class members received disclosures with the same alleged deficiencies, implementing the awarded remedy would require separate courts to engage in individualized inquiries into a variety of facts and circumstances. Thus, the district court proceeding was not a class action within the meaning of Rule 23 but rather, pursuant to the district court's declaration, a mere launching pad for a host of new individual proceedings.

A class action cannot be concocted merely by issuing a declaration and certifying a class under Rule 23(b)(2), as the district court did in this case. Declaratory relief is not available even to individual plaintiffs under TILA and thus cannot be appropriate with respect to the class as a whole, as Rule 23(b)(2) requires. Nor was the declaration announced by the district court tantamount to an injunction or "final," as Rule 23(b)(2) further requires. Instead, that declaration *initiated* a rescission process that will require individualized tailoring in potentially thousands of future proceedings.

Nor may a class be certified under Rule 23(b)(3). The many individualized disputes to which the rescission process gives rise, as well as the varying circumstances of the putative class members and the varying state laws that would be implicated, ensure that individual issues would predominate over common ones. That same host of individualized issues would make a class action unmanageable.

Moreover, this is not a case where a class action is necessary. Rescission provides those borrowers who desire rescission with sufficient incentive to bring individual lawsuits, as many do every year.

**STANDARD OF REVIEW**

Although a class certification ruling is generally reviewed for abuse of discretion, any "purely legal" determinations made in support of that ruling are reviewed *de novo. Mace v. Van Ru Credit Corp., 109 F.3d 338, 340 (7th Cir. 1997).*

15ARGUMENT

**I. The Only Two Courts Of Appeals To Address This Issue Have Held That TILA Rescission Classes May Not Be Certified.**

The only two courts of appeals to address the propriety of TILA rescission classes have held that they may not be certified. See *McKenna v. First Horizon Home Loan Corp., 475 F.3d 418 (1st Cir. 2007); James v. Home Constr. Co., 621 F.2d 727 (5th Cir. 1980).* There is no valid reason for this Court to depart from those rulings and create a conflict among the circuits where none now exists.

In *McKenna,* the First Circuit held, on a Rule 23(f) appeal, that "as a matter of law, class certification is not available for rescission claims, direct or declaratory, under the TILA." 475 F.3d at 423. That holding rested on the court's conclusion that "Congress did not intend rescission suits to receive class-action treatment." *Ibid.* The First Circuit noted that class actions are specifically addressed in the TILA section providing a right to damages (§ 1640(a)(2)(B)) but not in the TILA section providing a right to rescission (§ 1635). *Ibid.* The court also found it "plain that unrestricted class action

availability for rescission claims would open the door for vast recoveries," which would be "considerably in excess of the cap [that] Congress painstakingly established for damages class actions." *Id.* at 424. In addition, the court found that the relevant TILA amendment history confirms that Congress "had not intended that **\*16** lenders would be made to face overwhelming liability for relatively minor violations," as would be the case if rescission were available as a class remedy. *Ibid.* In addition, the court explained, "[t]he highly individualized character of this process and the range of variations that may occur render rescission largely incompatible with a sensible deployment of the class-action mechanism." *Id.* at 424-25.[FN4]

FN4. In its stay opinion, the district court criticized the First Circuit's use of legislative history, relying on *Matter of Sinclair, 870 F.2d 1340, 1342 (7th Cir. 1989).* A31. But the Court in *Sinclair* explained that "[l]egislative history may be invaluable in revealing the setting of the enactment and the assumptions its authors entertained about how their words would be understood." 870 F.2d at 1342. This Court and the Supreme Court continue to use legislative and amendment history to illuminate and confirm the textual meaning of statutes. *E.g., Granholm v. Heald, 544 U.S. 460, 476 (2005); Humphries v. CBOCS West, Inc., 474 F.3d 387, 398 (7th Cir. 2007); South Austin Coalition Community Council v. SBC Communications, Inc., 274 F.3d 1168, 1172 (7th Cir. 2001).* Thus, the district court's criticism of the First Circuit analytical framework, which used legislative history as "confirmatory evidence" to support its textual reading (475 F.3d at 424), was misplaced.

In *James,* the Fifth Circuit held that rescission is "a purely personal remedy" and that certifying a rescission class "would contradict what would seem to be the Congressional intent about the nature of this action." 621 F.2d at 730-31. The court explained:
The language of Section 1635(b), it seems clear, gives the creditor ten days in each case in which to go through the steps of rescission before the matter can be brought to court. This is a right which the creditor has with each individual obligor. Thus the notion of a

class action in this sort of context would contradict what would seem to be the Congressional intent about the nature of this action.

**\*17**Ibid. (citations omitted). The district court expressed its disagreement with James but did not offer any critique of the above analysis. See A16.

Instead, in its stay opinion, the district court relied on several cases for the proposition that TILA does not bar class actions. Wilcox v. Commerce Bank, 474 F.2d 336 (10th Cir. 1973); Haynes v. Logan Furniture Mart, Inc., 503 F.2d 1161 (7th Cir. 1974); Goldman v. First Nat'l Bank, 532 F.2d 10 (7th Cir. 1976); Johnson v. West Suburban Bank, 225 F.3d 366 (3d Cir. 2000). A29-A30. Significantly, however, each of those cases involved only claims for damages, not rescission, and thus can have no bearing on the issue at hand. Moreover, Johnson held that arbitrating TILA claims individually is consistent with both TILA and Rule 23. Johnson, 225 F.3d at 373-75; accord Livingston v. Associate Fin., Inc., 339 F.3d 553, 558 (7th Cir. 2003). It follows, a fortiori, that litigating TILA rescission claims individually cannot be inconsistent with TILA or Rule 23.

In short, this Court should agree with the First and Fifth Circuits that rescission class actions are not available under TILA. Given the text, amendment history, and purpose of the TILA remedy provisions, as explained more fully below, there is no viable reason to create a circuit split over this issue. See Rockford League of Women Voters v. United States Nuclear Regulatory Comm'n, 679 F.2d 1218, 1221 (7th Cir. 1982) ("Even if we were somewhat inclined as an original matter to come out **\*18** the other way, we much prefer where possible to avoid creating a conflict among circuits"); accord United States v. Neal, 46 F.3d 1405, 1411 (7th Cir. 1995), aff'd on other grounds, 516 U.S. 284 (7th Cir. 1996).

## II. Certification Of Rescission Classes Would Be Inconsistent With The Text, History, And Purpose Of TILA's Remedy Provisions.

The First and Fifth Circuits reached the right conclusion. The text, history, and purpose of TILA's remedy provisions refute the district court's view that TILA authorizes class-wide rescission. McKenna, 475 F.3d at 423-26; see Universities Research Ass'n v. Coutu, 450 U.S. 754, 784 (1981) (looking to a statute's "language, history, [and] purpose" to determine whether Congress intended a private right of action).

## A. Certification of rescission classes would be inconsistent with the text of TILA's remedy provisions.

A review of the applicable TILA text refutes the district court's view that "nothing in the text of TILA supports the proposition that TILA bars courts from certifying classes whose members seek rescission." A28.

TILA contains two remedy sections. Section 1640(a), which governs actual and statutory damages, expressly provides for class actions. In contrast, section 1635, which governs rescission, contains no language authorizing or even mentioning class actions. The district court erred by assuming that such an omission carries no meaning. "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress **\*19** acts intentionally and purposefully in the disparate inclusion or exclusion." Beach v. Ocwen Fed. Bank, 523 U.S. 410, 418 (1998); Doe v. Smith, 470 F.3d 331, 355 (7th Cir. 2006). As the First Circuit concluded, "the variation in the treatment of class actions in the two relevant sections of the TILA strongly suggests that Congress did not intend to include a class-action mechanism within the compass of section 1635." McKenna, 475 F.3d at 423; accord Murry v. America's Mortgage Banc, Inc., 2005 WL 1323364, at \*10 (N.D. Ill. May 5, 2005), aff'd, 2006 WL 1647531 (N.D. Ill. June 5, 2006); LaLiberte v. Pacific Mercantile Bank, 53 Cal. Rptr. 3d 745, 751 (App. 2007). Commentators too have recognized that the lack of any mention of class actions in section 1635 shows that the TILA "does not contemplate rescission as a class remedy." Ralph J. Rohner & Fred H. Miller, Truth in Lending ¶ 12.08[5], at 881 (2000) ("Truth in Lending").

Moreover, class actions are addressed in section 1640 in relation to a cap on awardable damages. The lack of any comparable cap on amounts to be rescinded pursuant to section 1635 confirms that Congress did not contemplate rescission being awardable other than in individual proceedings. As the First Circuit explained, "[t]he notion that Congress would limit

liability to $500,000 with respect to one remedy while allowing the sky to be the limit with respect to another remedy for the same violation strains credulity." *McKenna, 475 F.3d at 424*.

**\*20** The description of the rescission process in section 1635 further confirms that Congress did not contemplate rescission class actions. Section 1635 gives borrowers who received the required disclosures a three-day "cooling-off" period after closing on their loans to change their minds. 15 U.S.C. § 1635(a). Borrowers do not change their minds as a class. Thus, borrowers wishing to rescind must provide notice of that intent to the creditor, a requirement that is inherently individual. *Ibid.* Moreover, the actions prescribed for both the creditor and borrower during the rescission process depend on what is "appropriate," "impracticable," and "inequitable." *Ibid.* The application of such terms is inherently specific to the context of each creditor-borrower relationship and thus inconsistent with class-action treatment. See *infra* Part III.B.1.

Indeed, section 1635(b) expressly authorizes case-by-case treatment by providing that "[t]he procedures prescribed by this subsection shall apply except when otherwise ordered by a court." That provision confers equitable authority on courts to tailor the rescission process to fit the specific context of each creditor-borrower relationship. Such case-by-case tailoring cannot be reconciled with the district court's view that section 1635(b) authorizes class-wide rescission.

The district court relied on the fact that TILA does not say in so many words that rescission class actions are barred. But as the First Circuit explained, "TILA contains no language describing the process by **\*21** which parties may sue in federal court to enforce rescission rights. We would not expect Congress expressly to exempt from class-action rules a process for which it never fully delineated an individual right of action." *McKenna, 475 F.3d at 425-26*. This Court's opinion in *Brown v. Payday Check Advance, Inc., 202 F.3d 987, 991 (7th Cir. 2000)*, further refutes the district court's expansive reading of the TILA remedy provisions. The question before the Court was whether statutory damages are available for a violation of section 1632(a) of TILA, where TILA nowhere expressly states that such damages are barred for a violation of section 1632(a). The Court held that the omission of section 1632(a) from the

provisions listed in section 1640(a) as giving rise to statutory damages was sufficient to show that statutory damages are unavailable for a violation of section 1632(a). Here, too, the omission of any reference to class actions in section 1635, especially in light of their express reference in section 1640, signifies that rescission class actions are unavailable under TILA.

Finally, the declaration issued by the district court also conflicts with the TILA text, which authorizes damages and rescission as the sole remedies for violation of its provisions. Neither section 1635 nor section 1640 (nor any other TILA provision) authorizes a borrower to obtain declaratory relief. Courts construing similar provisions in similar statutes - the Fair Debt Collection Practices Act and Fair Credit **\*22** Reporting Act - have refused to allow private litigants (as opposed to government agencies) to seek declaratory or equitable relief not specified in the statute. *E.g., Crawford v. Equifax Payment Servs., Inc., 201 F.3d 877, 882 (7th Cir. 2000)* ("all private actions under the Fair Debt Collection Practices Act are for damages"); *Weiss v. Regal Collections, 385 F.3d 337, 341 n.7 (3d Cir. 2004)* ("most courts have found declaratory or equitable relief is not available to private litigants under the FDCPA"); *Washington v. CSC Credit Servs., Inc., 199 F.3d 263, 268 (5th Cir. 2000)* (equitable or declaratory relief is not available to private parties under the FCRA); *Anderson v. Capital One Bank, 224 F.R.D. 444, 448-49 (W.D. Wis. 2004)* (same). Because TILA bars an individual borrower from obtaining declaratory relief, the district court erred by granting declaratory relief to the Andrews and to all the other individual borrowers in the certified class.

### B. Certification of rescission classes would be inconsistent with the history and purpose of TILA's remedy provisions.

As demonstrated in the prior section, the plain meaning of the TILA remedy provisions is that TILA does not authorize courts to award rescission on a class-wide basis. See *United States v. Ron Pair Enters., 489 U.S. 235, 240-41 (1989)*. Any doubt on that score is refuted by the amendment history of those provisions, which confirms their plain meaning.

**\*23** Permitting TILA rescission classes would defeat Congress's intent to limit lenders' liability. Before

1974, TILA did not mention class actions. Congress amended section 1640 in 1974 to adopt caps on statutory damages, including an aggregate cap of $100,000 in class actions, without making any change to section 1635. Truth in Lending Act Amendments, Pub. L. No. 93-495, tit. IV, §407, 88 Stat. 1500 (1974). This was the first (and remains the only) reference to class actions in TILA. Congress adopted the 1974 amendments "to place an aggregate limitation on a creditor's class action liability for violations not involving actual damages." S. Rep. No. 93-278, at 14-15 (1973). The fact that Congress adopted no similar limitation on rescission liability suggests that it did not contemplate class action rescissions, given the devastating impact that wholesale rescissions would have on the mortgage lending industry.

The district court did not find this different treatment of statutory damages and rescission in the 1974 amendments to be "significant," opining that it was "just as likely that Congress did not intend to limit rescission claims in any way." A16. But as the First Circuit explained, it is "much more likely" in light of the cap on statutory damages that Congress "intended rescission to be totally unavailable as a class remedy in the TILA milieu" than to be "available unrestrainedly in TILA cases, *24 not subject to any special limiting conditions." McKenna, 475 F.3d at 423-24.

Responding to McKenna in its stay memorandum, the district court suggested that the 1974 amendment did not address rescission class actions either because Congress "did not regard such actions as posing the same economic threat to the credit industry as class actions involving damages" or because Congress "never considered the issue." A30. But a Congress that was sufficiently concerned about economic impact on the lending industry to impose a statutory damages cap cannot have been oblivious to the economic threat posed by allowing enormous classes of borrowers to rescind their mortgages at one fell swoop. The district court should not have deemed meaningless the distinction Congress drew between statutory damages and rescission with respect to class actions. See Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11, 20 (1979) ("In view of these express provisions for enforc[ement], it is highly improbable that Congress absentmindedly forgot to mention an intended private action").

Congress raised the statutory damages cap to $500,000 in 1976, explaining that it viewed that cap as both appropriate to protect against devastating liability and sufficient to "act as a significant deterrent to even the largest creditor." S. Rep. No. 94-590, at 8 (1976), reprinted in 1976 U.S.C.C.A.N. 431, 438; see Consumer Leasing Act of 1976, *25Pub. L. No. 94-240, 90 Stat. 257. Again, it defies belief that Congress, in executing such a balancing act, would have completely disregarded rescission if it thought that remedy was available in class actions. As one court recently explained, it is unlikely "that Congress would carefully balance the deterrent effect of class actions under TILA against the potential harm to businesses in the context of statutory damages, and yet allow class action rescission to proceed without any safeguard for the affected business." LaLiberte, 53 Cal. Rptr. 3d at 751.

Congress again amended section 1640(a) in 1980 "to curtail damages awards for picky and inconsequential formal errors." Brown, 202 F.3d at 991. The amendment also barred aggregate recoveries from exceeding the cap in a "series of class actions arising out of the same failure to comply by the same creditor." Truth in Lending Simplification and Reform Act, Pub. L. No. 96-221, tit. VI, § 615(a)(1), 94 Stat. 132 (1980); see supra p. 3. The Senate Report immediately followed its discussion of class actions, where only statutory damages are mentioned as available relief, with a discussion of changes to the TILA rescission provisions, stating that the amendment "makes explicit that a consumer may institute suit [to] enforce the right of rescission" (S. Rep. No. 96-368, at 32 (1979), reprinted in 1980 U.S.C.C.A.N. 236, 268 (emphasis added)), again showing Congress's understanding that rescission is an inherently individual remedy.

*26 In 1995, Congress further limited the potential for expansive TILA liability, first, by temporarily suspending all TILA class actions and then by increasing the tolerance levels for minor deviations from disclosure obligations. See Truth in Lending Class Action Relief Act of 1995, Pub. L. No. 104-12, 109 Stat. 161; Truth in Lending Act Amendments of 1995, Pub. L. No. 104-29, 109 Stat. 271. Congress adopted those amendments in response to concerns about potentially devastating lender liability following a flurry of class action lawsuits filed in the

wake of _Rodash v. AIB Mortgage Co., 16 F.3d 1142, 1147 (11th Cir. 1994)_, in which the court held (in a non-class-action case) that minor violations of TILA triggered a mortgagor's right to rescind. Congress acted to prevent the ensuing class actions from imposing "disastrous losses" on the mortgage industry. Truth in Lending ¶ 6.01[2], at 359-60; _see, e.g.,_ 141 Cong. Rec. S14566, 14567 (Sept. 28, 1995) (statement of Sen. Banking Committee Chairman D'Amato). The House Report estimated that the potential cost of rescinding three years' worth of refinanced mortgage loans would be $217 billion (H.R. Rep. No. 104-193, at 52 (1995)), a figure repeatedly cited by proponents of the legislation. _E.g.,_ 141 Cong. Rec. H4120-04, 4121 (Apr. 4, 1995) (statement of chief House sponsor Rep. Roukema).

In response to _Rodash,_ Congress narrowed the circumstances in which a borrower could seek rescission. In doing so, not a single participant in the floor debate ever suggested that rescission would be **\*27** available to an entire class of consumers. To the contrary, as one proponent explained, the amendments "largely preserved" the right of rescission for "_the consumer_ [in] _particular circumstances_" (141 Cong. Rec. H9513-01, 9515 (Sept. 27, 1995) (statement of Rep. Gonzalez)), a formulation incompatible with class resolution. As the First Circuit explained in _McKenna:_

Amendment of the TILA's substantive provisions was a predictable reaction to _Rodash_ - one that promised to ameliorate "the threat of wholesale rescissions." Every indication is that Congress, while making no provision for class actions in the rescission context, intended to keep at bay the ominous prospect of large-scale liability that would be inherent in rescission class actions.

475 F.3d at 425 (citation omitted).

Rescission class actions would conflict with this consistent Congressional effort to prevent disproportionate liability for lenders charged with TILA violations. By protecting lenders from intolerable liability, Congress recognized that complying with the complex TILA disclosure provisions is not easy and that a failure to do so should not be disproportionately punished. Despite clarifying amendments over the years, "it remains the case with regard to real estate transactions that it is not a simple matter to know when and how to apply

statutory and regulatory provisions regarding what to disclose, how to calculate the **\*28** necessary disclosures, and when to give those disclosures." Truth in Lending ¶ 6.01[5], at 365.

This case provides a telling example. Chevy Chase is not charged with failing to disclose required material information but primarily for _including_ product tracking language in the TILDS. A9-12. The district court also ruled that Chevy Chase did not make clear that mortgage payments would be due monthly (A6), even though the TILDS states that "this loan program allows you to select the type of payment you make _each month_" (A24, emphasis added), and there was no evidence that plaintiffs or any other Chevy Chase borrower ever thought that his or her mortgage payment would be due at any different interval. Under the district court's class-wide rescission ruling, Chevy Chase could be forced to provide thousands of borrowers with a three-year interest-free loan and a refund of properly charged finance charges and fees - a burden that here (and in most class actions) would amount to tens of millions of dollars and thus greatly exceed TILA's $500,000 cap on aggregate damages. That is just the type of crushing sanction that Congress sought to limit in its series of amendments from 1974 through 1995. See _Jefferson v. Security Pac. Fin. Servs., Inc., 161 F.R.D. 63, 69 (N.D. Ill. 1995)_ (contrary to the intent of Congress, classwide rescission "would turn Section 1635(b) into a penal provision").

**\*29III. Alternatively, The Proposed Class Does Not Satisfy The Requirements Of Rule 23.**

The district court incorrectly opined that only Rule 23, not TILA, governs the propriety of its class certification order. A30. But even if TILA did not bar rescission classes (it does, as demonstrated in Part II, _supra_),Rule 23 does not rescue the district court's order because plaintiffs have not satisfied the Rule's requirements.

"Class certification requires a rigorous investigation into the propriety of proceeding as a class." _Livingston, 339 F.3d at 558_ (rejecting class certification in TILA suit in favor of individual remedy). A court may certify a class only if it finds that "all of the prerequisites" of Rule 23 have been satisfied. _Szabo v. Bridgeport Machs., Inc., 249 F.3d 672, 676 (7th Cir. 2001)_. "[I]t is the plaintiffs burden

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

to prove the class should be certified." *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006). A class may not be certified when a class action would entail "sacrificing procedural fairness" and "abridg[ing]" the "substantive right" of defendants to raise and present evidence on individualized defenses. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997) (citing Rules Enabling Act, 28 U.S.C. § 2072(b)); accord *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 845 (1999). Applying these principles, the district court should have denied plaintiffs' class certification motion.

**\*30A. The district court erred by certifying this class under Rule 23(b)(2).**

The district court should not have certified a class under Rule 23(b)(2). A (b)(2) class may be certified only if it is "appropriate" to issue "final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed. R. Civ. P. 23(b)(2). "Declaratory relief 'corresponds' to injunctive relief when as a practical matter it affords injunctive relief or serves as a basis for later injunctive relief." Advisory Committee Note to 1966 Amendment to Rule 23. Whether styled as injunctive or declaratory relief, it must be "final." 7AA Charles A. Wright, Arthur R. Miller, & Mary K. Kane, Federal Practice & Procedure § 1775, at 41 (3d ed. 2005). The declaratory relief ordered by the district court does not satisfy these standards.

First, as explained above in Part II.A, TILA does not authorize a private action for declaratory relief at all, much less in a class action. Second, the district court's declaration does not correspond to injunctive relief. It does not order Chevy Chase to do anything specific, nor could it do so because, as described in the next section, the course of each rescission necessarily varies from transaction to transaction depending on individual circumstances. Third, the district court's declaration was far from "final." Even if all the disclosures provided to the putative class members were deficient, the court's declaration merely initiated the **\*31** rescission process and the inevitable disputes to which it gives rise, which will have to be resolved in separate actions in different courts. As the First Circuit noted in *McKenna*, a declaration to seek rescission "plainly would not settle the controversy" because "the equitable nature of rescission generally entitles the affected creditor to

judicial consideration of the individual circumstances of the particular transaction." *McKenna*, 475 F.3d at 427 n.6.

The district court defended its declaration on the ground that "the personal aspects of rescission do not come into play in a declaratory action but only after a borrower actually attempts to rescind." A33. But the court thereby recognized that the actual rescission process will involve "personal aspects" that would require further court actions in multiple courts, effectively refuting its own view that a declaration somehow avoids the problems inherent in a rescission class action. As the First Circuit noted, a "professed distinction between a suit for a declaratory judgment that rescission is possible and a suit for rescission simpliciter elevates form over substance." *McKenna*, 475 F.3d at 426; accord *Murry*, 2005 WL 1323364, at \*11;*Gibbons*, 208 F.R.D. at 285.

Indeed, the district court issued its declaration without any evidence that any of the absent class members even wishes to rescind a mortgage. "Not all members of a class may have the desire or the ability to rescind," which requires them in most cases to refinance their **\*32** mortgage. Truth in Lending ¶ 12.08[5], at 881. As one court noted, many class members "may be perfectly satisfied with the work done on their homes and the loan transactions in their entirety." *Nelson v. United Credit Plan*, 77 F.R.D. 54, 58 (E.D. La. 1978) (concluding that "it may be better to allow each member to sue individually if he wishes").

Declaring a right to rescind on the part of borrowers who have no wish to rescind therefore amounts to an impermissible "advisory opinion" because "it is not at all clear that a justiciable controversy exists between the class and defendants." *Gibbons*, 208 F.R.D. at 285; accord *Jefferson*, 161 F.R.D. at 69 (citing *Highsmith v. Chrysler Credit Corp.*, 18 F.3d 434, 436-37 (7th Cir. 1994)). Because "Article III standing requirements must be assessed with reference to the class as a whole, not simply with reference to the individual named plaintiffs" *(Payton v. County of Kane*, 308 F.3d 673, 680 (7th Cir. 2002)), borrowers who have never indicated a desire to rescind their mortgages lack standing to seek a right to rescind. See *Swain v. Brinegar*, 517 F.2d 766, 780 (7th Cir. 1975) (rejecting class action where absent class members would not be affected by

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

proposed relief).

For all these reasons, the court's certification of a class under Rule 23(b)(2), based on a declaration of a right to seek rescission, cannot be sustained.

### *33B. Plaintiffs have not satisfied the predominance and superiority requirements of Rule 23(b)(3).

Class-wide rescission would require Chevy Chase to reimburse vast amounts of interest, points, finance charges, and application fees received over several years from thousands of borrowers. Accordingly, if a class action were available at all, monetary relief would predominate, requiring that any class be certified under Rule 23(b)(3) and satisfy the predominance and superiority elements of that provision. *See Lemon v. International Union of Operating Eng'rs,* 216 F.3d 577, 582 (7th Cir. 2000) (vacating Rule 23(b)(2) certification where requested monetary damages were more than "incidental").

The predominance and superiority requirements of Rule 23(b)(3) are "far more demanding" than the Rule 23(a) requirements for class certification. *Amchem,* 521 U.S. at 624. As demonstrated below, plaintiffs cannot satisfy those (b)(3) requirements because individual issues would predominate in any rescission class action, and a class action would not be the superior means of adjudicating the putative class members' claims.

#### *1. Individual issues would predominate over common issues in any class-wide rescission.*

A class may not be certified under Rule 23(b)(3) where individual issues would predominate. *Nagel v. ADM Inv. Servs., Inc.,* 217 F.3d 436, 443 (7th Cir. 2000). That would certainly be the case if the thousands of **34** class members were to seek rescission. As noted *supra* p. 20, section 1635(b) expressly recognizes the individualized character of the rescission process by authorizing courts to modify the rescission procedures it prescribes. See also S. Rep. No. 96-368, *supra* p. 25, at 29 ("the courts, at any time during the rescission process, may impose equitable conditions to insure that the consumer meets his obligations after the creditor has performed his obligations as required under the Act"). That authorization of equitable court intervention shows

that Congress viewed rescission as "a personal, rather than a class, remedy" *(Murry,* 2005 WL 1323364 at *10),* requiring "factual findings too numerous to manage as a class action." *Jefferson,* 161 F.R.D. at 68-69.

The judicial intervention authorized by section 1635(b) occurs frequently. *E.g., Ruiz v. R&G Fin. Corp.,* 383 F. Supp. 2d 318 (D.P.R. 2005); *American Mortgage Network v. Shelton,* 2006 U.S. Dist. LEXIS 23180 (W.D.N.C. Apr. 6, 2006). It is not surprising, for example, that the borrower and lender often disagree over the precise amount to be reimbursed to the borrower. *E.g., Semar v. Platte Valley Fed. Sav. & Loan Ass'n,* 791 F.2d 699, 705 (9th Cir. 1986). Disputes also frequently arise over eligibility for rescission. For example, since rescission applies only to a principal residence, courts often must resolve disputes over whether the property securing the loan is in fact the borrower's principal residence as opposed to a vacation home or investment property. *E.g., *35Kovalik v. Delta v. Corp.,* 611 P.2d 955, 957-58 (Ariz. App. 1980).[FN5] Similarly, disputes can arise over whether the loan was for business purposes, in which case the loan would not be subject to rescission or even to TILA at all. *See Gombosi v. Carteret Mortgage Corp.,* 894 F. Supp. 176 (E.D. Pa. 1995). Or a dispute may arise over whether the mortgaged property had been sold, such as where a contract for sale has been executed but the sale has not occurred, which too would make the loan ineligible for rescission. See 15 U.S.C. § 1635(f); 12 C.F.R. § 226.23(e)); *Hefferman v. Bitton,* 882 F.2d 379, 383-84 (9th Cir. 1989); *Dailey v. Leshin,* 792 So. 2d 527, 531-32 (Fla. App. 2001). Such disputes can be resolved only by delving into the particular circumstances of each case.

> FN5. In fact, borrowers can have an incentive to misrepresent the status of the property because a loan secured by the borrower's principal residence typically qualifies for a lower interest rate.

Yet another example involves whether the borrower will be able to return the principal once the creditor voids the security interest. In practice, most borrowers do not have sufficient funds on hand to tender back the principal, or they may be barred from doing so due to a bankruptcy or wage earner proceeding (see S. Rep. No. 96-368, *supra* p. 25, at

2007 WL 959966 (C.A.7)

29), and they therefore arrange for alternative financing. Accordingly, lenders frequently seek judicial intervention so that they are not left completely unprotected before the borrower tenders back the **\*36** principal. *E.g., Yamamoto v. Bank of N.Y.,* 329 F.3d 1167, 1171 (9th Cir. 2003); *Large v. Conseco Fin. Serv. Corp.,* 292 F.3d 49, 55 (1st Cir. 2002); *AFS Fin., Inc. v. Burdette,* 105 F. Supp. 2d 881, 881-82 (N.D. Ill. 2000). In these circumstances, courts often use their modification authority to require the borrower to repay the principal before the lien is released. "[T]here is a strong trend in favor of conditioning rescission and the voiding of the creditor's security interest upon tender of the remaining principal, *according to the individual factual equities of the transaction."* Truth in Lending ¶ 8.04[2][b], at 303 (Supp. 2006) (citing cases) (emphasis added). These "individual factual equities" do not fit into the single-class framework.

Individualized issues also arise regarding payments to third parties. While a creditor generally must refund fees that the rescinding borrower paid to a third party, such as for a title search or appraisal, the creditor need not return amounts paid to a third party "outside of the credit transaction," such as costs incurred for a building permit or zoning variation. Commentary ¶ 226.23(d)(2)-2. Disputes thus may arise over whether a particular payment to a third party must be refunded. *E.g., General Home Capital Corp. v. Campbell,* 800 N.Y.S.2d 917, 918-19 (Dist. Ct. Nassau County 2005) (dispute over fee paid to mortgage broker); *Mortgage Source, Inc. v. Strong,* 75 P.3d 304, 307 (Mont. 2003) (same). Who is responsible, for example, for casualty and credit life insurance **\*37** payments made prior to rescission? The Commentary does not say. See Commentary ¶¶ 226.15(d)(2)-2, 226.23(d)(2)-2; Truth in Lending ¶ 8.04 [2][c], at 652. If the issue is disputed, a court must resolve it based on the case-specific facts and circumstances.

Parties also dispute the timeliness of rescission. Because such disputes depend on "the date of consummation of the transaction" (§ 1635(f)), the outcome necessarily depends on facts specific to each loan transaction. *E.g., Gibbons v. Interbank Funding Group,* 208 F.R.D. 278, 284 n.8 (N.D. Cal. 2002); *Westbank v. Maurer,* 658 N.E.2d 1381, 1389 (Ill. App. 1995). Other disputes may concern whether the creditor may set off the amount to be rescinded from

the principal it provided to the borrower (see *Harris v. Tower Loan,* 609 F.2d 120, 123 (5th Cir. 1980)), or whether the borrower may condition its tender of the money or property received from the lender (see *Regency Sav. Bank v. Chavis,* 776 N.E.2d 876, 868 (Ill. App. 2002)).[FN6]

> FN6. What is more, implementing the rescission process often requires courts to look to state law. What constitutes a security interest, for example, as well as its scope, "is basically a matter of state law," including "state real estate, contract, or other law." Truth in Lending § 8.02[1][b], at 607. Class-wide rescission would implicate the varying laws of many states in this nationwide class action, confirming that individual issues would predominate. See *In re Bridgestone/Firestone, Inc.,* 288 F.3d 1012, 1018 (7th Cir. 2002); *Castano v. American Tobacco Co.,* 84 F.3d 734, 741 (5th Cir. 1996).

**\*38** As these many examples make abundantly clear, the rescission process involves individual circumstances, choices, and time frames that inevitably give rise to disputes that can be resolved only through individualized judicial resolution. "Under Section 1635, individuals must choose to assert the right to rescind, on an individual basis and within individual time frames, before filing suit." *Jefferson,* 161 F.R.D. at 68-69. By its very nature, this process cannot take place in a single class action. The course of the entire rescission process "lies within the court's equitable discretion, taking into consideration all the circumstances," and "must be determined on a *case-by-case* basis." *Yamamoto,* 329 F.3d at 1173 (emphasis added); accord *Williams v. Homestake Mortgage Co.,* 968 F.2d 1137, 1140-41 (11th Cir. 1992). No wonder courts have concluded that TILA rescission is "a personal remedy not suitable for class treatment." *LaLiberte,* 53 Cal. Rptr. 3d at 751.

For all these reasons, individual issues would predominate in the multiplicity of separate proceedings to which the district court's declaration would give rise. As the district court itself recognized in its stay opinion, "rescission is an equitable remedy, and in determining whether to grant rescission and on what terms, courts may consider the *individual*

*circumstances* of the case before them." A32 (emphasis added). The court offered no plausible explanation as to how the class action device can account for such "individual circumstances."

### *392. A class action is not the superior means to adjudicate rescission claims.

The wealth of transaction-specific rescission issues precluding predominance also precludes a class action from being the superior means of resolving all the class members' rescission claims. Any attempt to adjudicate all these individual issues in one proceeding would be unmanageable as a practical matter. See *In re Bridgestone/Firestone, Inc.,* 288 *F.3d 1012, 1018-19 (7th Cir. 2002)* (reversing class certification due to unmanageability); *Hardy v. City Optical Inc.,* 39 *F.3d 765, 771 (7th Cir. 1994)* (same). Such a rescission class action would be a "Frankenstein monster posing as a class action." *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 169 (1974).

In light of these difficulties, a class action is not the efficient way to proceed. The "central planning model" advocated by the district court would not work in a multi-factor rescission case but rather would "suppress[] information that is vital to accurate resolution." *Bridgestone/Firestone,* 288 F.3d at 1020. The district court's solution - issuing a declaration that authorizes a multiplicity of separate actions in a variety of courts - is not a solution at all and certainly not what Rule 23 contemplates.

Public policy does not support a class action in these circumstances, as the district court opined (A 16). This Court has warned *40 that large class actions create "intense pressure to settle" even meritless claims. *In re Rhone-Poulenc Rorer, Inc.,* 51 *F.3d 1293, 1298 (7th Cir. 1995).* TILA rescission class actions in particular would pose the risk of devastating lender liability and thereby risk coercing settlements regardless of the merits. The costs of such meritless settlements inevitably would be passed on to borrowers.

Nor is a class action necessary. This is not the type of case where small recoveries negate any incentive to bring individual actions. If each class member has "a sufficiently large stake to be able to afford to litigate on his own," that "weighs against allowing a suit to

proceed as a class action." *Nagel,* 217 *F.3d at 443;* accord *Frahm v. Equitable Life Assurance Soc'y,* 137 F.3d 955, 957 (7th Cir. 1998).

TILA "facilitates" the bringing of individual rescission claims *(McKenna,* 475 *F.3d at 426)* by authorizing borrowers to obtain up to three years' worth of free interest, finance charges, points, and other fees. To take a simple example: On a typical mortgage of $300,000, originated for one point and $500 of additional loan charges at a 6% interest rate, rescission after three years would provide the consumer with at least $57,500 - $3,000 in points, $500 in additional loan costs, *41 and $54,000 in interest.[FN7] On top of this rescission amount, plaintiffs in some TILA cases may seek actual and statutory damages as well. See 15 U.S.C. § 1640. Thus, it is not true, as the district court opined, that denial of class action status would "reward" TILA violators and leave wronged borrowers "uncompensated." A16.

> FN7. This example also confirms that class action rescission would have an extraordinary impact on lenders. Indeed, in *McKenna,* the First Circuit noted that certification of the class to seek rescission in that case would have required the lender to refund roughly $200 million. 475 F.3d at 424.

In addition, TILA provides for the recovery of attorneys' fees (15 U.S.C. § 1640(a)(3)), effectively removing another common obstacle to individual suits. See *Mayo v. Sears, Roebuck & Co.,* 148 *F.R.D. 576, 583 (S.D. Ohio 1993)* (availability of attorneys' fees makes individual actions a viable alternative to rescission class actions); accord *Nelson,* 77 *F.R.D. at 58.* The availability of a substantial recovery, "when combined with the attorneys' fees normally awarded to successful plaintiffs in TILA rescission cases, afford a powerful incentive to debtors to sue individually." *McKenna,* 475 *F.3d at 428* (citations omitted). Accordingly, there is no shortage of cases where individual TILA plaintiffs have sought rescission. *E.g., Handy v. Anchor Mortgage Corp.,* 464 *F.3d 760 (7th Cir. 2006); Carmichael v. The Payment Center, Inc.,* 336 *F.3d 636 (7th Cir. 2003); Clay v. Johnson,* 264 F.3d 744 (7th Cir. 2001).

*42 Even apart from individual actions, TILA

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

provides "significant incentives for creditor compliance with its strictures." *McKenna,* 475 F.3d at 426; see *Johnson,* 225 F.3d at 373 (rejecting TILA plaintiffs contention "that class actions are necessary to provide deterrence or fulfill any of the other goals of the Act"). Federal agencies have full authority to enforce TILA and to order restitution of interest and finance charges to consumers, including for "pattern and practice" violations. 15 U.S.C. § 1607. In the case of federal savings banks, including Chevy Chase, those powers are exercised by the Office of Thrift Supervision *(id.* § 1607(a)(2)), which takes that task seriously. See Office of Thrift Supervision, *Consumer Affairs Laws and Regulations* § 1310 & App. A, http://www.ots.treas.gov/CL.CFM?DON=422225&AN=11; *Joint Policy Statement on Administrative Enforcement of the Truth in Lending Act -Restitution* (1999), in Truth in Lending Comptroller's Handbook 105 (2006), http://www.occ.treas.gov/handbook/til.pdf.

In sum, the unmanageability of resolving thousands of individualized rescission claims via a single class action, the likelihood that certifying such a class would risk coercing settlement regardless of the merits, and the strong incentives to bring individual suits for rescission demonstrate that plaintiffs' class certification motion should have been denied for failure to satisfy the superiority requirement of Rule 23(b)(3).

### 43CONCLUSION

For the foregoing reasons, this Court should reverse the district court's order certifying a class in this matter.

Appendix not available.

Susan and Bryan Andrews and a class of persons similarly situated, Plaintiffs-Appellees, v. CHEVY CHASE BANK, F.S.B., Defendant-Appellant.
2007 WL 959966 (C.A.7)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 2**

Fax 7142476464            Jun 17 2008 02:26pm  P004/012

Filed
Comptroller of The Currency
Northeastern District

Date FEB 1 3 1986

## BT TRUST COMPANY OF CALIFORNIA, NATIONAL ASSOCIATION

### ARTICLES OF ASSOCIATION

For the purpose of organizing an association to carry on the business of a limited purpose trust company under the laws of the United States, the undersigned do enter into the following articles of association:

FIRST:    The title of this Association shall be "BT Trust Company of California, National Association".

SECOND:    The main office of the Association shall be in the City of Los Angeles, County of Los Angeles, State of California.  The general business of the Association shall be conducted at its main office and its branches.

THIRD:    The Board of Directors of this Association shall consist of not less than five nor more than twenty-five shareholders, the exact number of Directors within such minimum and maximum limits to be fixed and determined from time to time by resolution of a majority of the full Board of Directors or by resolution of the shareholders at any annual or special meeting thereof.  Each director, during the full term of his or her directorship, shall own a minimum of $1,000 aggregate par value of stock of this association or a minimum par market value or equity interest of $1,000 of stock in the bank holding company controlling this association.  Unless otherwise provided by the laws of the United States, any vacancy in the Board of Directors for any reason, including an increase in the number thereof, may be filled by action of the Board of Directors.

FOURTH:  The annual meeting of the shareholders for the election of Directors and the transaction of whatever other business may be brought before said meeting shall be held at the main office or such other place as the Board of Directors may designate, on the day of each year specified therefor in the By-laws, but if no election is held on that day, it may be held on any subsequent day according to the provisions of law; and all elections shall be held according to such lawful regulations as may be prescribed by the Board of Directors.

Nominations for election to the Board of Directors may be made by the Board of Directors or by any shareholder of any outstanding class of capital stock of the Association entitled to vote for election of directors.  Nominations other than those made by or on behalf of the existing management of the Association, shall be made in writing and shall be delivered or mailed to the President of the Association and to the Comptroller of the Currency, Washington, D.C., not less than 14 days nor more than

**EXHIBIT 5**

-2-

50 days prior to any meeting of shareholders called for the
election of directors;, provided, however, that if less than 21
days' notice of the meeting is given to shareholders, such
nomination shall be mailed or delivered to the President of the
Association and to the Comptroller of the Currency not later than
the close of business on the seventh day following the day on
which the notice of meeting was mailed. Such notification shall
contain the following information to the extent known to the
notifying shareholder: (a) the name and address of each proposed
nominee; (b) the principal occupation of each proposed nominee;
(c) the total number of shares of capital stock of the Associa-
tion that will be voted for each proposed nominee; (d) the name
and residence address of the notifying shareholder; and (e) the
number of shares of capital stock of the Association owned by the
notifying shareholder. Nominations not made in accordance
herewith may, in his/her discretion, be disregarded by the
chairperson of the meeting, and upon his/her instructions, the
vote tellers may disregard all votes cast for each such nominee.

FIFTH: The authorized amount of capital stock of this
Association shall be 5,000 shares of common stock of the par
value of One Hundred Dollars and no cents ($100.00) each; but
said capital stock may be increased or decreased from time to
time, in accordance with the provisions of the laws of the United
States.

No holder of shares of the capital stock of any class
of the Association shall have any pre-emptive or preferential
right of subscription to any shares of any class of stock of the
Association, whether now or hereafter authorized, or to any
obligations convertible into stock of the Association, issued, or
sold, nor any right of subscription thereto other than such, if
any, as the Board of Directors, in its discretion may from time
to time determine and at such price as the Board of Directors may
from time to time fix.

If the capital stock is increased by a stock dividend,
each shareholder shall be entitled to his/her proportionate
amount of such increase in accordance with the number of shares
of capital stock owned by him/her at the time the increase is
authorized by the shareholders, unless another time subsequent to
the date of the shareholders' meeting is specified in a
resolution adopted by the shareholders at the time the increase
is authorized.

The Association, at any time and from time to time, may
authorize and issue debt obligations, whether of not subordi-
nated, without the approval of the shareholders.

-3-

SIXTH:  The Board of Directors (a majority of whom
shall be a quorum to do business) shall appoint one of its
members to be President of the Association who shall hold office
(unless he shall become disqualified or be sooner removed by a
two-thirds vote of the members of the Board) for the term for
which he was elected a Directors.  The Board of Directors may
appoint one of its members to be Chairperson of the Board, who
shall perform such duties as may be designated by it.  The Board
of Directors shall have power to appoint one or more Vice-
Presidents; and to appoint a Cashier and such other officers and
employees as may be required to transact the business of the
Association.

The Board of Directors shall have the power to define
the duties of the officers and employees of the Association; to
fix the salaries to be paid to them; to dismiss them; to require
bonds from them and to fix the penalty thereof; to regulate the
manner in which any increase of the capital of the Association
shall be made; to manage and administer the business and affairs
of the Association; to make all by-laws that it may be lawful for
them to make and generally do and perform all acts that it may be
legal for a board of directors to do and perform.

SEVENTH:  The Board of Directors shall have the power
to change the location of the main office of the Association to
any other place within the limit of the City of Los Angeles,
without the approval of the shareholders but subject to the
approval of the Comptroller of the Currency; and shall have the
power to establish or change the location of any branch or
branches of the Association to any other location, without the
approval of the shareholders but subject to the approval of the
Comptroller of the Currency.

EIGHTH:  The corporate existence of this Association
shall continue until terminated in accordance with the laws of
the United States.

NINTH:  The Board of Directors of this Association, or
any three or more shareholders owning, in the aggregate, not less
than 25 percent of the stock of this Association, may call a
special meeting of shareholders at any time.  Unless otherwise
provided by the laws of the United States, a notice of the time,
place, and purpose of every annual and special meeting of the
shareholders shall be given by first-class mail, postage prepaid,
mailed at least ten days prior to the date of such meeting to
each shareholder of record at his/her address as shown upon the
books of this Association.

-4-

**TENTH**: Any person, his/her heirs, executors or administrators, may be indemnified or reimbursed by the Association for liability and reasonable expenses (including amounts paid in settlement or in satisfaction of judgments or as fines or penalties) actually incurred in connection with any claim, action, suit, or proceeding, civil or criminal, whether or not by or in the right of the Association, in which he/she or they shall be involved or threatened to be involved by reason of his/her being or having been a director, officer, or employee of the Association or of any firm, corporation, or organization which he/she serves or has served in any such capacity at the request of the Association (provided he/she so served at the specific request of the Association in writing signed by the Chairperson of the Board or the President and specifically referring to this Article Tenth); provided, however, that no person shall be so indemnified or reimbursed (1) in relation to any matter in an action, suit or proceeding as to which he/she shall finally be adjudged to have been guilty of, or liable for, willful misconduct, gross neglect of duty or criminal acts in the performance of his/her duties to the Association or such firm, corporation or organization; or (2) in relation to any matter in a claim, action, suit or proceeding which has been made the subject of a settlement except with the approval of (a) a court of competent jurisdiction, (b) the Board of Directors, acting by vote of Directors not parties to the same or substantially the same action, suit or proceeding, constituting a majority of the whole number of the Directors, or (c) the shareholders, acting by vote of a majority of the outstanding shares of capital stock; and provided further that, in the case of persons serving another firm, corporation or organization at the request of the Association, the indemnity provided in this Article Tenth shall apply only if and to the extent that, after making such efforts as the Board of Directors or shareholders shall deem adequate under the circumstances, such person shall be unable to obtain indemnification from such firm, corporation or organization. The foregoing provisions for indemnification or reimbursement shall not be exclusive of other rights to which such person, his/her heirs, executors or administrators, may be entitled by contract or otherwise. Unless the context clearly requires otherwise, the term "the Association" as used in this Article shall include any predecessor corporation.

The Association may, upon the affirmative vote of a majority of its Board of Directors, purchase insurance for the purpose of indemnifying its directors, officers and other employees to the extent that such indemnification is allowed in the preceding paragraph. Such insurance may, but need not, be for the benefit of all directors, officers, or employees.

—5—

   ELEVENTH: The powers of the Association shall be limited to conducting the business of a trust company under a national bank charter, and no amendment to such powers may be made without the prior approval of the Comptroller of the Currency.

   TWELFTH: These Articles of Association may be amended at any regular or special meeting of the shareholders by the affirmative vote of the holders of a majority of the stock of this Association, voting in person or by proxy, unless the vote of the holders of a greater amount of stock is required by law, and in that case by the vote of the holders of such greater amount.

   IN WITNESS WHEREOF, we have hereunto set our hands this on the date appearing opposite our names.

_____    10/7/85
Peter E. Lengyel             date

_____    10/7/85
Harold K. Atkins             date

_____    10/7/85
John L. Murphy              date

_____    10/7/85
Allan C. Martin             date

_____    10/7/85
Rein Timmi              date

_____    10/7/85
Gerard P. Hourihan           date

State of New York

County of New York

Before the undersigned, a Notary Public of the State of New York personally appeared Peter E. Lengyel, to me known, who acknowledged that he executed the foregoing certificate for the purposes therein mentioned.

Witness my hand and seal of office this 7 day of October , 1985.

_Dand Abrauson_
Notary Public

DAVID ABRAMSON
Notary Public, State of New York
No. 60-0007765
Qualified in Westchester County
Certificate filed in New York County
Commission Expires March 30, 1987

State of New York
County of New York

Before the undersigned, a Notary Public of the State of New York personally appeared John L. Murphy, to me known, who acknowledged that he executed the foregoing certificate for the purposes therein mentioned.

Witness my hand and seal of office this 7 day of October , 1985.

_Dand Abrauson_
Notary Public

DAVID ABRAMSON
Notary Public, State of New York
No. 60-0007765
Qualified in Westchester County
Certificate filed in New York County
Commission Expires March 30, 1987

State of New York
County of New York

Before the undersigned, a Notary Public of the State of New York personally appeared Harold K. Atkins, to me known, who acknowledged that he executed the foregoing certificate for the purposes therein mentioned.

Witness my hand and seal of office this 7 day of October , 1985.

_Dand Abrauson_
Notary Public

DAVID ABRAMSON
Notary Public, State of New York
No. 60-0007765
Qualified in Westchester County
Certificate filed in New York County

Fax 7142476464          Jun 17 2008 02:26pm  P001

## CERTIFICATE OF AMENDMENT
## OF
## ARTICLES OF ASSOCIATION
## OF
## BANKERS TRUST COMPANY OF CALIFORNIA, N.A.

I, David Abramson, certify that:

1.   I am the duly elected Secretary of Bankers Trust Company of California, N.A.

2.   On January 17, 1992, at a special meeting of the Shareholders of Bankers Trust Company of California, N.A., the following resolution and amendment to Article FIFTH of the Articles of Association of Bankers Trust Company of California, N.A. was adopted:

> RESOLVED, that Bankers Trust Holdings, Inc., the sole shareholder of Bankers Trust Company of California, N.A. ("BTCal"), hereby approves of the amendment to the first paragraph of Article FIFTH of the Articles of Association of BTCal, to read as follows:

>> The authorized amount of capital stock of this Association shall be 500,000 shares of common stock of the par value of One Hundred Dollars and no cents ($100.00) each; but said capital stock may be increased or decreased from time to time, in accordance with the provisions of the laws of the United States.

Article FIFTH of the Articles of Association of Bankers Trust Company of California, N.A. is restated in entirety, as follows:

>> The authorized amount of capital stock of this Association shall be 500,000 shares of common stock of the par value of One Hundred Dollars and no cents ($100.00) each; but said capital stock may be increased or decreased from time to time, in accordance with the provisions of the laws of the United States.

No holder of shares of the capital stock of any class of the Association shall have any pre-emptive or preferential right of subscription to any shares of any class of stock of the Association, whether now or hereafter authorized, or to any obligations convertible into stock of the Association, issued, or sold, nor any right of subscription thereto other than such, if any, as the Board of Directors, in its discretion may from time to time determine and at such price as the Board of Directors may from time to time fix.

If the capital stock is increased by a stock dividend, each shareholder shall be entitled to his/her proportionate amount of such increase in accordance with the number of shares of capital stock owned by him/her at the time the increase is authorized by the shareholders, unless another time subsequent to the date of the shareholders' meeting is specified in a resolution adopted by the shareholders at the time the increase is authorized.

The Association, at any time and from time to time, may authorize and issue debt obligations, whether or not subordinated, without the approval of the shareholders.

3.    The foregoing amendment of the Articles of Association has been duly approved by the Board of Directors of Bankers Trust Company of California, N.A. on January 7, 1992.

4.    The Resolution and Amendment set forth above has not been modified or rescinded and is in full force and effect.

IN WITNESS WHEREOF, I have set my hand and the seal of this Association this 22nd day of January, 1992.


David Abramson
Secretary

DATE ACCEPTED:                    FEBRUARY 10, 1992

2          BY:

JOHN C. BEERS
Acting Director for Analysis
Western District

## BT TRUST COMPANY OF CALIFORNIA, NATIONAL ASSOCIATION

I, DAVID ABRAMSON, certify that:

I am the duly constituted Secretary of BT Trust Company of California, National Association, and as such officer I am the official custodian of its records; and that the following is a true and correct copy of a resolution of the Association's Shareholders, and such resolution is now lawfully in force and effect:

> RESOLVED, that the amendment of the First Article of Association is hereby approved, shall be effective immediately, and shall read as follows:
>
> FIRST:    The title of this Association shall be "Bankers Trust Company of California, National Association".

And that the following is a true and correct copy of a resolution of the Association's Board of Directors, and such resolution is now lawfully in force and effect:

> RESOLVED, that the amendment of the title of the Association's By-Laws to read "Bankers Trust Company of California, National Association", is hereby approved.

Dated: _March 26, 1987_

_____
Secretary

## BANKERS TRUST COMPANY OF CALIFORNIA, NATIONAL ASSOCIATION

I, DAVID ABRAMSON, certify that:

1.    I am the duly elected and acting Secretary of Bankers Trust Company of California, National Association (formerly, BT Trust Company of California), and as such officer, I am the official custodian of its records; that the following is a true and correct copy of resolutions adopted by the Association's shareholders; and that such resolutions are now lawfully in force and effect:

> RESOLVED, that the Association is hereby authorized to amend the First Article of Association to read as follows:

>> FIRST:    The title of this Association shall be "Deutsche Bank National Trust Company."

> FURTHER RESOLVED, that the effective date of the amendment of the First Article of Association shall be April 15, 2002.

2.    The following is a true and correct copy of a resolution of the Association's Board of Directors, and such resolution is now lawfully in force and effect:

> RESOLVED, that the amendment of the First Article of Association to change the title of the Association to "Deutsche Bank National Trust Company" is hereby approved, effective April 15, 2002.

3.    The foregoing amendment to the Articles of Association has been duly approved by the Board of Directors of Bankers Trust Company of California, National Association on March 21, 2002.

4.    The Resolution and Amendment set forth above has not been modified or rescinded and is in full force and effect.

IN WITNESS WHEREOF, I have set my hand and the seal of this Association this 27th day of March 2002.

David Abramson
Secretary

(S E A L)

State of New York     )
                      ) ss.:
County of New York  )

On the 27th day of March in the year 2002 before me, the undersigned, a Notary Public in and for
said state, personally appeared David Abramson, personally known to me or proved to me on the
basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument
and acknowledged to me that he executed the same in his capacity, and that by his signature on the
instrument, the individual, or the person upon behalf of which the individual acted, executed the
instrument.

_____
Notary Public

SANDRA L. WEST
Notary Public, State Of New York
No.01WE4942401
Qualified In New York County
Commission Expires September 19, 20 _

## Office of the Comptroller of the Currency

Accepted by: _____
              James A. Cundy, Licensing Manager

Date: _4/4/02_____